**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| INSTITUTIONAL SHAREHOLDER SERVICES INC., *Plaintiff*, v. GENTNER DRUMMOND, in his official capacity as the Oklahoma Attorney General, *Defendant*. | Case No. __ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Institutional Shareholder Services Inc. ("ISS") brings this Complaint for declaratory and injunctive relief against Gentner Drummond, in his official capacity as Attorney General of the State of Oklahoma, to challenge a newly enacted Oklahoma statute, House Bill 4429 ("H.B. 4429"), that, if allowed to take effect, will subject ISS to a stunningly broad regime of state-mandated warnings whenever ISS gives advice to its clients that goes against what company managers want their shareholders to do. Two other federal district courts have already enjoined materially indistinguishable laws in Kansas and Indiana as violating ISS' First Amendment rights, and a third court enjoined a similar Texas statute last year. Oklahoma's law is no different. Because H.B. 4429 takes effect on November 1, 2026—and threatens ISS with felony prosecution, imprisonment, and ruinous fines—ISS respectfully requests a decision on its forthcoming motion for a preliminary injunction in advance of the law's effective date of November 1, 2026.

## PRELIMINARY STATEMENT

1. With more than 40 years of corporate governance expertise, Plaintiff ISS is a leading proxy advisor that provides services to meet market demand from institutional investors for corporate governance and investing solutions. A proxy advisor is an independent third-party service provider that sophisticated institutional investors hire to provide information, advice, and recommendations to help them decide how to vote on board elections, shareholder proposals, and other shareholder votes.

2. Before proxy advisors like ISS offered their services to institutional investors, those investors often followed the so-called Wall Street Rule ("vote with management or sell") because it was too expensive and time-consuming to inform themselves about thousands of shareholder votes across all the companies in their investment portfolios. That changed after ISS, in the 1980s, became the first proxy advisor. ISS' services allowed institutional investors to "get objective, sophisticated, well-researched opinions about proxy issues," George W. Dent, Jr., *A Defense of Proxy Advisors*, 2014 Mich. St. L. Rev. 1287, 1289 (2014), thus helping institutional investors to make their own informed decisions about how to vote their shares in line with their own investing priorities and proxy voting preferences. For each shareholder vote, ISS analyzes relevant data, reviews voluminous proxy materials, and provides its clients with reports that provide extensive information about the votes at issue and make recommendations according to criteria that are selected by its investor clients to fit their specific needs and priorities regarding corporate governance matters.

3. Oklahoma is the latest of several states to have enacted legislation imposing onerous obligations on proxy advisors, including ISS, when they issue a recommendation to a client that the client not vote in line with the preferred outcome of the company's management. Kansas and Indiana enacted materially identical laws earlier this year, and Texas adopted a similar one last year, all of which federal courts have preliminarily enjoined as likely unconstitutional as applied to ISS. *ISS v. Kobach*, No. 2:26-cv-02254-HLT-RES, 2026 WL 1815236 (D. Kan. June 24, 2026); *ISS v. Rokita*, No. 1:26-cv-00717-MPB-MKK, __ F. Supp. 3d ___, 2026 WL 1847882 (S.D. Ind. June 26, 2026); Text Order, *ISS v. Paxton*, No. 1:25-cv-01160-ADA (W.D. Tex. Aug. 29, 2025).

4. Like all of those enjoined laws, Oklahoma's H.B. 4429 imposes burdens on ISS based on the content and viewpoint of ISS' advice. If ISS adheres to the views of company management, H.B. 4429 requires nothing at all. But if ISS "makes a recommendation *against company management*" on a ballot item up for a shareholder vote, or "a default recommendation or policy involving votes against company management," H.B. 4429 would require ISS to either produce an idiosyncratically defined "written financial analysis" or else issue a series of self-denigrating warnings about its advice. H.B. 4429 § 4. This "written financial analysis" ignores that many issues that come up for a shareholder vote do not lend themselves to financial prediction—like whether to vote for or against reelecting a particular board member who has missed too many meetings in the past, or whether to vote for or against a nonbinding request that a company prepare an additional report analyzing its supply chain vulnerability to climate change. And the law ignores that different clients ask ISS to give advice based on each client's own (and often

differing) views about the best way to advance shareholder value. Moreover, attempting to perform this "written financial analysis" would force ISS to take positions on controversial issues that ISS would not otherwise. The law would, for example, compel ISS to "conclude[] what vote or course of action is most likely to positively affect shareholder value"—something ISS is not in the business of doing. Worse yet, the law obligates ISS to send that "written financial analysis" to the companies that are the subject of ISS' advice.

5. If ISS does not perform a "written financial analysis" meeting every element of H.B. 4429's definition, the law requires ISS to issue a series of warnings: ISS must tell not only its clients receiving the recommendation, but also the company that is the subject of the advice and the broader public, that ISS has not considered "the impact" that ISS' recommendation would have on its clients—even though that statement is patently false. If that weren't bad enough, the law would also force ISS to turn over confidential information to the company that is the subject of ISS' advice: ISS must "identif[y]" both the services ISS performed for each client and what ISS recommended.

6. If a proxy advisor fails to comply with any of these requirements, H.B. 4429 declares that failure a "deceptive trade practice," H.B. 4429 § 5(A), which is both a felony punishable by years in prison, as well as a civil violation punishable by civil fines of up to $10,000 "per violation," Okla. Stat. tit. 15, §§ 753(21), 761.1(C), (E).

7. H.B. 4429 extends its mandates far beyond Oklahoma. The law seemingly applies to *any* anti-management recommendation that ISS—a company headquartered in Maryland and incorporated in Delaware—makes to *any* of its clients, about *any* company,

*anywhere* on Earth—whether in Oklahoma, Maine, or Switzerland. H.B. 4429 offers no legal basis for exporting Oklahoma's policy preferences globally.

8. H.B. 4429's attempt to compel compliance with management violates the U.S. Constitution multiple times over.

9. First, the law violates the First Amendment. As district courts in Kansas and Indiana have indicated, H.B. 4429 is state-imposed viewpoint discrimination that burdens anti-management—and *only* anti-management—speech. The law's goal is to force ISS to walk the line that corporate executives want, even if ISS and its clients believe that course of action is wrong. It is hard to imagine a more plainly viewpoint-discriminatory law. On top of viewpoint discrimination, the law also compels ISS' speech—forcing ISS either to perform the law's idiosyncratic "financial analysis" and speak on controversial issues, or else to publicize self-disparaging and misleading warnings about ISS' services. Whether because the law is viewpoint discriminatory, or because it compels ISS' speech, the result is the same: H.B. 4429 violates the First Amendment.

10. Second, the law is unconstitutionally vague. H.B. 4429 is riddled with vague terms about when, how, and to whom ISS must make the State's series of compelled warnings—a set of labyrinthian requirements that invite arbitrary enforcement by the Attorney General against politically disfavored speakers like ISS, backed by the threat of imprisonment and business-crushing fines.

11. Third, H.B. 4429 violates the Constitution's prohibitions on direct extraterritorial regulation. The Constitution forbids states from flexing the kind of extraterritorial reach that H.B. 4429 does, demanding global application of Oklahoma's

policy choices. The State of Oklahoma may not dictate how other states and countries regulate business in their own jurisdictions.

12. The consequences of not enjoining H.B. 4429 as an unconstitutional exercise of state power are severe: H.B. 4429 threatens to distort the free flow of information that sophisticated investors rely on when managing their investment portfolios all over the world. ISS' sophisticated clients do not need Oklahoma to protect them from receiving the very services they hired ISS to perform.

13. For more than three decades, the SEC has recognized that inserting government regulators "into every exchange and conversation among shareholders, their advisors and other parties on matters subject to a vote certainly would raise serious questions under the free speech clause of the First Amendment." Regulation of Communications Among Shareholders, 57 Fed. Reg. 48,276, 48,279 (Oct. 22, 1992). H.B. 4429 is just the latest in an unsuccessful and unconstitutional chapter of states attempting to deviate from that basic principle to target proxy advisors for the content of their speech. Both Kansas and Indiana tried it and were promptly met with preliminary injunctions. Texas did, too, and met the same fate. And when Missouri tried and failed to mandate warnings for so-called "nonfinancial" investment advice, it left taxpayers to foot the bill for the plaintiff's legal fees. *Sec. Indus. & Fin. Mkts. Ass'n v. Ashcroft*, 745 F. Supp. 3d 783, 801 (W.D. Mo. 2024). H.B. 4429 is of the same ilk, and this Court should likewise hold it unconstitutional as applied to ISS.

## PARTIES

14. Plaintiff Institutional Shareholder Services Inc. ("ISS") is a corporation organized in Delaware with its headquarters at 702 King Farm Boulevard, Suite 400, Rockville, MD 20850. ISS supplies proxy voting research and advice and other services to institutional investors, including to clients in Oklahoma.

15. Defendant Gentner Drummond is the Oklahoma Attorney General and is responsible for enforcing H.B. 4429. *See* H.B. 4429 § 5; Okla. Stat. tit. 15, § 751 *et. seq*. He is sued in his official capacity. Defendant Drummond maintains an office at 313 NE 21st St., Oklahoma City, OK 73105.

## JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a) because Plaintiff's claims arise under the United States Constitution, as well as the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988.

17. This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-02.

18. Defendant Attorney General Drummond is not immune under the Eleventh Amendment because this is a pre-enforcement challenge seeking prospective relief for violations of federal law. *See Ex parte Young*, 209 U.S. 123 (1908); *see also Cressman v. Thompson*, 719 F.3d 1139, 1146 n.8 (10th Cir. 2013) ("Under *Ex parte Young*, a plaintiff may avoid the Eleventh Amendment's prohibition on suits against states in federal court by seeking to enjoin a state official from enforcing an unconstitutional statute.") (citation

omitted). H.B. 4429 specifically tasks Defendant Attorney General Drummond with enforcing the law. *See* H.B. 4429 § 5; *e.g.*, Okla. Stat. tit. 15, §§ 756.1, 761.1(C)-(E), 762.

19. There is every reason to believe that Defendant Attorney General Drummond will vigorously enforce H.B. 4429 against ISS. *See Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014). H.B. 4429 was specifically designed with proxy advisors like ISS in mind. *See* H.B. 4429 § 2(3) (referencing proxy advisors that have made recommendations "in their benchmark policies" involving environmental, social, and governance issues ("ESG"), which ISS has). Attorney General Drummond, too, has already taken action against proxy advisors like ISS. In 2023, Attorney General Drummond, along with other state attorneys general, sent a demand letter to ISS and another proxy advisory firm accusing them of violating "consumer protection laws prohibiting unfair and deceptive trade practices."[1] The next year, Attorney General Drummond cosigned a similar letter to asset managers.[2] Attorney General Drummond also cosigned a letter to Congress in 2023 criticizing a Department of Labor rule for "embrac[ing] managers' use of ESG factors in investment decisions and proxy voting."[3] In 2024, Attorney General Drummond, along with other state attorneys general, brought suit against three investment management firms for their ESG practices; earlier this year,

[1] Letter from State Attorneys General to ISS and Glass Lewis (Nov. 29, 2023), https://perma.cc/8UUU-DWWV.

[2] Letter from State Attorneys General to Asset Managers (Aug. 29, 2024), https://perma.cc/H5GD-JD7E.

[3] Letter from State Attorneys General to Congress (Feb. 14, 2023), https://perma.cc/D7XF-AU98.

one of those firms settled, agreeing, among other things, to restrictions on its proxy voting practices.[4] And the Attorney General has, in vowing to appeal an injunction blocking "enforcement of the state's anti-ESG . . . law," asserted his commitment "to protect[ing] Oklahoma's oil and gas industry from discriminatory practices by financial entities kowtowing to a radical environmental agenda."[5] H.B. 4429 enables Attorney General Drummond to continue this yearslong campaign: The law's findings make clear that it is motivated by proxy advisors' ESG-related recommendations, H.B. 4429 § 2, and the law labels the failure to comply with H.B. 4429's requirements "a deceptive trade practice" under the Oklahoma Consumer Protection Act, actionable by the Oklahoma Attorney General both criminally and civilly, *id.* § 5; *see* Okla. Stat. tit. 15, §§ 753(21), 756.1, 761.1(C)-(E), 762(B).

20. As a directly regulated entity, ISS plainly has standing to bring this challenge. H.B. 4429 inflicts numerous harms on ISS. *See infra* ¶¶ 55-59. ISS engages in constitutionally protected speech, which H.B. 4429 directly regulates. Oklahoma's law and the threat of significant penalties for non-compliance chill ISS' constitutionally protected speech, violate ISS' constitutional due process rights, and impermissibly regulate beyond Oklahoma's borders.

[4] *See* Second Am. Compl., *Texas v. BlackRock, Inc.*, No. 6:24-cv-0437 (E.D. Tex. Jan. 5, 2026), ECF No. 145; *see also* Tate Miller, *13 State AGs, Including Indiana's, Win Against ESG With Vanguard Settlement*, Greater Fort Wayne Bus. Weekly (Mar. 4, 2026), https://www.fwbusiness.com/article_85d08774-9200-4bb4-aec9-ae329a17a1b9.html.

[5] Office of the Oklahoma Attorney General, Press Release, *Drummond Appeals Permanent Injunction Against State's Anti-ESG Law* (Dec. 3, 2024), https://perma.cc/NGY5-6U5M.

21. Venue is proper in this District because Defendant resides in this District, 28 U.S.C. § 1391(b)(1), and because substantial events material to Plaintiff's claims occurred in this District, *id.* § 1391(b)(2).

## BACKGROUND

### I. Proxy Advisory Services

22. Publicly traded companies are required to hold annual and special meetings to conduct business that may require shareholder approval. At these meetings, shareholders vote on various matters, including board elections, proposals submitted by the board or by shareholders, and any other decisions for which state or federal laws, listing rules, or a corporation's charter or bylaws require a shareholder vote.

23. Matters requiring shareholder votes are compiled into a "proxy statement," which contains information about pending resolutions and other votes for upcoming shareholder meetings and are distributed to shareholders in advance. At the meetings, shareholders, or more typically their proxies—the specified designees who vote the shares owned by particular stockholders—will vote.

24. The issues put to a shareholder vote range in complexity, including everything from changing a corporate name or approving an auditor, to electing the board of directors, making key management decisions, or approving proposed mergers and acquisitions.

25. Proposals put forth by shareholders may cover a range of topics, including issues of corporate governance, executive compensation, disclosure and transparency factors, as well as risks to the company stemming from environmental and social factors.

Shareholder proposals are a component of shareholder democracy, as they allow shareholders to express their views on significant issues facing the companies that the shareholders collectively own. The results of a vote on a shareholder proposal are typically non-binding, but by submitting proposals and "voting their shares" in corporate elections, shareholders may influence how companies are run.

26. Institutional investors include pension plans, asset managers, and mutual funds. Because of their vast stock holdings in multiple companies, institutional investors regularly cast thousands of votes every year on complex questions across these companies. Shareholder meetings of U.S. companies tend to be concentrated during the four-month period from March to June—a time period known as "proxy season." There is a similar concentration in this time frame of meetings in other major capital markets (such as Canada, Europe, Asia). This compressed timeline compounds the challenges associated with voting decisions for institutional investors. To navigate the volume of shareholder votes and complexity of issues, institutional investors often hire independent proxy advisors to provide research and advice on how they should vote on each issue in a shareholder meeting. A proxy advisor aggregates publicly available data, analyzes voluminous proxy materials, offers research and analysis about ballot proposals put forth by companies or shareholders, and provides voting advice in accordance with the investor client's selected criteria and priorities.

**II. ISS And Proxy Advising**

27. Founded in 1985, ISS is a full-service proxy advisor that helps institutional investors make informed voting decisions, manage the complex process of voting their

shares, and report their votes to stakeholders and regulators. ISS fulfills market demand for objective and impartial advice and analysis, and its client base includes many of the world's most sophisticated institutional investors. In 2025 alone, ISS helped approximately 1,400 clients make and execute informed proxy voting decisions for approximately 52,000 shareholder meetings in approximately 100 developed and emerging markets worldwide. ISS makes voting recommendations for board elections, board/management proposals, and shareholder proposals, only for the companies in which its clients hold shares, and only based on the client's selected voting policy or policies. ISS does not put forth shareholder proposals, nor does ISS assist any clients in formulating shareholder proposals.

28. ISS has no financial interest in the outcome of a shareholder vote. ISS does not seek to maintain or gain control of a corporation, or to win the passage (or defeat) of a ballot measure. A proxy advisor, "although it holds itself out to attract clients, does not initiate the exchange; it provides advice only in response to the client's request." *ISS v. SEC*, 142 F.4th 757, 767 (D.C. Cir. 2025). ISS offers research and analysis to its clients to help inform their own evaluation of the proposals on which they are entitled to vote.

29. ISS is registered as an investment adviser with the U.S. Securities and Exchange Commission ("SEC") under the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.* ("Advisers Act"). As such, ISS is subject to a comprehensive regulatory regime, including registration, reporting, and conduct requirements. ISS is also subject to the Advisers Act's fiduciary duties of care and loyalty, which follow the contours of ISS' contractual relationship with its clients.

30. Although ISS is a registered investment adviser, it "does not manage investment accounts."[6] As ISS explains in its public-facing brochure, ISS also does not "make buy, sell or hold investment recommendations to clients, other than indirect purchase or sale recommendations that might be implicit in a proxy voting recommendation, such as a recommendation on a vote on whether or not to approve a proposed merger transaction." *Id.* ISS states in the same brochure that it "does not guarantee that its advice will produce any particular investment return or other results for clients." *Id.*

31. As part of its core offerings, ISS provides proxy voting recommendations based on its research and corporate governance data. Importantly, it provides these recommendations to each client based on the proxy voting policies selected by its clients. Institutional investors are not monolithic, and so ISS tailors its advice to the directives, priorities, and goals the client selects. Recommendations extend to votes on all issues that appear on the ballot for which shareholders are entitled to vote, including core issues of corporate governance, such as board of directors elections, shareholder rights, and executive compensation.

32. ISS provides its proxy advisory services to its clients in exchange for fees. ISS' proxy advisory services meet a market need, which is why institutional investors are willing to pay for the services. ISS does not provide proxy voting advice to any investor who has not specifically engaged ISS for this purpose.

---

[6] ISS, Part 2 Brochures at 11 (updated Mar. 31, 2026), https://perma.cc/MDL6-WDC4.

33. ISS is organized in Delaware and its headquarters is in Maryland.

34. ISS provides proxy advisory services to about 1,400 clients around the country and the world. ISS currently provides proxy voting research and advice to four clients that are based in Oklahoma.

### A. ISS Offers Three Policy Frameworks: Custom, Benchmark, and Thematic Policies

35. In order to meet the needs of its diverse clientele, ISS offers three different types of voting policies, which are market-specific frameworks that guide ISS' proxy vote recommendations: (1) client-specific Custom Policies; (2) the Benchmark Policy; and (3) various Thematic Policies, also known as Specialty Policies.

#### (1) Custom Policies

36. Custom Policies are designed by ISS' clients or in some cases third parties to address clients' unique needs and preferences. ISS assists investors in administering custom voting policies that investors develop, in consultation with their governance departments, boards of trustees, and portfolio managers. A client's Custom Policy reflects the client's own specific approach to proxy voting and/or the mandates they have with the clients for whom they manage assets.

37. Custom Policies are a significant category of policies at ISS. In 2025, ISS issued Custom Policy vote recommendations under approximately 450 Custom Policies, including approximately 250 U.S. Custom Policies. In 2024, approximately 90% of the shares for which ISS processed voting instructions globally on behalf of its clients were owned by clients that had Custom Policies.

**(2) Benchmark Policy**

38. The Benchmark Policy is a policy that ISS created and updates each year and to which ISS clients may subscribe. The Benchmark Policy is based on ISS' four key tenets: accountability, stewardship, independence, and transparency. The Benchmark Policy is publicly available on ISS' website.[7] The Benchmark Policy explains in detail ISS' general framework for providing advice on particular issues and the criteria considered in making case-by-case voting decisions.

39. ISS forms its Benchmark Policy through an annual review and development process. ISS starts by collecting feedback from a diverse range of market participants through multiple channels: an annual policy survey, roundtables with investor clients and corporate directors, and ongoing feedback during proxy season. ISS uses these inputs and ISS' expertise to develop its draft policy updates each year. ISS then publishes draft updates for an open review and comment period. Anyone can comment or participate in the survey process—including investors, companies, and the general public. ISS reviews these comments before publishing its final updated policy at the end of each year, to apply to meetings held the following year.

40. Much of the Benchmark Policy is designed to protect shareholders from what market participants and clients have generally deemed to be weak corporate governance practices. For example, based on market input, ISS generally recommends that

[7] ISS, U.S. Proxy Voting Guidelines, 2026 Benchmark Policy Recommendations (Dec. 9, 2025), https://www.iss-stoxx.com/file/policy/current/americas/us-voting-guidelines.pdf ("2026 U.S. Benchmark Policy").

shareholders vote against board nominees if the board adopted certain policies called "poison pills"—a defensive tactic to try to defeat takeover bids—without shareholder approval, because poison pills risk entrenching corporate managers unresponsive to shareholders. *See* 2026 U.S. Benchmark Policy at 15. ISS also recommends voting against "overboarded directors," meaning directors who sit on too many company boards to give another board sufficient care and attention. *Id.* at 13. ISS recommends voting against directors and boards that adopt provisions "materially adverse to shareholder rights," such as "[s]upermajority vote requirements" for amending the company's bylaws or charter, or "classified board structure[s]" that divide a company's board into classes serving staggered terms, diminishing director accountability to shareholders. *Id.* at 16. And the Benchmark Policy generally recommends voting against proposals that insulate directors from removal, and for proposals "to restore shareholders' ability to remove directors with or without cause." *Id.* at 24.

**(3) Thematic Policies**

41. In addition to the Custom Policies and the Benchmark Policy, ISS also offers seven thematic policy frameworks that evaluate governance issues from a variety of specific perspectives: (1) faith-based, (2) board-aligned, (3) labor unions, (4) public funds, (5) sustainability, (6) social responsibility, and (7) climate. As with the Benchmark Policy, ISS publishes the Thematic Policies on its website.[8] The Thematic Policies are intended to address common client preferences when it comes to certain strategic, policy, and social

[8] ISS, Current Voting Policies, 2026, https://www.iss-stoxx.com/stewardship/voting-policy-gateway/proxy-voting-policies/ (select from "Our Thematic Policies" dropdowns).

issues. ISS crafted these policies to meet client demand for coverage tailored to these specific approaches and the factors that the clients demanding these policies view as material.

42. For example, ISS developed its U.S. Global Board-Aligned Policy in response to market demand for voting recommendations that generally defer to board judgment on environmental and social issues.[9] The Global Board-Aligned Policy thus uses a "presumption on environmental and social topics that the board's recommendations should generally prevail"; for example, the policy generally recommends voting against shareholder proposals that request a company to disclose its levels of greenhouse-gas emissions or its reduction targets. U.S. Global Board-Aligned Policy at 74.

43. As another example, ISS' U.S. Catholic Faith-Based Policy generally takes as its "frame of reference policies and proposals promulgated by the Catholic Bishops' Pastoral on economics, the Socially Responsible Investment Guidelines adopted by the Bishops, and the policies developed by members of the Interfaith Center on Corporate Responsibility."[10] U.S. Catholic Faith-Based Policy at 11. This policy recognizes faith-based investors' "dual objectives: financial and social." *Id.* These faith-based investors "invest for economic gain, as do all investors, but they also require that companies in which

---

[9] ISS, U.S. Global Board-Aligned Proxy Voting Guidelines, 2026 Policy Recommendations (Jan. 16, 2026), https://www.iss-stoxx.com/file/policy/current/specialty/global-board-aligned-us-voting-guidelines.pdf ("U.S. Global Board-Aligned Policy").

[10] ISS, U.S. Catholic Faith-Based Policy Proxy Voting Guidelines, 2026 Policy Recommendations (Dec. 31, 2025), https://www.iss-stoxx.com/file/policy/current/specialty/catholic-us-voting-guidelines.pdf ("U.S. Catholic Faith-Based Policy").

they invest conduct their business in a socially and environmentally responsible manner." *Id.*

### B. ISS Applies Its Clients' Chosen Framework(s) To Provide Advice On Proxy Votes

44. Clients' Custom Policies and ISS' Benchmark and Thematic Policies detail frameworks for addressing corporate governance issues. When clients select these policies, they ask ISS to apply the policy or policies they selected to upcoming shareholder meetings. ISS then provides clients with reports summarizing its research and providing voting recommendations based on the particular policy or policies to which each client subscribes.

45. ISS looks at each proposal on the ballot, pulls relevant publicly available information and data, and then analyzes the proposal and data through the prism of the applicable policy to come up with a voting recommendation. ISS does not determine which issues appear on a proxy ballot or the ballots or agenda items on which it renders advice, nor does ISS engage in solicitation activities in support of (or against) any ballot item.

46. ISS has no financial interest in the outcome of any shareholder vote, regardless of whether its clients ultimately support a proposal, reject a proposal, or abstain from voting altogether. Indeed, because ISS' clients have a wide variety of different policies and voting criteria, ISS often provides different clients with different recommendations about the same vote, depending on the voting criteria the client selects. For example, ISS may advise clients using its Benchmark Policy to vote for a certain

proposal, while advising clients who employ faith-based or sustainability-based voting criteria to vote against that same proposal.

### C. Additional Services

47. ISS also provides other services, which are sometimes performed in connection with an upcoming proxy vote and sometimes not. ISS provides general environmental, social, and governance data and ratings; thought leadership, research, and other market information on corporate governance and voting practices and trends; portfolio screening; and other assessment tools and services. ISS also provides services tailored to markets in other countries.

## III. Oklahoma H.B. 4429

48. Proxy advisors have come under increasing attack in recent years. As noted above, Attorney General Drummond has played a leading role in this campaign to quell shareholder participation and to stifle speech, including by proxy advisors, that some view as unpopular. The President has issued an executive order targeting ISS and one of its competitors for "regularly" advancing so-called ESG "agendas." Exec. Order No. 14,366, *Protecting American Investors From Foreign-Owned and Politically-Motivated Proxy Advisors*, 90 Fed. Reg. 58,503 (Dec. 11, 2025). Kansas, Indiana, and Texas have all enacted anti-proxy-advisor laws that have since been enjoined. *See supra* ¶ 3. Kentucky, too, has enacted a law targeting speech by proxy advisors, which ISS has also challenged. *See ISS v. Coleman*, No. 3:26-cv-00036-REW-EBA (E.D. Ky.).

49. Oklahoma's H.B. 4429 is part of this trend. The law, which is materially identical to the enjoined Kansas and Indiana laws, largely parrots a model law drafted by

an advocacy group calling itself "Consumers Defense," a group whose self-proclaimed "mission" is to "protect[] Americans from the scourge of ESG in all its forms, in every state, and in every arena where it infects."[11]

50. H.B. 4429 imposes onerous obligations on proxy advisors that make recommendations "against company management" "in connection with or in relation to a company or . . . to any person in this state." H.B. 4429 §§ 3(7), 4. A "company" under H.B. 4429 is broadly defined to mean "a publicly traded, for-profit corporation, limited liability company, partnership, or other business entity." *Id.* § 3(3).

51. Whenever "a proxy advisor makes a recommendation against company management" on a proposal, "or makes a default recommendation or policy involving votes against company management" on proposals, H.B. 4429 requires the advisor to either produce an idiosyncratically defined "written financial analysis" or else issue a series of self-denigrating warnings. *Id.* § 4. The law defines a "written financial analysis" as "a written document" that (1) "analyzes the expected short-term and long-term financial benefits and costs to the company of implementing" the proposal; (2) "concludes what vote or course of action is most likely to positively affect shareholder value"; and (3) "explains the methods and processes used to prepare the analysis, including the experience and geographic location of the personnel who formed the recommendation." *Id.* § 3(10).

---

[11] Consumers Defense, https://consumersdefense.com/ (last visited Aug. 10, 2026); *see Proxy Advisor Transparency Act*, Consumers Defense, https://consumersdefense.com/model-legislation/proxy-advisor-transparency-act/ (last visited Aug. 10, 2026).

52. If a proxy advisor performs this "written financial analysis," the advisor must provide "a clear and conspicuous disclosure" to the client receiving the service "stat[ing] that the proxy advisor has made the recommendation or policy based on a written financial analysis" and that this "analysis is available upon request," *id.* § 4(B)(1)(c)-(d); if requested, the advisor must "[m]ake such analysis available within a reasonable time," *id.* § 4(B)(2).[12] And proxy advisors must provide a copy of the "written financial analysis" "to the board of directors of each company that is the subject of the service," "concurrently with providing" advice to ISS' clients. *Id.* § 4(B)(3).

53. If the advisor does not produce this specific "written financial analysis" when advising against the company board's position, H.B. 4429 requires the proxy advisor to do three things. *Id.* § 4(A). *First*, the advisor must "include a conspicuous disclosure" to each client receiving the advice that "states that the proxy advisor has made the recommendation or policy without doing so based on a written financial analysis regarding the impact of that recommended action on company investors" that "(1) analyzes the expected short-term and long-term financial benefits and costs to the company of implementing" the proposal; "(2) concludes what vote or course of action is most likely to positively affect shareholder value"; and "(3) explains the methods and processes used to prepare the analysis, including the experience and geographic location of the personnel who formed the recommendation." *Id.* § 4(A)(1)(c). *Second*, the proxy advisor must make the same "disclosure" "by

[12] ISS interprets § 4(A)(1), (B)(1), & (B)(2) to refer only to the particular ISS client receiving the service. If the Attorney General's views differ, ISS reserves the right to address the additional constitutional problems that would result.

electronic means and U.S. mail" "to the board of directors of each company that is the subject of the service." *Id.* § 4(A)(2). The "disclosure" to company management must also "identif[y] the service" and "identif[y] the recommendation or policy" the proxy advisor provided its clients. *Id.* § 4(A)(1), (2). *Third*, the proxy advisor must "publicly and conspicuously disclose on the home or front page of" its website a "statement" that the advisor's services "include recommendations or policies against company management" that "are not made based on a written financial analysis regarding the impact of that recommended action on company investors." *Id.* § 4(A)(3). This "disclosure" must remain online "[w]hile such services are being provided." *Id.*

54. A proxy advisor that fails to comply with H.B. 4429 is deemed to have committed a "deceptive trade practice," *id.* § 5(A), which the Attorney General may prosecute as a Class D1 felony punishable by a $5,000 fine and up to five years imprisonment for a first offense and up to ten years for subsequent offenses. Okla. Stat. tit. 15, §§ 753(21), 761.1(E), 762(B); *see* Okla. Stat. tit. 21, § 20N(B)-(C). On top of that, the Attorney General may also seek injunctive relief, as well as civil penalties of up to $10,000 "per violation." *See* Okla. Stat. tit. 15, §§ 756.1, 761.1(C)-(D).

**IV. H.B. 4429 Will Result In Direct, Concrete Harms To Plaintiff ISS**

55. H.B. 4429 violates ISS' free speech rights under the First Amendment; is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment; and is impermissibly extraterritorial under numerous constitutional provisions.

56. H.B. 4429 will irreparably harm ISS by depriving ISS of its constitutional rights under the First and Fourteenth Amendments. H.B. 4429 tries to force ISS to agree

with company management by burdening ISS' speech that disagrees with company managers. H.B. 4429 puts ISS in an impossible position where, no matter what ISS chooses, ISS would be forced to make a series of damaging statements that ISS does not believe. If ISS attempted to perform H.B. 4429's "written financial analysis," ISS would be forced to take public positions on controversial issues, implicitly rank the value of clients' preferences, and provide its speech widely—without compensation—if ISS wishes to speak at all. If ISS refuses to conduct H.B. 4429's "written financial analysis," the law would force ISS to say to its clients, company issuers, and the general public that ISS gave its advice "without doing so based on a written financial analysis regarding the impact of that recommended action on company investors," including that ISS did not "analyze[] the expected short-term and long-term financial benefits and costs to the company of implementing" the proposal; did not "conclude[] what vote or course of action is most likely to positively affect shareholder value"; and did not "explain[] the methods and processes used to prepare the analysis." H.B. 4429 § 4(A)(1)(c).

57. The statute thus forces ISS to make statements that are false and misleading. ISS *does* consider "the impact of . . . recommended action on company investors" because ISS makes its recommendations based on its clients' chosen criteria. And ISS' detailed proxy voting reports and public disclosures detail ISS' "methods and processes." Forcing ISS to say that it did not determine the proposal's "short-term and long-term financial benefits and costs" is misleading because it suggests that such an analysis is possible and that ISS is withholding it. The research reports and voting recommendations ISS offers its clients often contain dozens of pages of financial information and analysis, including tables

and charts reflecting the company's historic performance; performance compared to peer companies; valuation and executive compensation; and other financial metrics. Many issues on proxy ballots, however, do not lend themselves to financial quantification, let alone a prediction about how a vote outcome would affect stock value.

58. Attempting to comply with H.B. 4429's labyrinthian requirements also harms ISS. The statute is riddled with vague terms, making it difficult for ISS to determine what is required. And if ISS guesses incorrectly, ISS faces the same ruinous fines despite its efforts.

59. Attempting to comply with H.B. 4429 will also work a severe financial hardship on ISS, even aside from the specter of devastating fines, including by requiring ISS to develop systems to supply an enormous volume of information to numerous entities and track information that ISS does not currently collect. Designing a system with tracking and reporting capabilities—if it is even possible—would be extraordinarily expensive, require tremendous personnel resources, and likely take substantial time to develop. If ISS does not comply, ISS risks criminal prosecution and significant civil penalties of up to $10,000 per violation.

**COUNT ONE**
**(First and Fourteenth Amendments—Freedom of Speech)**

60. ISS incorporates all prior paragraphs of this Complaint.

61. The First Amendment, which applies to the states through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech." U.S. Const. amend. I. H.B. 4429 is unconstitutional as applied to ISS.

62. ISS engages in speech and expression protected by the First Amendment when it provides independent advice, recommendations, and analysis to its clients. *Nat'l Inst. of Fam. & Life Advocs. (NIFLA) v. Becerra*, 585 U.S. 755, 767 (2018) ("professional speech" protected by First Amendment). ISS' speech and expression address matters of critical importance, including topics such as who should govern a company, corporate transactions like mergers and acquisitions, executive compensation, and a company's corporate governance policies—and are thus at the core of the First Amendment's protections.

63. H.B. 4429 burdens ISS' protected speech and cannot survive any level of scrutiny.

64. ***Content and viewpoint discrimination***. H.B. 4429 is a presumptively unconstitutional content- and viewpoint-based regulation of speech. H.B. 4429 on its face "imposes financial burdens on certain speakers based on the content of their expression"—and because the law also selectively burdens "particular views," the First Amendment violation "is all the more blatant." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828-829 (1995); *see also Chiles v. Salazar*, 146 S. Ct. 1010, 1020-21 (2026). H.B. 4429's burdensome requirements are triggered *only* if ISS "makes a recommendation *against* company management" on how to vote on a company or shareholder proposal. H.B. 4429 § 4(A), (B) (emphasis added). Speakers that parrot the views of the company board get a free pass. In this way, H.B. 4429 is "viewpoint-based on its face because the law draws a distinction based on the message conveyed." *ISS v. Kobach*, 2026 WL 1815236, at *8; *see also ISS v. Rokita*, 2026 WL 1847882 at *4. That is the definition of

viewpoint discrimination. *See Chiles*, 146 S. Ct. at 1024; *Animal Legal Defense Fund v. Kelly*, 9 F.4th 1219, 1233 (10th Cir. 2021) (finding viewpoint discrimination where law "places pro-animal facility viewpoints above anti-animal facility viewpoints"); *Chaker v. Crogan*, 428 F.3d 1215, 1227-28 (9th Cir. 2005) (finding viewpoint discrimination where law criminalized "false speech critical of peace officer conduct" but left unregulated "false speech supportive of peace officer conduct").

65. H.B. 4429 is also impermissibly "aimed at particular speakers" and riddled with other content- and viewpoint-based exceptions. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). H.B. 4429 imposes unique requirements on a specific type of speech (proxy advisory services) and class of speakers (proxy advisors that give advice "for compensation") based on Oklahoma's desire to elevate the viewpoints of other speakers (company management). H.B. 4429 does not apply equally to all speakers that also advise institutional investors about how to vote on proxy proposals: It does not apply to company management, shareholder proponents of proxy proposals, those who solicit proxy votes, other shareholders, certain charities, or anyone willing to give their advice away for free.

66. Content and viewpoint discrimination are also inherent in H.B. 4429's design and purpose: It was adopted "because of disagreement with the message the speech conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (citation and brackets omitted). The law's findings make clear the law is a reaction to recommendations "based on environmental, social, or governance (ESG) investing[ and] diversity, equity, or inclusion (DEI)." H.B. 4429 § 2(3). In introducing the bill in a committee hearing, a state legislator touted that the bill is "good" because the nonprofit Green America, which

believes that "[l]arge businesses and their supply chains need to go green in order to bring social and environmental solutions to scale," is "opposed to the bill."[13] Another legislator, when discussing H.B. 4429's companion bill applicable to state pension systems, lambasted proxy advisors who "talk about goofy things with DEI" or make decisions based on "any of the ESG kinds of things or any other what I'll call political agenda."[14] And the model law on which H.B. 4429 is based is part of a broader mission to cleanse "the scourge of ESG in all its forms, in every state, and in every arena where it infects."[15] *See ISS v. Rokita*, 2026 WL 1847882, at *5 (concluding that overlap with model law "confirm[ed]" the facial viewpoint discrimination of Indiana's materially identical law). It is clear that the Oklahoma Legislature fundamentally disagrees with the advice it believes ISS gives. But Oklahoma may not "burden the speech of others in order to tilt public debate in a preferred direction." *Sorrell*, 564 U.S. at 578-579.

67. ***Compelled Speech.*** Whenever proxy advisors provide advice "against" company management, H.B. 4429 would require ISS to utter a series of state-mandated statements that burden ISS' speech, alter ISS' message, and misrepresent ISS' services—or risk imprisonment and crippling fines. But "[i]n this Nation, no official . . . may command our tongues." *Chiles*, 146 S. Ct. at 1021.

---

[13] Oklahoma House of Representatives, Banking, Financial Services and Pensions Committee Hearing at 3:10:35-3:10:50 (Feb. 10, 2026), https://tinyurl.com/3ucf67f6.

[14] Oklahoma House of Representatives, Government Oversight Committee Hearing at 10:59:22-11:00:10 (March 5, 2026), https://tinyurl.com/2sr9rz3t.

[15] Consumers Defense, https://consumersdefense.com/ (last visited Aug. 10, 2026).

68. The exact content of the forced statements depends on whether the advisor made its recommendation "based on a written financial analysis" meeting Oklahoma's idiosyncratic statutory definition. H.B. 4429 § 4; *see id.* § 3(10). This "analysis" must include "the expected short-term and long-term financial benefits and costs to the company of implementing" the proposal and offer a "conclu[sion]" as to "what vote or course of action is most likely to positively affect shareholder value." *Id.* § 3(10). But, as noted above, many proxy ballot issues do not lend themselves to that kind of financial quantification. It is unclear how anyone could purport to predictably quantify the "expected short-term and long-term financial benefits and costs" of a vote for one director on the company board over another, a vote to ratify or reject a particular auditor, or a vote for or against a nonbinding shareholder proposal that the company can ignore even if it passes. Perhaps that is why no rule requires company issuers, shareholder proponents, or solicitors of proxy votes to quantify the "financial benefits and costs" of proxy voting proposals, even though all those entities would be better situated than ISS to try to do so.

69. If ISS attempted to produce this "written financial analysis," the law would force ISS to create speech and take positions on controversial issues that ISS would not otherwise. ISS is not in the business of predicting stock returns; ISS' research reports and voting recommendations are informational and take into account the varied interests of ISS' diverse clientele, meaning that ISS frequently offers different clients different voting recommendations on the same issue based on each client's chosen criteria. Yet ISS would be forced to "conclude[]" *which* vote "is most likely to positively affect shareholder value"—forcing ISS to undertake a fraught comparative analysis on controversial issues

such as disclosures about climate change risk and executive compensation, when many of ISS' clients disagree. Worse still, H.B. 4429 would then force ISS to disseminate this speech not only to its clients, but also to the companies about which ISS provides advice.

70. If ISS chooses not to engage in this fraught prognosticating, H.B. 4429 would force ISS to make misleading statements that denigrate its services. ISS must tell its clients in "a conspicuous disclosure" that ISS made its recommendation "without doing so based on a written financial analysis regarding the impact of that recommended action on company investors," including that ISS did not "analyze[] the expected short-term and long-term financial benefits and costs to the company of implementing" the proposal; did not "conclude[] what vote or course of action is most likely to positively affect shareholder value"; and did not "explain[] the methods and processes used to prepare the analysis." *Id.* § 4(A)(1). All these statements are misleading.

71. For starters, ISS *does* consider "the impact of [a] recommended action on company investors" because ISS makes its recommendations based on its clients' chosen criteria. In addition, ISS' detailed proxy advisor reports and analyses thoroughly explain "the methods and processes" ISS used in reaching its conclusions. H.B. 4429 would force ISS to falsely say the opposite. And forcing ISS to say that its advice did not analyze "short-term and long-term financial benefits" or "conclude[]" which vote "is most likely to positively affect shareholder value" misleadingly suggests both that such an analysis is possible and that ISS' analyses and advice are not rigorous. These warnings also make no sense: Because many clients subscribe to more than one policy, H.B. 4429 would force ISS to provide warnings to a client if ISS recommends against company management under

one of the client's policies, but not if ISS recommends supporting the company's position under another of the client's policies—even on the same vote. And by exempting pro-management recommendations from any requirement, H.B. 4429 falsely suggests that management's recommendations are rigorous and backed by extensive modeling when, in ISS' experience, that only rarely is the case.

72. H.B. 4429 would then force ISS to trumpet those false and misleading statements to the world in perpetuity, requiring ISS to "publicly and conspicuously disclose" them on "the home or front page" of ISS' website. *Id.* § 4(A)(3). Capping it all, H.B. 4429 would not only force ISS to deliver these self-denigrating statements directly to the companies that are the subjects of ISS' advice, but would also force ISS to reveal confidential information to these companies: "identif[ying] the service" and "identif[ying] the recommendation or policy" that ISS provided to each of its clients. *Id.* § 4(A)(1)(a)-(b), (2).

73. No matter what ISS does, H.B. 4429 forces ISS "to create speech on weighty issues with which [ISS] disagrees" and then disseminate that speech to an audience ISS has not chosen. *303 Creative LLC v. Elenis*, 600 U.S. 570, 599 (2023); *ISS v. Rokita*, 2026 WL 1847882, at *4 (explaining the "lose-lose situation" facing ISS). That is textbook compelled speech.

74. ***Strict scrutiny.*** Whether viewed as content and viewpoint discrimination or compelled speech, H.B. 4429 is unconstitutional. Viewpoint discrimination is never constitutionally permissible. *See Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) ("The Court's finding of viewpoint bias end[s] the matter."). And compelled speech is anathema to the

First Amendment; courts thus regularly reject compelled-speech laws without considering whether they could survive strict scrutiny. *See, e.g.*, *303 Creative*, 600 U.S. at 603. But strict scrutiny applies at the bare minimum, and H.B. 4429 cannot survive it: H.B. 4429 is not "narrowly tailored to serve compelling state interests." *NIFLA*, 585 U.S. at 766. Oklahoma does not have even a legitimate interest—let alone a compelling one—in forcing ISS to make misleading statements to its clients and the public and to share confidential information with companies all over the world. Nor is H.B. 4429 tailored in any fashion—let alone narrowly—to any possible interest Oklahoma could drum up in this litigation.

75. Oklahoma cannot prove that a commercial-speech exception to strict scrutiny applies. "Commercial speech is that which does no more than propose a commercial transaction." *United States v. Wenger*, 427 F.3d 840, 846 (10th Cir. 2005) (citation and quotation marks omitted). The speech that H.B. 4429 targets plainly does much more: H.B. 4429 purports to compel ISS' speech on controversial social and political issues. Nor do ISS' voting recommendations satisfy any of the factors that "sort[] out commercial from non-commercial speech." *Id.* at 847. "The voting recommendations are not advertisements." *ISS v. Kobach*, 2026 WL 1815236, at *9. They "are not referencing a product." *Id.* And ISS' speech is not "motivated by an economic interest" in the relevant sense, *Wenger*, 427 F.3d at 847; speech is "not transformed into commercial speech merely because [it is] sold for profit," *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 970 (10th Cir. 1996). At the least, ISS' speech is "inextricably intertwined" with "otherwise fully protected speech," meaning strict scrutiny applies. *Riley v. Nat'l*

*Fed'n of the Blind*, 487 U.S. 781, 796 (1988). Even under some lesser standard of scrutiny, however, H.B. 4429 could not survive.

76. Because H.B. 4429's unconstitutional content- and viewpoint-based triggering provisions and compelled speech requirements are integral to the entire law and are unsupported by any valid state interest, the entire law must be invalidated and enjoined as to ISS. *See, e.g.*, *Vasquez v. Dillard's, Inc.*, 381 P.3d 768, 775-776 (Okla. 2016). Unless invalidated and enjoined as to ISS, H.B. 4429 will deprive ISS of its First Amendment rights and cause it to suffer irreparable injuries.

**COUNT TWO**
**(First and Fourteenth Amendments—Due Process—Void for Vagueness)**

77. ISS incorporates all prior paragraphs of this Complaint.

78. Under the Fourteenth Amendment's Due Process Clause, a state law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-254 (2012). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.*

79. H.B. 4429 is unconstitutionally vague as applied to ISS. It is vague in the conditions that trigger H.B. 4429's burdensome requirements, and once those requirements are triggered, it is vague about what ISS is supposed to do.

80. H.B. 4429's triggering conditions are not clearly defined. To take only a few examples, Section 4 is triggered when ISS "makes a recommendation against company

management on a company proposal or proxy proposal, or makes a default recommendation or policy involving votes against company management on company proposals or proxy proposals." H.B. 4429 § 4(A), (B). But the law's definition of "default recommendation or policy" is intractably vague, covering everything from "system[s]" to "guidelines." *Id.* § 3(5). Making matters worse, Section 4 later refers to a "proxy advisory service." *Id.* § 4(A)(1), (B)(1). The law defines "proxy advisory service" more broadly than just making recommendations or default recommendations or policies, *id.* § 3(7), rendering it even more unclear when the law's burdens apply.

81. Another problem is the law's application to advice to out-of-state clients about out-of-state companies. H.B. 4429 applies when proxy advisory services "are provided in connection with or in relation to a company"—broadly defined to mean "a publicly traded, for-profit corporation, limited liability company, partnership, or other business entity"—"or [when proxy advisory services] are provided to any person in this state." H.B. 4429 § 3(3), (7). Advice "in connection with or in relation to a company" does not appear limited to companies "in this state," as is the clause about advice to a "person in this state." Without an "in this state" limitation, H.B. 4429 appears to extend to ISS' advice about any company anywhere to any client anywhere. The State of Kansas and the State of Indiana have taken the positions that similar language in their laws should be construed to mean that the laws apply to advice to in-state clients about out-of-state companies, as well as advice to out-of-state clients about in-state companies, but do *not*

apply to advice to out-of-state clients about out-of-state companies.[16] It is unclear whether Oklahoma would or could take the same position. H.B. 4429's companion legislation defines "a company" to mean an "entity that conducts its operations and is headquartered within the United States," H.B. 4428 § 1(1), and the absence of similar language in H.B. 4429 constraining the definition of a company to operations and headquarters "within the United States" suggests that H.B. 4429 may have a global sweep.

82. It is also unclear what a proxy advisor must do if it tries to produce a "written financial analysis," but the issue does not lend itself to the sort of crystal-ball quantification demanded by H.B. 4429's definition of "written financial analysis": Would the law permit ISS to say that any "short-term and long-term" benefits and costs are unclear, or that ISS cannot "conclude[]" which vote is "most likely to positively affect shareholder value"? Or must ISS state that it made the recommendation without conducting this so-called "written financial analysis"?[17]

83. Once triggered, H.B. 4429 leaves substantial uncertainty about how ISS should comply. For instance, the law does not explain what counts as a "conspicuous disclosure," *id.* § 4(A)(1), or whether this differs from a "*clear and* conspicuous

---

[16] Kansas Opp. 33, *ISS v. Kobach*, No. 2:26-cv-02254-HLT-RES (D. Kan. May 29, 2026), ECF No. 33 (law applies to "proxy advice about Kansas companies and for Kansas clients"); Indiana Opp. 28, *ISS v. Rokita*, No. 1:26-cv-00717-MPB-MKK (S.D. Ind. May 20, 2026), ECF No. 46 (similar).

[17] H.B. 4429's references to "the experience and geographic location of the personnel who formed the recommendation," §§ 3(10)(c), 4, are also vague. Insofar as the Attorney General would construe this phrase to include information that could be used to identify ISS employees or the particular locations where they work, ISS reserves the right to address constitutional problems that would result from that overbroad interpretation.

disclosure," *id.* § 4(B)(1) (emphasis added), or how "public[]" and "conspicuous[]" the website "disclosure" must be, *id.* § 4(A)(2), (3). Nor does the law detail how promptly ISS must respond to a request for a "written financial analysis," nor explain how long this production requirement as to any particular recommendation persists. *See id.* § 4(B)(2).

84. This vagueness invites arbitrary enforcement. For the same reasons the law leaves ISS guessing at how to comply, it fails to "establish minimal guidelines to govern law enforcement," *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (citation omitted), thus leaving enforcement up to the Attorney General's "personal predilections," *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (citation omitted).

85. H.B. 4429 imposes criminal and quasi-criminal penalties on proxy advisors that fail to comply: The Oklahoma Attorney General may criminally prosecute violations, as well as seek civil penalties of up to $10,000 "per violation," which could quickly add up to a staggering sum. Okla. Stat. tit. 15, §§ 756.1, 761.1(C)-(E), 762(B). The potential breadth of H.B. 4429 and the consequences for failing to comply with what the Attorney General may deem sufficient chill ISS from exercising its First Amendment speech rights.

86. Because H.B. 4429's unconstitutionally vague provisions are integral to the entire law, the entire law must be invalidated and enjoined as to ISS. *See, e.g.*, *Vasquez*, 381 P.3d at 775-776. Unless invalidated and enjoined as to ISS, H.B. 4429 will deprive ISS of its due-process rights and cause it to suffer irreparable injuries.

**COUNT THREE**
**(Unconstitutional Extraterritorial Regulation)**

87. ISS incorporates all prior paragraphs of this Complaint.

88. The Constitution restricts the power of states to directly regulate conduct in another state. That principle is reflected in several of the Constitution's structural protections, is inherent in the plan of the Convention, and is deeply rooted in our nation's historical tradition.

89. For example, the Commerce Clause gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. "Although the Clause is framed as a positive grant of power to Congress," the Supreme Court has "long held that this Clause also prohibits state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019) (citation omitted). This negative aspect of the Commerce Clause extends to state laws implicating foreign commerce as well. *See, e.g.*, *Wardair Canada, Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1, 7-8 (1986); *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87-88 (1984); *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 749 (5th Cir. 2006). A state law violates the dormant Commerce Clause when it directly regulates commerce that "takes place wholly outside of the State's borders." *Edgar v. MITE Corp.*, 457 U.S. 624, 642-643 (1982) (plurality op.); *see ACLU v. Johnson*, 194 F.3d 1149, 1160-61 (10th Cir. 1999) (explaining that "regulat[ing] conduct occurring wholly outside of the state" violates the dormant Commerce Clause); *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376

n.1 (2023) (citing *Edgar* plurality op.); *Antilles Cement Corp. v. Acevedo Vila*, 408 F.3d 41, 46 (1st Cir. 2005) ("same doctrine applies to international commerce").

90. The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause, like the Commerce Clause, prohibits a State from "exercis[ing] 'extra territorial jurisdiction' "—a State may not "regulate and control activities wholly beyond its boundaries." *Watson v. Emps. Liab. Assurance Corp.*, 348 U.S. 66, 70 (1954); *accord Hartford Accident & Indem. Co. v. Delta & Pine Land Co.*, 292 U.S. 143, 149 (1934).

91. Several other provisions of the Constitution reflect and implement an equal-sovereignty principle prohibiting one state from directly regulating conduct occurring in another state. Article I, Section 10 strips states of traditional sovereign powers that could be wielded against one another, including the right to "lay any Imposts or Duties on Imports or Exports," and to "lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, [or] enter into any Agreement or Compact with another State." U.S. Const. art. I, § 10, cls. 2-3. Article IV, in turn, preserves the rights of each state in relation to each, requiring, among other things, that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." U.S. Const. art. IV, § 1. And the Tenth Amendment ensures that each state preserves its own "integrity, dignity, and residual sovereignty." *Bond v. United States*, 564 U.S. 211, 221 (2011); *see* U.S. Const. amend. X.

92. Moreover, "the territorial limits of state authority under the Constitution's horizontal separation of powers" barring a state from directly regulating conduct beyond the state's borders inhere in "the original and historical understandings of the Constitution's structure and the principles of 'sovereignty and comity' it embraces." *Nat'l Pork Producers*, 598 U.S. at 376 & n.1 (citation omitted); *see id.* at 408-410 (Kavanaugh, J., concurring in part and dissenting in part); *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 154 (2023) (Alito, J., concurring in part and concurring in the judgment) (explaining that this principle is "an 'obviou[s]' and 'necessary result' of our constitutional order," and "is not confined to any one clause or section, but is expressed in the very nature of the federal system that the Constitution created and in numerous provisions that bear on States' interactions with one another") (citation omitted); *cf. PennEast Pipeline Co. v. New Jersey*, 594 U.S. 482, 501 (2021) ("The plan of the Convention reflects the 'fundamental postulates implicit in the constitutional design.' ") (citation omitted). The Constitution forbids "the statutes of [one state] to operate beyond the jurisdiction of that State"; allowing otherwise would "throw[] down the constitutional barriers by which all the States are restricted within the orbits of their lawful authority and upon the preservation of which the Government under the Constitution depends." *New York Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914).

93. H.B. 4429 violates the Constitution's prohibitions against direct extraterritorial regulation. Whenever ISS "makes a recommendation against company management," H.B. 4429 would require ISS to send warnings to clients receiving that advice, H.B. 4429 § 4(A)(1), (B)(1), and "to the board of directors of each company that is

the subject" of the advice, *id.* § 4(A)(2), (B)(3)—no matter where those clients and company boards of directors are located. The law also purports to force ISS to post a warning "on the home or front page" of its website, without any limitation to Oklahoma's borders. *Id.* § 4(A)(3). Oklahoma may not export its laws to the rest of the nation by forcing ISS to provide out-of-state warnings, whether to clients, company issuers, or on ISS' website.

94. H.B. 4429 would be unconstitutionally extraterritorial even if it applied only to advice to Oklahoma clients or about Oklahoma companies. *See supra* ¶ 81. That would still force ISS to provide warnings to out-of-state clients, to out-of-state companies, and on ISS' website accessed out-of-state. ISS' four Oklahoma clients hold interests in hundreds of companies all over the country and world; whenever ISS advises those four Oklahoma clients to vote "against company management" on a proposal, H.B. 4429 would force ISS to send warnings to the boards of directors for each of those companies. There is a similar problem for advice about Oklahoma companies: ISS has non-Oklahoma clients that hold interests in Oklahoma companies, and H.B. 4429 would require ISS to provide warnings to those out-of-state clients. Oklahoma's attempt to reach into other states to mandate warnings exceeds the Constitution's limits on state power.

95. Unless invalidated and enjoined, H.B. 4429 will cause ISS to suffer irreparable injuries.

## PRAYER FOR RELIEF

96. For the foregoing reasons, ISS prays for the following relief:

a. Declare that H.B. 4429 unconstitutionally infringes ISS' free speech rights under the First and Fourteenth Amendments of the U.S. Constitution;

b. Declare that H.B. 4429 is void for vagueness under the First Amendment and the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution, as applied to ISS;

c. Declare that H.B. 4429 violates the U.S. Constitution's prohibitions against extraterritorial regulation, either on its face or as applied to ISS;

d. Declare that H.B. 4429's invalid provisions are integral to and inseverable from any surviving portion, such that H.B. 4429 must be declared invalid in its entirety as applied to ISS;

e. Preliminarily and permanently enjoin Defendant and his successors, agents, employees, and all persons acting under his direction or control from taking any action to enforce H.B. 4429 against ISS, including but not limited to intervention in any private right of action, *see* H.B. 4429 § 5(B);

f. Enter judgment in favor of ISS;

g. Award reasonable costs and attorneys' fees incurred in bringing this action, under 42 U.S.C. § 1988; and

h. Award ISS all other relief as the Court deems just and proper.

Respectfully submitted,

/s/ Robert G. McCampbell

ROBERT G. MCCAMPBELL
Oklahoma Bar No. 10390
rmccampbell@gablelaw.com
NICHOLAS V. MERKLEY
Oklahoma Bar No. 20284
nmerkley@gablelaw.com
GABLEGOTWALS
499 Sheridan Ave., Suite 2200
Oklahoma City, OK 73102
(405) 235-5500

BRUCE D. OAKLEY*
bruce.oakley@hlc.com
HOGAN LOVELLS CADWALADER US LLP
609 Main Street, Suite 4200
Houston, TX 77002
(713) 632-1420

JESSICA L. ELLSWORTH*
jessica.ellsworth@hlc.com
DAVID M. FOSTER*
david.foster@hlc.com
MICHAEL J. WEST*
michael.west@hlc.com
DANA A. RAPHAEL*
dana.raphael@hlc.com
HOGAN LOVELLS CADWALADER US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

* application for pro hac vice forthcoming

*Counsel for Plaintiff Institutional Shareholder Services Inc.*

August 12, 2026