**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

INSTITUTIONAL SHAREHOLDER SERVICES INC.,

*Plaintiff*,

v.

GENTNER DRUMMOND, in his official capacity as the Oklahoma Attorney General,

*Defendant*.

Case No. 5:26-cv-02111-PRW

The Hon. Patrick R. Wyrick

ORAL ARGUMENT REQUESTED

**PLAINTIFF INSTITUTIONAL SHAREHOLDER SERVICES INC.'S MOTION FOR PRELIMINARY INJUNCTION AND OPENING BRIEF IN SUPPORT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... v

INTRODUCTION ..... 1

BACKGROUND ..... 2

A. ISS And Proxy Advisory Services ..... 2

B. Oklahoma H.B. 4429 ..... 5

STANDING ..... 7

ARGUMENT ..... 7

I. ISS Is Likely To Succeed On The Merits ..... 7

A. H.B. 4429 Violates ISS' First Amendment Rights ..... 7

1. H.B. 4429 Discriminates Based On Content And Viewpoint ..... 8

2. H.B. 4429 Is Independently Unconstitutional For Compelling ISS' Speech ..... 11

3. The State Cannot Show That H.B. 4429 Satisfies Strict Scrutiny ..... 14

4. The State Cannot Show A Commercial-Speech Exception Applies ..... 17

B. H.B. 4429 Is Unconstitutionally Vague As Applied To ISS ..... 20

1. H.B. 4429 Leaves ISS Guessing How to Comply ..... 21

2. H.B. 4429 Invites Arbitrary Enforcement ..... 23

C. H.B. 4429 Is Impermissibly Extraterritorial ..... 23

II. The Remaining Factors Overwhelmingly Favor Preliminary Relief ..... 25

CONCLUSION ..... 25

CERTIFICATE OF SERVICE

EXHIBITS

Ex. 1: Oklahoma House Bill 4429

Ex. 2: Declaration of Marc Goldstein

**TABLE OF CONTENTS—Continued**

Ex. 3: Declaration of David M. Foster

Ex. 4: Excerpts of ISS, U.S. Proxy Voting Guidelines, 2026 Benchmark Policy Recommendations (Dec. 9, 2025), with the full version available at https://perma.cc/6E8F-ZSQC

Ex. 5: Excerpts of ISS, U.S. Catholic Faith-Based Policy Proxy Voting Guidelines, 2026 Policy Recommendations (Dec. 26, 2025), with the full version available at https://perma.cc/Y6H4-G2GD

Ex. 6: Excerpts of ISS, U.S. Climate Policy Proxy Voting Guidelines, 2026 Policy Recommendations (Dec. 31, 2025), with the full version available at https://perma.cc/W75X-DQRY

Ex. 7: ISS, redacted U.S. Benchmark Policy proxy analysis and voting recommendations for November 6, 2025 shareholder meeting of Tesla, Inc.

Ex. 8: ISS, redacted U.S. Catholic Faith-Based Policy proxy analysis and voting recommendations for November 6, 2025 shareholder meeting of Tesla, Inc.

Ex. 9: ISS, redacted U.S. Benchmark Policy proxy analysis and voting recommendations for May 21, 2025 shareholder meeting of Amazon.com, Inc.

Ex. 10: ISS, redacted U.S. Climate Policy proxy analysis and voting recommendations for May 21, 2025 shareholder meeting of Amazon.com, Inc.

Ex. 11: ISS, redacted U.S. Benchmark Policy proxy analysis and voting recommendations for May 31, 2023 shareholder meeting of Exxon Mobil Corp.

Ex. 12: ISS, redacted U.S. Climate Policy proxy analysis and voting recommendations for May 31, 2023 shareholder meeting of Exxon Mobil Corp.

Ex. 13: ISS, Part 2 Brochure (updated Mar. 31, 2026), https://perma.cc/MDL6-WDC4

Ex. 14: Ross Kerber, *Proxy Adviser ISS Expands Offerings for 'ESG Skeptic' Clients*, Reuters (Mar. 4, 2024), https://tinyurl.com/38f7z776

Ex. 15: Bowyer Research, *Summary of Bowyer Research Proxy Voting Guidelines for States*, https://perma.cc/86T8-MUJT

Ex. 16: Transcript of excerpts from Oklahoma House of Representatives Banking, Financial Services, and Pensions Committee hearing on February 10, 2026

Ex. 17: Transcript of excerpts from Oklahoma House of Representatives Government Oversight Committee hearing on March 5, 2026

**TABLE OF CONTENTS—Continued**


Ex. 18: Transcript of excerpts from Oklahoma House of Representatives session proceedings on March 25, 2026

Ex. 19: Transcript of excerpts from Oklahoma Senate, Business & Insurance Committee hearing on April 9, 2026

Ex. 20: Transcript of excerpts from Oklahoma Senate legislative session on April 28, 2026

Ex. 21: Transcript of excerpts from Oklahoma House of Representatives Government Oversight Committee hearing on March 4, 2025

Ex. 22: Consumers Defense, https://perma.cc/U97G-TW9M

Ex. 23: Consumers Defense, *Proxy Advisor Transparency Act*, https://perma.cc/B3P3-FNAF

Ex. 24: Recommendation of the SEC Investor Advisory Committee (Jan. 24, 2020), https://perma.cc/HH22-AN8K

Ex. 25: New York State Common Retirement Fund, Comments on Proposed Rule (Feb. 3, 2020), https://perma.cc/2EH9-VZP4

Ex. 26: T. Rowe Price, Letter to SEC Re: Proxy Voting Roundtable (Dec. 13, 2018), https://perma.cc/F45A-7EYM

Ex. 27: Council of Institutional Investors, Letter Re: Proposed Legislation (Feb. 27, 2018), https://perma.cc/VL7L-XH2M

Ex. 28: Elliott Mgmt. Corp., Letter to SEC (Mar. 30, 2020), https://perma.cc/S2T5-KLLU

Ex. 29: Better Markets, Letter to SEC (Feb. 3, 2020), https://perma.cc/E8SM-SV9N

Ex. 30: Exxon Mobil Corp., Letter to SEC (Sep. 15, 2025), https://perma.cc/7JB5-9S4G

Ex. 31: National Center for Public Policy Research, Press Release, Conservative Group Launches Proxy Navigator Tool to Fight Woke Corporations (Mar. 7, 2024), https://perma.cc/MVB9-DNVV

Ex. 32: Elizabeth Harris, *Advisory Group Opposes Re-election of Most of Target's Board*, N.Y. Times (May 28, 2014), https://tinyurl.com/wp4brkmt

Ex. 33: *JPMorgan Pushes Back on ISS Recommendations on Severance, Independent Chair*, Reuters (May 14, 2024), https://tinyurl.com/58u7as2j

Ex. 34: Marco Quiroz-Gutierrez, *With $1 Trillion Pay Package on the Line, Elon Musk Blasts Influential Firms Telling Shareholders to Reject It: 'Those Guys Are*

**TABLE OF CONTENTS—Continued**

*Corporate Terrorists'*, Fortune Mag. (Oct. 23, 2025), https://tinyurl.com/3kd77puw

Ex. 35: Matt Egan, *Corporate America Loves Deregulation. Then Why Is It Pushing For These Rules?*, CNN (Mar. 29, 2019), https://tinyurl.com/5f7jpnr6

Ex. 36: Letter from State Attorneys General to ISS and Glass Lewis (Nov. 29, 2023), https://perma.cc/8UUU-DWWV

Ex. 37: Excerpts of Letter from State Attorneys General to Asset Managers (Aug. 29, 2024), with the full version available at https://perma.cc/H5GD-JD7E

Ex. 38: Letter from State Attorneys General to Congress (Feb. 14, 2023), https://perma.cc/D7XF-AU98

## TABLE OF AUTHORITIES

Page(s)

**CASES:**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) ........ 11, 14

*AbbVie Inc. v. Drummond*,
808 F. Supp. 3d 1266 (W.D. Okla. 2025) ........ 25

*ACLU v. Johnson*,
194 F.3d 1149 (10th Cir. 1999) ........ 24

*Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*,
978 F.3d 481 (6th Cir. 2020) ........ 9

*Animal Legal Def. Fund v. Kelly*,
9 F.4th 1219 (10th Cir. 2021) ........ 9, 10, 17

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983) ........ 18

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ........ 15, 17

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,
95 F.3d 959 (10th Cir. 1996) ........ 18

*Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*,
492 F.3d 484 (4th Cir. 2007) ........ 24

*Chaker v. Crogan*,
428 F.3d 1215 (9th Cir. 2005) ........ 9

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) ........ 9, 13, 20, 21

*Citizens United v. Gessler*,
773 F.3d 200 (10th Cir. 2014) ........ 25

*Cont'l Res., Inc. v. Wolla Oilfield Servs., LLC*,
510 P.3d 175 (Okla. 2022) ........ 24, 25

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Diamond Alt. Energy, LLC v. EPA*,
606 U.S. 100 (2025) .......... 7

*Does 1-11 v. Bd. of Regents of Univ. of Colo.*,
100 F.4th 1251 (10th Cir. 2024) .......... 7

*DoorDash, Inc. v. City of New York*,
No. 25-81, __ F.4th __, 2026 WL 2249119 (2d Cir. Aug. 5, 2026) .......... 14

*Edgar v. MITE Corp.*,
457 U.S. 624 (1982) .......... 24

*Ent. Software Ass'n v. Blagojevich*,
469 F.3d 641 (7th Cir. 2006) .......... 19, 20

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) .......... 20, 21

*Free Speech Coal., Inc. v. Paxton*,
95 F.4th 263 (5th Cir. 2024) .......... 19, 20

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) .......... 21

*Harris v. Quinn*,
573 U.S. 616 (2014) .......... 18

*Honeyfund.com Inc. v. Governor*,
94 F.4th 1272 (11th Cir. 2024) .......... 9

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
538 U.S. 600 (2003) .......... 15

*ISS v. Kobach*,
No. 2:26-cv-02254, 2026 WL 1815236 (D. Kan. June 24, 2026) .......... *passim*

*ISS v. Rokita*,
No. 1:26-cv-00717, __ F. Supp. 3d __, 2026 WL 1847882
(S.D. Ind. June 26, 2026) .......... *passim*

*ISS v. SEC*,
142 F.4th 757 (D.C. Cir. 2025) .......... 2, 3

**TABLE OF AUTHORITIES—Continued**

Page(s)

*ISS v. SEC*,
718 F. Supp. 3d 7 (D.D.C. 2024) .......... 2, 15

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
585 U.S. 878 (2018) .......... 12

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
385 U.S. 589 (1967) .......... 21

*Kolender v. Lawson*,
461 U.S. 352 (1983) .......... 23

*Lane v. Franks*,
573 U.S. 228 (2014) .......... 7

*Mallory v. Norfolk S. Ry. Co.*,
600 U.S. 122 (2023) .......... 24

*Matal v. Tam*,
582 U.S. 218 (2017) .......... 9

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .......... 16

*NAM v. SEC*,
800 F.3d 518 (D.C. Cir. 2015) .......... 14, 19

*Nat'l Inst. of Fam. & Life Advocs. (NIFLA) v. Becerra*,
585 U.S. 755 (2018) .......... *passim*

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023) .......... 23

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) .......... 12

*N.Y. Life Ins. Co. v. Head*,
234 U.S. 149 (1914) .......... 24

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .......... 10

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988) .......... 17, 19

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .......... 9

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) .......... 10

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .......... 7

*Thakur v. Trump*,
176 F.4th 1187 (9th Cir. 2026) .......... 10

*United States v. Lesh*,
107 F.4th 1239 (10th Cir. 2024) .......... 23

*United States v. Wenger*,
427 F.3d 840 (10th Cir. 2005) .......... 18

*Utah Pol. Watch, Inc. v. Musselman*,
179 F.4th 1241 (10th Cir. 2026) .......... 8

*Watson v. Emps. Liab. Assurance Corp.*,
348 U.S. 66 (1954) .......... 24

*Wyo. Gun Owners v. Gray*,
83 F.4th 1224 (10th Cir. 2023) .......... 21, 22, 23

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*,
471 U.S. 626 (1985) .......... 19

**STATUTES:**

Okla. Stat. tit. 15, § 753(21) .......... 7

Okla. Stat. tit. 15, § 756.1 .......... 7

Okla. Stat. tit. 15, § 761.1(C) .......... 7

Okla. Stat. tit. 15, § 761.1(D) .......... 7

## TABLE OF AUTHORITIES—Continued

Page(s)

Okla. Stat. tit. 15, § 761.1(E) ... 7

Okla. Stat. tit. 15, § 762(B) ... 7

Okla. Stat. tit. 21, § 20N(B) ... 7

Okla. Stat. tit. 21, § 20N(C) ... 7

**REGULATIONS:**

17 C.F.R. § 240.14a–8(m)(1) ... 3

84 Fed. Reg. 33,669 (July 12, 2019) ... 12

57 Fed. Reg. 48,276 (Oct. 22, 1992) ... 13, 15

**RULE:**

Fed. R. Civ. P. 65(c) ... 25

**OTHER AUTHORITY:**

George W. Dent, Jr., *A Defense of Proxy Advisors*, 2014 Mich. St. L. Rev. 1287 (2014) ... 3, 4, 19

## INTRODUCTION

Institutional Shareholder Services Inc. ("ISS") moves for a preliminary injunction preventing enforcement against ISS of Oklahoma House Bill ("H.B.") 4429 (Ex. 1). Because the law threatens ISS with prosecution and ruinous fines for exercising its rights, ISS respectfully requests a decision in advance of the law's November 1 effective date.

ISS is a proxy advisor: an independent third-party firm that sophisticated institutional investors hire to provide research and advice to help them decide how to vote on board elections, shareholder proposals, and other ballot items for publicly traded companies. For each ballot item, ISS analyzes relevant publicly available data, reviews voluminous materials, and provides its institutional investor clients with detailed reports and advice according to criteria that clients select to fit their specific needs.

H.B. 4429 seeks to tilt the playing field in shareholder elections away from shareholders and toward corporate boards. If ISS advises its client to follow the board's preferred outcome, the law has no effect. But if ISS advises its client to vote against the board's wishes, the law compels ISS to issue disparaging and misleading statements about ISS' business. Failure to comply is a felony, plus up to $10,000 in civil fines per violation.

Oklahoma's law is nearly identical to recent Kansas and Indiana laws and similar to a Texas law—each of which was preliminarily enjoined as likely unconstitutional as applied to ISS. *ISS v. Kobach*, No. 2:26-cv-02254, 2026 WL 1815236 (D. Kan. June 24, 2026); *ISS v. Rokita*, No. 1:26-cv-00717, __ F. Supp. 3d __, 2026 WL 1847882 (S.D. Ind. June 26, 2026); Text Order, *ISS v. Paxton*, No. 1:25-cv-01160 (W.D. Tex. Aug. 29, 2025). This Court should do the same. H.B. 4429 burdens ISS' speech only if ISS dissents from

the views of company management—and is thus textbook viewpoint discrimination. H.B. 4429 compounds that free-speech violation by compelling ISS to recite a series of misleading warnings about its own services. While the Court need not reach ISS' other claims, H.B. 4429 is also unconstitutionally vague—leaving ISS guessing at how it must comply and inviting arbitrary enforcement—and impermissibly extraterritorial by purporting to force ISS to send out-of-state warnings.

The remaining preliminary-injunction factors favor ISS. If not enjoined, ISS faces irreparable harm—including imprisonment and business-crushing fines—and Oklahoma has no interest in enforcing an unconstitutional statute. ISS' motion should be granted.

## BACKGROUND

### A. ISS And Proxy Advisory Services

Publicly traded companies hold meetings to conduct business requiring shareholder approval. Matters requiring shareholder votes at upcoming meetings are compiled into what is known as a "proxy statement"; at these meetings, shareholders' proxies—designees who vote the shares owned by particular shareholders—vote on the items listed in the proxy statement. Proxy statements include a variety of issues, including routine and high-profile matters like electing directors and executive compensation. *See ISS v. SEC*, 718 F. Supp. 3d 7, 11 (D.D.C. 2024), *aff'd*, 142 F.4th 757 (D.C. Cir. 2025). Votes on certain matters, such as federally mandated "say-on-pay" votes, are nonbinding. *See, e.g.*, Ex. 5 at 64.

Shareholders satisfying certain requirements may also submit proposals, such as requesting that the company issue a report about reduced consumer demand, *e.g.*, Ex. 12 at 57, or the risks of artificial intelligence, *e.g.*, Ex. 10 at 43. Companies may seek to

exclude shareholder proposals from proxy statements; where a shareholder proposal is included, it is typically nonbinding, and companies can offer their "own point of view" urging shareholders to vote against it. 17 C.F.R. § 240.14a–8(m)(1); *e.g.*, Ex. 7 at 44-48; Ex. 9 at 25, 30-31; Ex. 11 at 39, 42, 45. Many issues spur fierce competition for votes: Proponents, other shareholders, and outside groups may lobby shareholders or institutional investors to vote in a certain way—referred to as "soliciting" proxy votes. *See ISS*, 142 F.4th at 766-767; *e.g.*, Ex. 7 at 17, 26, 31-32 (discussing "vote no" campaigns).

Institutional investors—sophisticated market participants that may manage billions or even trillions of dollars for thousands of investors across numerous companies—field thousands of shareholder votes each year. Historically, these investors often followed the so-called Wall Street Rule ("vote with management or sell") because it was too expensive and time-consuming to inform themselves about thousands of shareholder votes across all the companies in their portfolios. *See* George W. Dent, Jr., *A Defense of Proxy Advisors*, 2014 Mich. St. L. Rev. 1287, 1288-89 (2014). The entry of proxy advisors like ISS—which provide research and advice about voting items—helped institutional investors break from this default and make informed decisions about how to vote in line with their own preferences. *See ISS*, 142 F.4th at 761. ISS is registered with the SEC under the Investment Advisers Act. Ex. 2 (Declaration of Marc Goldstein) ¶ 4. But ISS is not akin to a personal investment adviser; "ISS does not manage investment accounts or make buy, sell or hold investment recommendations to clients." Ex. 13 at 11. Instead, ISS offers research and advice to its sophisticated institutional investor clients, based on each client's chosen framework, about upcoming shareholder elections. Goldstein Decl. ¶¶ 4-34. The clients,

in turn, "must determine whether and how to incorporate [ISS'] research . . . into their investment decision-making process." Ex. 13 at 5. "ISS does not guarantee that its advice will produce any particular investment return or other results for clients." *Id.* at 11.

To meet its clients' diverse needs, ISS offers three types of voting policies that guide recommendations: (1) the Benchmark Policy, *see* Ex. 4, which is a market-specific voting framework ISS has developed, and updated year after year, through a robust consultative process with investors, companies, and other industry experts; (2) Thematic Policies, which evaluate issues from perspectives such as faith-based investing; and (3) Custom Policies reflecting clients' specific approaches to voting. Goldstein Decl. ¶¶ 21-31. Some clients choose policies developed by third parties, *id.* ¶ 22; for example, ISS administers an "ESG skeptical" policy developed by Bowyer Research, *see* Exs. 14-15.

For an upcoming shareholder vote, ISS looks at each proposal on the ballot, pulls relevant publicly available information and data, and then analyzes the proposal and data through the prism of the applicable policy to develop a voting recommendation. Goldstein Decl. ¶ 33. ISS routinely offers different advice about the same vote to different clients, depending on the client's chosen voting policy. *Id.* ¶ 20. Some clients choose a policy that accounts for environmental considerations; some clients make voting decisions that account for religious beliefs; other clients choose other policies with different values. *Id.* ¶ 18. ISS has no financial interest in the outcome of a shareholder vote. *Id.* ¶¶ 20, 33. And it is not unusual for ISS clients to "ignore its advice, especially the larger institutions and especially on higher profile issues." *Defense of Proxy Advisors* at 1326.

In 2025, ISS assisted approximately 1,400 clients in connection with voting analyses

and recommendations for about 52,000 shareholder meetings in about 100 developed and emerging markets worldwide.[1] Goldstein Decl. ¶ 15. ISS currently provides proxy voting research and advice to four clients based in Oklahoma. *Id.*

### B. Oklahoma H.B. 4429

H.B. 4429 imposes onerous obligations on proxy advisors when they advise clients to vote "against company management" on a proposal—requiring the advisor to either produce a specifically defined "written financial analysis" or else issue a series of warnings. H.B. 4429 § 4. A "written financial analysis" is a "document" that (1) "analyzes the expected short-term and long-term financial benefits and costs to the company of implementing" the proposal; (2) "concludes what vote or course of action is most likely to positively affect shareholder value"; and (3) "explains the methods and processes used to prepare the analysis, including the experience and geographic location of the personnel who formed the recommendation." *Id.* § 3(10).

If an advisor performs this "written financial analysis," the advisor must provide "a clear and conspicuous disclosure" to the client receiving the advice "stat[ing] that the proxy advisor has made the recommendation or policy based on a written financial analysis" and that this "analysis is available upon request," *id.* § 4(B)(1)(c), (d); if requested, the advisor must "[m]ake such analysis available within a reasonable time," *id.* § 4(B)(2). Advisors must also "concurrently" provide a copy of the "written financial analysis" "to the board of directors of each company that is the subject" of the advice. *Id.* § 4(B)(3).

[1] ISS also offers a suite of other services, including risk assessment tools, scoring, and thought leadership. Goldstein Decl. ¶¶ 35-40.

If the advisor does not create this specific "written financial analysis" when advising against the company board's position, H.B. 4429 requires the advisor to do three things. *First*, the advisor must "include a conspicuous disclosure" to clients receiving the advice that "states that the proxy advisor has made the recommendation or policy without doing so based on a written financial analysis regarding the impact of that recommended action on company investors" that: "(1) analyzes the expected short-term and long-term financial benefits and costs to the company of implementing" the proposal, "(2) concludes what vote or course of action is most likely to positively affect shareholder value, and (3) explains the methods and processes used to prepare the analysis, including the experience and geographic location of the personnel who formed the recommendation." *Id.* § 4(A)(1)(c).

*Second*, the advisor must make the same "disclosure" "by electronic means and U.S. mail" "to the board of directors of each company that is the subject" of the advice. *Id.* § 4(A)(2). The "disclosure" to company boards must also "identif[y] the service" and "identif[y] the recommendation or policy" the advisor provided clients. *Id.* § 4(A)(1), (2).

*Third*, the advisor must "publicly and conspicuously . . . state[]" on its website's "home or front page" that its services "include recommendations or policies against company management" that "are not made based on a written financial analysis regarding the impact of that recommended action on company investors." *Id.* § 4(A)(3). This statement must remain online while any advisory "services are being provided." *Id.*

A proxy advisor that violates H.B. 4429 is deemed to have committed a "deceptive trade practice," *id.* § 5(A), which the Attorney General may prosecute as a felony punishable by a $5,000 fine and up to five years imprisonment for a first offense and up to

ten years for subsequent offenses. Okla. Stat. tit. 15, §§ 753(21), 761.1(E), 762(B); *see id.* tit. 21, § 20N(B)-(C). The Attorney General may also seek injunctive relief and civil penalties of up to $10,000 "per violation." *Id.* tit. 15, §§ 756.1, 761.1(C)-(D).

**STANDING**

As the object of H.B. 4429, ISS' standing is self-evident. *See Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). ISS would suffer economic, reputational, and constitutional harms if the Attorney General enforces H.B. 4429, which would be redressed by enjoining enforcement. *See* Goldstein Decl. ¶¶ 41-55; *Kobach*, 2026 WL 1815236, at *6 n.7 (ISS has standing).

**ARGUMENT**

Preliminary relief is warranted where the movant shows (1) likely success on the merits; (2) irreparable harm; (3) that harm outweighs any harm to the non-moving party; and (4) the public interest favors relief. *Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1267-68 (10th Cir. 2024). Every factor favors ISS. Oklahoma bears the burden on the "ultimate question" of H.B. 4429's "constitutionality." *Id.* (citation omitted).

**I. ISS Is Likely To Succeed On The Merits.**

**A. H.B. 4429 Violates ISS' First Amendment Rights.**

When ISS provides advice on issues running the gamut from executive pay packages to disclosures of climate-related risks, ISS is speaking "on matters of public concern" "at the heart of the First Amendment," which protects the "unfettered interchange of ideas." *Lane v. Franks*, 573 U.S. 228, 235-236 (2014) (cleaned up). H.B. 4429 is unconstitutional as applied to ISS because it discriminates based on viewpoint and compels

ISS' speech. Strict scrutiny applies to each of these faults. Even if the Court applied a lower standard, H.B. 4429 still could not survive.

**1. H.B. 4429 Discriminates Based On Content And Viewpoint.**

H.B. 4429 regulates based on content and viewpoint and is thus presumptively unconstitutional. The law's heavy obligations apply *only* if ISS "makes a recommendation against company management." H.B. 4429 § 4. So when ISS recommends voting against an executive pay package, Ex. 7 at 1, 18-39 (Benchmark Policy Recs., 11/6/2025 Tesla, Inc. meeting), advises clients subscribing to the Catholic Faith-Based Policy to vote for a proposal seeking a report on potential child labor in the company's supply chain, Ex. 8 at 1-2, 53-55 (Catholic Faith-Based Policy Recs., 11/6/2025 Tesla, Inc. meeting), or recommends that clients subscribing to the Climate Policy vote against the board chair given the board's management of climate-related issues, Ex. 10 at 1-2, 16-24 (Climate Policy Recs., 5/21/2025 Amazon.com, Inc. meeting), for example, H.B. 4429 would require ISS to perform a complex, often impossible "written financial analysis" or else slap a series of warnings on ISS' advice and disseminate that speech widely—"a lose-lose situation." *Rokita*, 2026 WL 1847882, at *4. There is only one way ISS can avoid those obligations: advise clients to vote for whatever company management wants.

That is textbook viewpoint discrimination. H.B. 4429 "distinguishes between two opposed sets of ideas," *Utah Pol. Watch, Inc. v. Musselman*, 179 F.4th 1241, 1255 (10th Cir. 2026) (citation omitted)—those aligned with management and those that contradict management—and then "imposes burdens when [ISS'] speech *disagrees* with the view of company management but imposes no burdens when [ISS'] speech *agrees* with the view

of company management," *Kobach*, 2026 WL 1815236, at *1; *accord Rokita*, 2026 WL 1847882, at *6; *see also Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 978 F.3d 481, 499 (6th Cir. 2020) ("Viewpoint discrimination obviously exists when the government allows . . . speech promoting a [certain] 'policy'. . . but prohibits . . . speech criticizing that policy"). The statute's elevation of "pro-[company management] viewpoints above anti-[company management] viewpoints" is discriminatory in the same way that it is discriminatory to criminalize lying "to acquire or exercise control over an animal facility intending to expose wrongdoing," but not lying to "laud the facility," *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1233 (10th Cir. 2021); to criminalize "speech critical of peace officer conduct," but not "speech supportive of peace officer conduct," *Chaker v. Crogan*, 428 F.3d 1215, 1217 (9th Cir. 2005); and to prohibit trademarks for "[g]iving offense," but not those that align with society's values, *Matal v. Tam*, 582 U.S. 218, 243 (2017) (plurality op.); *see also Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277 (11th Cir. 2024) (law that applies only when "the speaker disagrees" "penalizes certain viewpoints"). The First Amendment "secures, even and especially, the right to voice dissenting views." *Chiles v. Salazar*, 146 S. Ct. 1010, 1024 (2026).

H.B. 4429 is also viewpoint discriminatory because the "perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). H.B. 4429 singles out proxy advisors for special regulation; the law does not apply to other speakers who also advise on votes, including company boards, shareholders, those who solicit proxy votes, and charities. H.B. 4429 § 3(6), (7)(e). And the law applies only when the proxy advisor's perspective is that an against-management

vote is warranted—with the explicit goal of facilitating a response by management to persuade voters. *Id.* § 2(5) ("notice of a proxy advisor's recommendation allows the company to provide additional responsive information to shareholders"); *id.* § 4(A)(2), (B)(3) (requiring warnings to company management but not to proponents of shareholder proposals). Oklahoma may not "license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules." *Animal Legal Def.*, 9 F.4th at 1245 (citation omitted). Worse still, the law reflects animus towards certain advice, targeting "recommended votes based on environmental, social, or governance (ESG) investing; diversity, equity, or inclusion (DEI); and social credit and sustainability scores," perspectives that H.B. 4429 implies are "erroneous." *Id.* § 2(3), (5); *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564-565 (2011) (considering "formal legislative findings"); *Thakur v. Trump*, 176 F.4th 1187, 1201, 1203 (9th Cir. 2026) (per curiam) (regulating on "perceived expression of DEI" or "environmental justice" is viewpoint discrimination).

Moreover, viewpoint discrimination inheres in H.B. 4429's design, reflecting it was adopted "because of disagreement with the message the speech conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (citation and brackets omitted); *see Animal Legal Def.*, 9 F.4th at 1233 ("legislative history" may "confirm[]" viewpoint discrimination). The drafter of the model law on which H.B. 4429 is based aims to cleanse "the scourge of ESG in all its forms, in every state, and in every arena where it infects." Ex. 22; *see* Ex. 23. And H.B. 4429's sponsors were not shy in decrying "ESG" as a "political agenda," Ex. 17 at 6 (3/5/2026 Tr.), and "not in the best interest of the shareholders or the companies," Ex. 19 at 3 (4/9/2026 Tr.); *see* Ex. 16 at 4 (2/10/2026 Tr.) (touting H.B. 4429 as "a good bill"

due to opposition from nonprofit that believes "[l]arge businesses . . . need to go green").

**2. H.B. 4429 Is Independently Unconstitutional For Compelling ISS' Speech.**

"[N]o government may affect a speaker's own message by forcing [it] to accommodate views [it] does not hold." *303 Creative LLC v. Elenis*, 600 U.S. 570, 584-585, 599-600 (2023) (cleaned up). But under H.B. 4429, whenever ISS provides advice "against company management," ISS must either produce a complex "written financial analysis" or else issue self-denigrating warnings. Either way, H.B. 4429 impermissibly "compels speech." *Kobach*, 2026 WL 1815236, at *9.

H.B. 4429's "written financial analysis" would make ISS "analyze[] the expected short-term and long-term financial benefits and costs to the company of implementing" a proposal and then force ISS to offer a "conclu[sion]" as to "what vote or course of action is most likely to positively affect shareholder value." H.B. 4429 § 4(B)(1)(c). But proxy voting items often involve qualitative issues that do not lend themselves to quantification. Goldstein Decl. ¶ 44. It is unclear how anyone could quantify the "financial benefits and costs" of a vote for or against a particular director, *e.g.*, Ex. 7 at 1; Ex. 32, or a vote for or against nonbinding shareholder proposals or say-on-pay votes that companies may ignore, *e.g.*, Ex. 9 at 18. Perhaps that is why no law requires public companies, shareholder proponents, or proxy vote solicitors to offer "the financial benefits and costs" of particular yes-or-no votes, even though all those entities would be better situated than ISS to try.[2]

[2] Costs to a company are generally not publicly disclosed. If a director fails to win reelection, ISS is not in a position to know the company's potential costs, which may depend on if the company has a replacement, needs to engage a search firm to find a new

Attempting to produce this "written financial analysis" would force ISS to create speech and take positions on controversial issues that ISS would not otherwise. ISS' research reports and voting advice are informational and consider the varied interests of ISS' diverse clientele, meaning that ISS frequently offers different clients different advice on the same issue based on each client's chosen criteria. Goldstein ¶ 45. Yet H.B. 4429 would force ISS to "conclude[] *what* vote" "is most likely to positively affect shareholder value"—forcing ISS to undertake a fraught comparative analysis on controversial issues such as disclosures about climate change risk, even though ISS' clients have varied views. *Id.*; *see Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 913-914 (2018) ("controversial subjects such as climate change" are "sensitive political topics" "occup[ying] the highest rung of the hierarchy of First Amendment values") (citations omitted). States may not "require businesses to . . . opine on highly controversial issues of public concern." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1120 (9th Cir. 2024). Worse still, ISS would be forced to disseminate this speech not only to its clients, but also "to the board of directors of each company that is the subject" of the advice. H.B. 4429 § 4(B)(3).

Forcing ISS to choose sides between clients offends ISS' core values: ISS believes its clients are best situated to determine their own needs, objectives, and risk tolerances, Goldstein Decl. ¶¶ 19, 45, consistent with ISS' duty "to adopt [the client's] goals, objectives, or ends," 84 Fed. Reg. 33,669, 33,672-73 (July 12, 2019). ISS honors its

director, or plans to reduce its board size. Goldstein Decl. ¶ 44. If a shareholder proposal requests a report on a particular topic and the company agrees to prepare it, ISS is not in a position to know, for instance, how many company employees would be required, what they would be paid, or how many hours would be spent. *Id.*

clients' choices; some may choose an "ESG skeptical" proxy voting policy, *see supra* p. 4, while other clients subscribe to ISS' Climate Policy because they believe "the environmental threats of climate change pose significant economic and business risks," Ex. 6 at 10. Even H.B. 4429's sponsor has acknowledged that ESG factors may "present economic risk or opportunities" that are "material." Ex. 21 at 12 (3/4/2025 Tr.). ISS does not countermand its clients' choices; ISS instead "seeks to help [its] clients reach their own stated objectives" by providing expert analysis on ballot items through the lens of the client's chosen framework. *See Chiles*, 146 S. Ct. at 1017. The SEC has long recognized that proxy advice is "by its nature judgmental" and a matter of "opinion[ ]" for which there "is not a 'correct' viewpoint." 57 Fed. Reg. 48,276, 48,278 (Oct. 22, 1992). By denigrating certain advice as "erroneous," H.B. 4429 § 2(5), Oklahoma assumes there must be a single right way to vote. "The people lose whenever the government transforms prevailing opinion into enforced conformity." *Chiles*, 146 S. Ct. at 1029 (cleaned up).

If ISS does not engage in this prognosticating, H.B. 4429 would force ISS to make misleading statements denigrating its services. ISS *does* consider "the impact of [its] recommended action on company investors," H.B. 4429 § 4(A)(1)(c), because ISS gives advice based on its clients' chosen criteria. Goldstein Decl. ¶ 47. ISS' detailed reports often contain dozens of pages of financial information and analyses—including tables reflecting the company's historic performance, valuation, executive compensation, and other financial metrics—along with analyses explaining ISS' "methods and processes." H.B. 4429 § 4(A)(1)(c); *e.g.*, Exs. 7-12. H.B. 4429 would force ISS to falsely say the opposite. Goldstein Decl. ¶ 47. And making ISS say it did not analyze "financial benefits

and costs" or "conclude[ ] what vote" "is most likely to positively affect shareholder value," H.B. 4429 § 4(A)(1)(c), misleadingly suggests that such an analysis is possible, that there is a single right answer, and that ISS' reports lack rigor. Goldstein Decl. ¶ 47. That "plainly alters the content" of ISS' speech. *Nat'l Inst. of Fam. & Life Advocs. (NIFLA) v. Becerra*, 585 U.S. 755, 766 (2018) (cleaned up). H.B. 4429 worsens the harm by making ISS broadcast those statements to the subject companies and on ISS' website. H.B. 4429 § 4(A)(1)-(3). "[R]equiring a company to publicly condemn itself" is "constitutionally offensive." *NAM v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (citation omitted).

On top of that, H.B. 4429 would force ISS to reveal confidential information about the proprietary investment management strategies of its clients—that "identifies the service" and "the recommendation or policy" ISS provided—to the companies that are the subject of the advice. H.B. 4429 § 4(A)(1), (2); *see* Goldstein Decl. ¶ 49. A requirement to turn over "customers' personal information" "compels" speech. *DoorDash, Inc. v. City of New York*, No. 25-81, __ F.4th __, 2026 WL 2249119, at *4-5 (2d Cir. Aug. 5, 2026).

Either way, H.B. 4429 would make ISS "create speech on weighty issues with which [ISS] disagrees"—that clients have not asked ISS for—and then disseminate that speech to an audience ISS has not chosen. *303 Creative*, 600 U.S. at 599. That is compelled speech.

**3. The State Cannot Show That H.B. 4429 Satisfies Strict Scrutiny.**

If strict scrutiny applies, this law is unconstitutional, as Kansas and Indiana acknowledged in ISS' challenges to those states' statutes. *See Kobach*, 2026 WL 1815236, at *8 (noting that this "position is wise and well taken"); *Rokita*, 2026 WL 1847882, at *6. Oklahoma likewise cannot show that H.B. 4429 is "narrowly tailored to serve compelling

state interests." *NIFLA*, 585 U.S. at 766 (citation omitted).

Start with Oklahoma's purported interests. H.B. 4429 labels proxy advisors' noncompliance with the law a "deceptive trade practice." H.B. 4429 § 5(A). It does so not to protect investors from deception, which federal and state law already do.[3] Instead, it does so to alleviate the Attorney General's need to prove the "deception" element of a deceptive trade practice claim—i.e., that a client who received a non-management-aligned recommendation from ISS was actually deceived. The First Amendment forbids states from adopting such "broad prophylactic rule[s]" on speech "lacking any nexus to the likelihood that the [speech] is fraudulent." *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 619 (2003) (cleaned up).

Strict scrutiny requires Oklahoma to "specifically identify an 'actual problem' in need of solving." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (citation omitted). There is none here. The supposed objects of H.B. 4429's protection—sophisticated institutional investors—do not need it: ISS' clients tell ISS what information they want to receive and they vote "independently" of ISS' advice. Ex. 25 at 8-9 (N.Y. State Common Retirement Fund); Ex. 26 at 2 (T. Rowe Price); *accord* Ex. 27 at 2-4 (Council of Institutional Investors). It is not "fraud for [ISS] to be providing these customers the information that they have sought." Hr'g Tr. 98-99, *ISS v. Paxton*, No. 1:25-cv-1160 (W.D. Tex. Aug. 29, 2025), ECF No. 44. Whatever "[t]ransparency" the law

---

[3] A "proxy advisory firm that deceives a client or fails to act in a client's interests" is subject to federal and state prohibitions on fraud, plus state tort liability. *ISS*, 718 F. Supp. 3d at 27; 57 Fed. Reg. at 48,278-79 (SEC's conclusion that existing rules "provide adequate protection against fraudulent and deceptive communications to shareholders").

claims, H.B. 4429 § 1, Oklahoma has "no evidence" that ISS' "clients have been confused or deceived," *Rokita*, 2026 WL 1847882, at *9. ISS offers detailed explanations about its methodologies under its Benchmark and Thematic Policies. Goldstein Decl. ¶¶ 26-31. And ISS' clients have the opportunity to design Custom Policies and thus know exactly what they are asking ISS to consider.[4] *Id.* ¶¶ 22-25. ISS' detailed reports often contain extensive financial information and analyses, but do "not purport to quantify or model the financial impact on company stock value of a particular vote recommendation." *Id.* ¶ 44. ISS is also clear that its clients "must determine whether and how to incorporate research or ratings into their investment decision-making process." Ex. 13 at 5.

As the formal legislative findings make clear, H.B. 4429's real aim is to facilitate speech by publicly traded companies to "[ ]rebut" what Oklahoma sees as "erroneous proxy voting recommendation[s]." H.B. 4429 § 2(5). That naked desire "to correct the mix of speech" or "yield[ ] greater balance in the marketplace of ideas" is a goal "the government may not pursue." *Moody v. NetChoice, LLC*, 603 U.S. 707, 740-742 (2024).

Besides lacking a compelling interest, the State cannot show the law is narrowly tailored. H.B. 4429 is "wildly underinclusive" as a deception-prevention tool. *NIFLA*, 585 U.S. at 774. Company managers are not all-knowing, yet proxy advisors that uncritically adopt management's views are unencumbered. Nor does the law have anything to say about public companies that encourage shareholders to cede voting rights to the company

[4] Indeed, while Oklahoma pension systems are not ISS clients, H.B. 4429's sponsor has acknowledged that "ISS [and] Glass Lewis" "could structure their service to our systems in any way we would ask for it," including eschewing "ESG." Ex. 21 at 6 (3/4/2025 Tr.).

in perpetuity[5] or groups that offer free "automate[d]" voting for anti-"woke" views[6]—even if that advice is not based on *any* analysis. H.B. 4429's carveouts confirm that the law "disfavor[s] a particular speaker or viewpoint." *NIFLA*, 585 U.S. at 774 (citation omitted).

H.B. 4429 is also "seriously overinclusive" as a deception-prevention measure, which is independently fatal. *Brown*, 564 U.S. at 804-805. The law applies regardless of what ISS clients have asked ISS to consider and regardless of any risk that clients are confused about ISS' services. There is no evidence ISS' clients are misled: Proxy voting items are public; ISS' reports generally include, among other information, the company's or proponent's statements on the proposal, *e.g.*, Ex. 7 at 53-54; and companies have ample channels to express their views.[7] A global "prophylactic rule of compelled speech" like H.B. 4429 is by definition "not narrowly tailored." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 798 (1988). Moreover, it is independently fatal that the Legislature did not consider "more benign and narrowly tailored options." *Id.* at 800.

**4. The State Cannot Show A Commercial-Speech Exception Applies.**

Because H.B. 4429 is viewpoint discriminatory, strict scrutiny applies. This Court thus need not decide whether the compelled speech is commercial or noncommercial. *See*

---

[5] Ex. 30 (Exxon Mobil Corp., Letter to SEC (Sep. 15, 2025), https://perma.cc/7JB5-9S4G).

[6] Ex. 31 (Conservative Group Launches Proxy Navigator Tool to Fight Woke Corporations (Mar. 7, 2024), https://perma.cc/MVB9-DNVV).

[7] *E.g.*, Ex. 33 (*JPMorgan Pushes Back On ISS Recommendations On Severance, Independent Chair*, Reuters (May 14, 2024), https://tinyurl.com/58u7as2j); Ex. 24 at 8 (SEC Investor Advisory Committee) (companies engage in "counter-speech" by filing "proxy supplements challenging proxy advisor opinions"); Ex. 28 at 2 (Elliott Mgmt. Corp.) (public companies "have access to other avenues including the media").

*Kobach*, 2026 WL 1815236, at *8; *cf. Animal Legal Def.*, 9 F.4th at 1236 ("viewpoint-discriminatory regulation" of even "unprotected speech" is still "subject to strict scrutiny"). In any case, the commercial-speech doctrine cannot save H.B. 4429.

*First*, ISS' "voting recommendations are not commercial speech." *Kobach*, 2026 WL 1815236, at *9. At its core, commercial speech "does no more than propose a commercial transaction," *United States v. Wenger*, 427 F.3d 840, 846 (10th Cir. 2005) (citation omitted), but ISS' advice to existing clients about issues in shareholder voting is "not offering a product for sale" or otherwise proposing commercial transactions. *Kobach*, 2026 WL 1815236, at *9. Nor does ISS' speech satisfy any of the factors "distinguish[ing] commercial speech from non-commercial speech." *Id.* ISS' "voting recommendations are not advertisements," which is "the quintessential commercial speech." *Id.*; *see Rokita*, 2026 WL 1847882, at *7 (ISS is "not engaged in commercial advertising"); *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 970 (10th Cir. 1996) (commercial speech is "essentially . . . advertising"). ISS' recommendations do not "refer[] to a specific product"; they "*are* the product." *Kobach*, 2026 WL 1815236, at *9 (citation omitted). And ISS' speech is not "motivated by an economic interest" in any relevant way, *Wenger*, 427 U.S. at 847 (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983)); ISS is paid regardless of the contents of its advice, Goldstein Decl. ¶¶ 16, 20, 33—not "for the specific vote," *Kobach*, 2026 WL 1815236, at *9. Speech is "not transformed into commercial speech merely because [it is] sold for profit." *Cardtoons*, 95 F.3d at 970. Moreover, ISS' speech is not of a "mundane commercial nature"; it has "stir[red] the passions of many." *See Harris v. Quinn*, 573 U.S. 616, 648

(2014) (citation omitted).[8] At the very least, any commercial aspect is "intertwined with otherwise fully protected speech," so strict scrutiny applies. *Riley*, 487 U.S. at 796.

*Second*, even if ISS' speech were commercial, it would not trigger the relaxed *Zauderer* standard, which is "limited to purely factual and uncontroversial information about the terms under which services will be available" in the context of "commercial advertising." *NIFLA*, 585 U.S. at 768-769, 771 (quoting *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985)) (ellipses omitted). *Zauderer* is "not applicable" because H.B. 4429 forces ISS to make "confusing or deceptive" statements based on the State's "opinion-based" definition of "financial analysis," with which ISS disagrees. *Rokita*, 2026 WL 1847882, at *6-8; *see Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006); *NAM*, 800 F.3d at 529-530. H.B. 4429 compels these statements in the context of controversial topics, including, for example, climate change and abortion.[9] And the issues that otherwise come up for shareholder votes routinely involve "widespread, good-faith dispute[s] over the topic." *See Free Speech Coal., Inc. v.*

---

[8] *E.g.*, *Defense of Proxy Advisors* at 1309 ("Corporate managers dislike the large proxy advisors . . . because of the voting advice they give."); Ex. 34 (Marco Quiroz-Gutierrez, *With $1 Trillion Pay Package On The Line, Elon Musk Blasts Influential Firms Telling Shareholders To Reject It: 'Those Guys Are Corporate Terrorists'*, Fortune Mag. (Oct. 23, 2025), https://tinyurl.com/3kd77puw); Ex. 29 at 5 (Better Markets) ("Silencing the proxy advisory firms has been on the wish-list of corporate management . . . for years"); Ex. 35 ("business groups are going after proxy advisers to silence shareholders by cutting them off from the rigorous research needed to scrutinize gaudy pay packages and evaluate complicated proposals on topics such as climate change and minimum wage hikes").

[9] *E.g.*, Ex. 6 at 10 ("climate-focused specialty proxy voting policy"); Ex. 5 at 119, 121 (Catholic Faith-Based Policy advising support for shareholder proposals asking companies to "stop manufacturing abortifacient drugs" or to report on "company policies related to the sale of mature-rated video games to children" or "involvement with pornography").

*Paxton*, 95 F.4th 263, 282 (5th Cir. 2024), *aff'd on other grounds*, 606 U.S. 461 (2025).

*Third*, even if *Zauderer* did apply, H.B. 4429 cannot survive because the law is "unjustified [and] unduly burdensome." *NIFLA*, 585 U.S. at 768. The supposed harms motivating the law are "purely hypothetical," *Rokita*, 2026 WL 1847882, at *7 (citation omitted), and the law is both "broader than reasonably necessary" and "curiously narrow," *NIFLA*, 585 U.S. at 776-777 (citation omitted); *see supra* pp. 16-17. H.B. 4429 also "unduly burdens" ISS' speech because the "detail required" by the "government-scripted, speaker-based disclosure requirement" "effectively rules out" speech. *NIFLA*, 585 U.S. at 777-778 (citation omitted); *see* Goldstein Decl. ¶¶ 52, 54-55 ("impossible" to comply); *Rokita*, 2026 WL 1847882, at *7-8 (identical law "imposes heavy burdens").

*Finally*, intermediate scrutiny is inapplicable. Where *Zauderer* does not apply—because the compelled speech is "neither purely factual nor uncontroversial"—courts "must apply strict scrutiny," not intermediate scrutiny. *Ent. Software Ass'n*, 469 F.3d at 652-653; *see Chiles*, 146 S. Ct. at 1022. And even where *Zauderer* applies, a law that fails *Zauderer*'s less exacting review—because it is unjustified or unduly burdensome—necessarily fails any higher standard. But H.B. 4429 "does not pass" even intermediate scrutiny, *see Rokita*, 2026 WL 1847882, at *8; ISS' speech concerns lawful activities, H.B. 4429 is not tailored to any substantial interest, and Oklahoma failed to consider less-restrictive alternatives. *See NIFLA*, 585 U.S. at 773-774, 777.

### B. H.B. 4429 Is Unconstitutionally Vague As Applied To ISS.

A law is too vague if it (1) fails to give "fair notice" of the conduct required, or (2) permits "seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*,

567 U.S. 239, 253 (2012) (citation omitted). These tests are even "more stringent" where the "law interferes with the right of free speech," *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1234 (10th Cir. 2023) (citation omitted), which "need[s] breathing space to survive," *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 604 (1967) (citation omitted). H.B. 4429 flunks each test. Its intricate scheme—backed by threats of prison and ruinous fines—aims to dissuade proxy advisors from breaking with management at all by placing a steep price on the "right to voice dissenting views." *Chiles*, 146 S. Ct. at 1024.

**1. H.B. 4429 Leaves ISS Guessing How To Comply.**

H.B. 4429 is vague because people of "common intelligence must necessarily guess at its meaning and differ as to its application." *Fox*, 567 U.S. at 253 (citation omitted). On the front end, the law's triggers are not "clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). It applies when "a proxy advisor makes a recommendation against company management" on a "proposal," H.B. 4429 § 4(A), (B), but it offers no guidance about whether the law applies if company management takes no position on a proposal, *e.g.*, Ex. 7 at 2, 43, or if ISS recommends abstaining—and if the answer depends on how a particular company's bylaws treat abstentions. *Compare* Ex. 7 at 18 (at Tesla, abstentions count as "against" votes), *with* Ex. 11 at 18 (at Exxon, abstentions not counted).

H.B. 4429's trigger also contains confusing references to "proxy advisory service," H.B. 4429 § 4(A), (B)—a phrase separately defined to include not just advice on a particular proposal, but also "research and analysis," "development of proxy voting recommendations," and "a rating or research regarding corporate governance," *id.* § 3(7)—making it unclear whether only against-management advice on a particular proposal

triggers the law, or whether ISS' broader services do too. *See* Goldstein Decl. ¶ 53(b). The same definition refers to services "provided in connection with or in relation to a company or are provided to any person in this state." H.B. 4429 § 3(7). The "in relation to a company" phrase is cryptic, *see Wyo. Gun Owners*, 83 F.4th at 1237, and—because it appears not to be bounded by the "in this state" limitation—seems to reach ISS' advice to out-of-state clients about companies anywhere. *See* Compl. ¶ 81.

When H.B. 4429 applies, it leaves substantial uncertainty about how to comply. The law's requirements differ depending on whether ISS has performed a "written financial analysis," H.B. 4429 §§ 3(10), 4, but that turns on undefined phrases like "short-term and long-term" horizons, *id.* § 3(10)(a), which differ between investors, *see* Goldstein Decl. ¶ 53(d). It also refers to "the impact . . . on company investors," "financial benefits and costs to the company," and "shareholder value," *id.* § 4(A)(1)(c), without saying whether those phrases mean the same thing, require quantification, or account for qualitative factors that may depend on the client's chosen policy.[10]

Other compliance questions abound. How much information need ISS give to company boards to have "identifie[d] the service being provided" to each client and "identifie[d] the recommendation or policy at issue"? *Id.* § 4(A)(1), (2). Do the phrases "concurrently" and "within a reasonable time" mean different things, and how much time

[10] Kansas and Indiana took opposite views on virtually identical language: Kansas says that a "written financial analysis" does not require "any 'quantification,' " Kansas Opp. 29, *ISS v. Kobach*, No. 2:26-cv-02254 (D. Kan. May 29, 2026), ECF No. 33, while Indiana says that an "advisor does not perform a 'written financial analysis' " if "an issue cannot be quantified," Indiana Br. 8, *ISS v. Rokita*, No. 1:26-cv-00717 (S.D. Ind. July 10, 2026), ECF No. 70; *see* Indiana Opp. 8-9 (S.D. Ind. May 20, 2026), ECF No. 46.

is ISS afforded? *Id*. § 4(A)(1), (2), (B)(1)-(3). Is a "conspicuous disclosure," *id.* § 4(A)(1), (3), different from a "*clear and* conspicuous disclosure," *id.* § 4(B)(1) (emphasis added), and what suffices? For the client "disclosures," may ISS add general language to a report's last page, or is a "disclosure" required for each recommendation? *Id.* § 4(A)(1), (B)(1). Uncertainty is not trivial when the law threatens ISS with years in prison and massive fines.

**2. H.B. 4429 Invites Arbitrary Enforcement.**

H.B. 4429 is also vague because, for the same reasons that ISS is left guessing how to comply, the law "invites arbitrary enforcement." *Wyo. Gun Owners*, 83 F.4th at 1238. The law's imprecision "vests unfettered discretion in the hands of the government to determine whether [a proxy advisor] has committed a violation on an 'ad hoc and subjective basis,' " *United States v. Lesh*, 107 F.4th 1239, 1250 (10th Cir. 2024) (citation omitted), as Kansas's and Indiana's differing interpretations underscore. That opens the door to enforcement based on "personal predilections," *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (citation omitted), that may target proxy advisors or particular advice Oklahoma disfavors. Indeed, the Attorney General has cosigned letters to ISS, institutional investors, and Congress criticizing ESG considerations and threatening legal action. Exs. 36-38.

**C. H.B. 4429 Is Impermissibly Extraterritorial.**

States may not directly regulate beyond their borders. This extraterritoriality principle is reflected in "the Constitution's structure and the principles of 'sovereignty and comity' it embraces," as well as a "number of the Constitution's express provisions." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 & n.1 (2023) (citation omitted); *see id.* at 408-410 (Kavanaugh, J., concurring in part and dissenting in part). The dormant

Commerce Clause, for example, forbids states from directly regulating "conduct occurring outside [the state's] borders." *ACLU v. Johnson*, 194 F.3d 1149, 1161 (10th Cir. 1999); *accord Edgar v. MITE Corp.*, 457 U.S. 624, 640-643 (1982) (plurality op.). The Fourteenth Amendment's Due Process Clause likewise precludes states from "regulat[ing] and control[ling] activities wholly beyond [their] boundaries." *Watson v. Emps. Liab. Assurance Corp.*, 348 U.S. 66, 70 (1954). More broadly, "the very nature of the federal system," *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 154 (2023) (Alito, J., concurring in part and concurring in the judgment), is "built upon 'the autonomy of the individual states within their respective spheres,' " *Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 490 (4th Cir. 2007) (citation omitted). Put simply, the Constitution forbids a state's statutes from "operat[ing] beyond the jurisdiction of that State." *N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914).

H.B. 4429 violates this bedrock rule by dictating what ISS must say outside Oklahoma. When ISS advises out-of-state clients in places like Illinois or Switzerland to vote "against" the advice of an Oklahoma-based company like the Williams Companies, H.B. 4429 would require ISS to send warnings to those out-of-state clients. H.B. 4429 § 4(A)(1), (B)(1)-(2). Likewise, when ISS advises its four Oklahoma-based clients to vote against the advice of out-of-state companies like Tesla or Amazon, H.B. 4429 would require ISS to send warnings to Tesla's and Amazon's boards of directors in Texas and Washington. *Id.* § 4(A)(2), (B)(3). The law would also make ISS post a warning on its website. *Id.* § 4(A)(3). H.B. 4429's "express language" forcing ISS to send out-of-state warnings exceed "the constitutional scope" of Oklahoma's authority. *Cont'l Res., Inc. v.*

*Wolla Oilfield Servs., LLC*, 510 P.3d 175, 181 (Okla. 2022).

## II. The Remaining Factors Overwhelmingly Favor Preliminary Relief.

"[I]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor." *Citizens United v. Gessler*, 773 F.3d 200, 218 (10th Cir. 2014) (citation omitted). But the remaining preliminary-injunction factors also favor ISS. *See Kobach*, 2026 WL 1815236, at *8; *Rokita*, 2026 WL 1847882 at *10-11. The "deprivation of a constitutional right is a prototypical irreparable injury," *AbbVie Inc. v. Drummond*, 808 F. Supp. 3d 1266, 1281 (W.D. Okla. 2025) (Wyrick, J.); indeed, "the loss of First Amendment freedoms" "unquestionably constitutes irreparable injury." *Gessler*, 773 F.3d at 218 (citation omitted). So do the "risk [of] civil fines," "possible criminal sanctions," and unrecoverable "large financial losses." *AbbVie Inc.*, 808 F. Supp. 3d at 1280-81; *see* Goldstein Decl. ¶¶ 41-55. Oklahoma "lacks 'an interest in enforcing a law that is likely constitutionally infirm.'" *AbbVie*, 808 F. Supp. 3d at 1281 (citation omitted). And Oklahoma has "no evidence" that upending "the status quo here"—allowing ISS to continue to speak freely—is likely to harm anyone in Oklahoma. *See id.*[11]

## CONCLUSION

This Court should enjoin Defendant and his successors, agents, employees, and all persons acting under his direction or control from taking any action to enforce H.B. 4429 against ISS, including but not limited to intervention in any private cause of action.

---

[11] The injunction should be issued without bond. The State is unharmed by enjoining enforcement of an unconstitutional statute against ISS, while requiring a bond would impair ISS' ability to exercise its constitutional rights. *See* Fed. R. Civ. P. 65(c); *Kobach*, 2026 WL 1815236, at *11; *AbbVie*, 808 F. Supp. 3d at 1282.

Respectfully submitted,

/s/ Robert G. McCampbell
ROBERT G. MCCAMPBELL
Oklahoma Bar No. 10390
rmccampbell@gablelaw.com
NICHOLAS V. MERKLEY
Oklahoma Bar No. 20284
nmerkley@gablelaw.com
GABLEGOTWALS
499 Sheridan Ave., Suite 2200
Oklahoma City, OK 73102
(405) 235-5500

BRUCE D. OAKLEY*
bruce.oakley@hlc.com
HOGAN LOVELLS CADWALADER US LLP
609 Main Street, Suite 4200
Houston, TX 77002
(713) 632-1420

JESSICA L. ELLSWORTH*
jessica.ellsworth@hlc.com
DAVID M. FOSTER*
david.foster@hlc.com
MICHAEL J. WEST*
michael.west@hlc.com
DANA A. RAPHAEL*
dana.raphael@hlc.com
HOGAN LOVELLS CADWALADER US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

* application for pro hac vice pending

*Counsel for Plaintiff Institutional Shareholder Services Inc.*

August 26, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2026, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, and served the filing by mail to:

Gentner Drummond, Attorney General of the State of Oklahoma
Office of the Oklahoma Attorney General
313 NE 21st Street
Oklahoma City, OK 73105

/s/ Robert G. McCampbell
Robert G. McCampbell