# Exhibit 15

# Summary of Bowyer Research Proxy Voting Guidelines for States

## Introduction to Proxy Voting

**Shareholder's Right to Vote**
Common stock shareholders in public corporations typically have the right to vote on matters of corporate policy, such as electing directors, approving dividends, or initiating mergers or acquisitions. The number of votes a shareholder has corresponds to the number of shares they own. Shareholders can vote in person at the annual meeting or by proxy. Shareholder voting rights are governed by the corporation's charter, bylaws, state laws, and SEC regulations

**Voting on Proposals**
Proxy proposals are issues or resolutions that are submitted by shareholders or management for a vote at the annual meeting. Shareholders can vote on proxy proposals by mail, internet, phone, or in person. The proxy statement provides background information and recommendations on each proposal. Shareholders can vote for, against, or abstain from each proposal. Proxy voting is important for influencing corporate governance and expressing shareholder views on various environmental, social, and governance (ESG) issues (Proxy voting policy for U.S. portfolio companies).

**Delegating Votes**
Corporate proxy voting is a way for shareholders of a company to participate in the decision-making process of the company without attending the annual meeting. Shareholders can delegate their voting rights to someone else, for example to a financial advisor who will vote on their behalf in alignment with their principles and interests, or they can retain control of their votes for themselves. Shareholders can vote on various issues, such as electing directors, approving executive compensation, or supporting shareholder proposals. Corporate proxy voting is important for ensuring transparency, accountability, and integrity in corporate governance.

**Proxy Advisory Services' Role**
Proxy advisory services are firms that provide research and recommendations to institutional investors on how to vote their shares in corporate matters. They help investors make informed decisions based on the best interests of their clients and the long-term value of the companies. Proxy advisory services also facilitate the voting process by collecting and submitting proxy ballots on behalf of their clients.

Some of the benefits of proxy advisory services are:

- They reduce the information and transaction costs for investors who own shares in many companies across different markets and sectors.
- They provide analysis of corporate governance, performance, and ESG issues.
- They promote shareholder engagement and activism by raising awareness of important topics and proposals.

- They foster accountability and transparency in corporate governance by monitoring and disclosing the voting behavior of investors and companies.

Some of the challenges and criticisms of proxy advisory services are:

- They may have conflicts of interest or biases that affect their voting recommendations, such as providing consulting services to companies or having ideological agendas.
- They may have limited resources or expertise to cover all the companies and issues that they advise on, leading to errors or oversights.
- They may have a one-size-fits-all approach that does not account for the specific circumstances and preferences of each investor and company.
- They may have undue influence or power over the voting outcomes, especially if investors rely too much on their advice without conducting their own due diligence
- They may be disproportionately influenced by activists groups or investment company representatives from the Stewardship, ESG or DEI departments, which might create a selection bias problem and a lack of ideological diversity.

There are three primary proxy advisory firms in the United States: Institutional Shareholder Services (ISS), Glass Lewis & Co., Egan-Jones Proxy Services. However, ISS and Glass Lewis share approximately 97 percent of the market and have significant influence over the voting decisions of institutional investors and the governance choices of publicly traded companies.

## Proxy Advisory Services' Pro-ESG Issues

Some critics argue that proxy advisory services have a pro-ESG political bias that affects their voting recommendations. They claim that proxy advisory services:

- Have conflicts of interest or biases that affect their voting recommendations, such as providing consulting services to companies or having ideological agendas
- Have a one-size-fits-all approach that does not account for the specific circumstances and preferences of each investor and company
- Have undue influence or power over the voting outcomes, especially if investors rely too much on their advice without conducting their own due diligence
- Encourage high support for ESG shareholder resolutions, which demonstrates a liberal bias and is hostile to the oil and gas industry
- Favor left-leaning proponents and freeze out conservatives

Other critics have argued that proxy advisory services are insufficiently committed to ESG and suffered from conservative bias.

**How Proxy Voting Guidelines Work**

The earlier wave of pro-ESG criticism led to the creation of a menu of proxy guideline offerings which are different from the advisory services benchmark or "house" policies, including options focused on sustainability, or on union concerns or a particular interpretation of Catholic social policy. These options are typically more consistently supportive of ESG than house policies. Service has more recently made available options aligned with the board of management of the company, but those are not reliably non-ESG in their approach which we will see below. Proxy advisory services are firms that provide research and recommendations to investors on how to vote their shares, based on their own menu of proxy voting guidelines or the

investors' customized guidelines. In our case, we have created an extensive custom guideline consistent with the more traditional understanding of fiduciary obligation which held prior to the emergence of the ESG movement and the shift towards stakeholder capitalism. Investors can use the proxy voting guidelines and advice from proxy advisory services to make informed and consistent voting decisions that align with their interests and goals or use a customized set of guidelines consistent with their values. However, investors are ultimately responsible for their own proxy voting decisions and should not rely solely on proxy advisory services without conducting their own due diligence and oversight.

Proxy voting guidelines can be general or specific, depending on the type and complexity of the issues to be voted on. Some common topics that proxy voting guidelines may cover are:

- Board composition, independence, diversity, and performance
- Executive compensation, equity plans, and incentives
- Audit and financial reporting quality and integrity
- Shareholder rights, such as voting power, anti-takeover measures, and shareholder proposals
- Environmental, social, and governance (ESG) issues, such as climate change, human rights, and diversity and inclusion increasingly included proposals designed to counter ESG proposals.

Our approach is deeply skeptical regarding ESG and therefore goes beyond simply not supporting it and onto actively countering it when we believe it conflicts with rigorous definitions of pecuniary return to shareholders, which we think it quite commonly does.

Proxy voting guidelines can be developed by different sources, such as:

- Proxy advisory services, which are firms that provide research and recommendations to institutional investors on how to vote their shares, based on their own proxy voting guidelines or the investors' customized guidelines
- Institutional investors, such as mutual funds, pension funds, and hedge funds, which may have their own proxy voting guidelines or adopt those of proxy advisory services or other organizations
- Individual investors, who may follow their own preferences or the guidance of proxy advisory services, institutional investors, or other sources
- Or a trusted third party such as the investor's financial advisor or subadvisor. This is what we offer, a highly transparent set of guidelines from a trusted third party which is well established in opposition to ESG as a movement which tends to politicize corporate governance. More below on our custom approach.

**More on How Custom Guidelines Work**
Custom guidelines are proxy voting guidelines that are tailored to the specific preferences and goals of an individual or institutional investor or of an institution representing individual investors. Custom guidelines allow investors to have more control and flexibility over their voting decisions, as well as to reflect their values and interests on various corporate matters. Custom guidelines can be developed by the investors themselves, or by proxy advisory services or other third-party providers, based on the investors' input and feedback. See below for more information about our custom guidelines.

To create custom guidelines, investors need to:

- Define their objectives and criteria for proxy voting, such as maximizing returns, enhancing governance, or advancing or opposing ESG issues.
- Modify or supplement the existing guidelines to suit their own preferences and needs, or create new guidelines from scratch. For reasons discussed below, we ultimately chose to create our own guidelines from scratch.

- Communicate their custom guidelines to their proxy advisory service or other provider, and ensure that they are implemented correctly and consistently. Proxy Advisory Services are often still used to implement voting policies even in cases in which proxy voting guidelines do not follow the services recommendations and are instead creating from scratch. For example, although we do not follow any Proxy Advisory Service's pre-packaged recommendations and have created our own guidelines, for reason to be discussed below, we still depend on a service to actually carry out the voting process for us.

Custom guidelines can help investors achieve better alignment and outcomes with their proxy voting, as well as to differentiate themselves from other investors. However, custom guidelines also require more time, resources, and expertise to develop and maintain, however, we have already expended the time and resources and procured the expertise to create custom guidelines which are designed to align with public fiduciaries which hold to a strong view of shareholder capitalism and a negative view towards stakeholder-based approaches.

**Fiduciary Responsibilities and Proxy Voting**
The principle of fiduciary responsibility applies to corporate proxy voting because investors who vote proxies on behalf of their clients or beneficiaries have a legal duty to act in their best interests. This means that investors must exercise their proxy voting rights prudently, loyally, and cost-effectively, based on relevant facts and research, and without conflicts of interest or undue influence. Institutional investors must also document and disclose their proxy voting policies and procedures, and monitor and evaluate their proxy voting outcomes. However, the definition of what constitutes a fiduciary approach to proxy voting has become a highly contested space, with some arguing for ESG as an effective way to manage risk and others arguing that ESG is in origin, or at least has become, politicized. Disagreements about what is and what is not fiduciary is one of the reasons that custom policies are built and are rising in demand. We produce annual written reports on our proxy voting policies which are available to clients, so they can judge for themselves whether our concept of fiduciary duty aligns with their own.

**Shareholder Capitalism is Fiduciary, and Stakeholder Capitalism is Not**
Shareholder capitalism is the view that the primary purpose of a corporation is to maximize the value of its shares for the benefit of its shareholders. Stakeholder capitalism is the view that the corporation should consider the interests and needs of all its stakeholders, such as employees, customers, suppliers, communities, and the environment, in addition to shareholders.

Shareholder capitalism is consistent with fiduciary responsibility, which is the legal duty of directors and executives to act in the best interests of the corporation and its shareholders. Stakeholder capitalism, however, challenges this view and suggests directors should expand their definition of fiduciary duty, by considering the impact of board decisions on all stakeholders — both internal and external — despite there currently being no legal requirement to do so.

The case for shareholder capitalism and fiduciary responsibility rests on the following arguments:

- Shareholder capitalism promotes economic efficiency and innovation, by aligning the incentives of managers and shareholders, and by allowing the market to allocate resources to the most productive and profitable uses. Stakeholder capitalism, on the other hand, creates conflicts of interest and trade-offs among different stakeholder groups, and may result in suboptimal decisions and outcomes.
- Shareholder capitalism respects the contractual rights and obligations of the parties involved in the corporation, by honoring the voluntary agreements between shareholders, managers, and other stakeholders. Stakeholder capitalism, however, may violate these contracts and imposes externalities and

costs on shareholders, who are the residual claimants and risk bearers of the corporation.

- Shareholder capitalism enhances accountability and transparency, by providing a clear and measurable objective for corporate performance, and by subjecting managers to the discipline and oversight of shareholders and the market. Stakeholder capitalism, however, reduces accountability and transparency, by introducing multiple and vague objectives for corporate performance, and by allowing managers to escape scrutiny and responsibility by claiming to serve the interests of various stakeholders.

Therefore, shareholder capitalism and fiduciary responsibility are the best way to ensure that corporations create value for shareholders and society, while stakeholder capitalism and fiduciary expansion are likely to harm both shareholders and stakeholders in the long run.

## Overview of Our Principles Regarding Proxy Voting and Engagement

Our guidelines are designed to appeal to investors who hold to a traditional understanding of the obligations of a company towards its shareholders--that is, a focus on shareholder capitalism as opposed to stakeholder capitalism-- and which are deeply skeptical about an ESG approach to corporate governance. While this means that although some might try to describe these guidelines as conservative, they are not designed to impose conservative politics on companies. Instead, they seek to depoliticize corporate governance, to put hotly debated issues such as climate change, abortion and racial justice back in the electoral process and out of corporate governance.

In application this means that the guidelines:

- Oppose attempts to pressure companies to diminish the use of fossil fuels.
- Oppose proposals which pressure financial companies to divest from fossil fuels.
- Oppose attempts to use congruency proposals to defund professional associations and advocacy groups along ideological lines.
- Oppose proposals which pressure companies to disinvest from pro-life states.
- Oppose proposals which seek to embarrass companies for seeking lower-tax jurisdictions.
- Oppose proposals which seek to focus management toward broad social goals (such as racial justice or general market or economic performance) as opposed to matters under company control.
- Oppose proposals which discourage financial services offered to businesses engaged in transactions protected by the 2nd Amendment, or impose surveillance obligation towards the same.
- Support proposals rescinding past decarbonization efforts.
- Support proposals that call into question debanking and deplatforming practices along religious or political lines, and
- Support proposals which discourage companies from speaking out on divisive non-core political issues regarding abortion, social justice, and sexual identity issues.
- Support proposals which examine the risk that DEI programs create legal risk in light of the Harvard SCOTUS ruling regarding race and gender quotas.

Our guidelines differ from board or management recommendations in that they oppose, for example, decarbonization pledges that come from management. Furthermore, we support anti-ESG shareholder proposals that seek to rescind past

decarbonization proposals and past racial equity audit proposals. Our guidelines also support proposals seeking to quantity the financial risks of decarbonization. Proposals such as these which come from outside the usual ESG community do not receive management endorsement, whereas they do tend to receive support from us.

However, we do not offer universal support for proposals from anti-ESG groups. We oppose any such proposals which seek to impose conservative politics on the company in the same way that we oppose proposals which seek to impose liberal ideology on companies. We also do not universally oppose proposals from pro-ESG groups. When pro-ESG proponents identify genuine risk factors, for example sexual predation in online forums or risks arising from sexual harassment in companies with a problematic history, we support them.

We differ from board aligned policies offered by large proxy services in that we do not impose penalties by voting against board members based on lack of racial and gender diversity. Votes against board members are based entirely on the financial underperformance of the company compared to peers.

In addition, we diverge from management recommendations in that our guidelines take a very strict approach when it comes to situations in which board/management interests diverge from shareholder interests. Examples include weakening of shareholder voting rights, compensation practices not aligned with stockholder returns, protections of management perks and job security and shareholder asset dilution.

# Appendix I

## Proxy Voting Instructions FAQ

*What is proxy voting?*

In this context, proxy voting refers to the process by which shareholders of publicly traded companies cast votes on topics such as who will represent their interests on the board of directors, various housekeeping items, and various resolutions placed on the ballot by other shareholders.

*What is the importance of shareholder proposals?*

A high proportion of shareholder proposals are politically sensitive and come from proponents who are aligned with the ESG (environment, social, governance) approach to investing, which is increasingly seen as seeking to advance political causes via the operation of financial markets. Recently, however, proposals are coming from other groups that are acting to counteract ESG activist groups. Currently the proportion of pro-ESG proposals to anti-ESG proposals has gone from roughly twenty to one, to roughly ten to one. That trend is likely to continue with anti-ESG proposals bridging the gap.

*Why did you create a set of proxy voting instructions?*

Proxy voting is extremely complex. There are several hundred shareholder proposals per year and that number is rising rapidly. Shareholder proposals often couch a highly politicized agenda in innocuous sounding language. Shareholder activists obfuscate their intentions by creating misleading titles in increasingly elaborate attempts to “hack” the rules used by Proxy Advisory Services and asset manager to gain’

support. Often, the intent of a proposal is hidden in the details of the proposal's Supporting Statement, which must be read in full to discover the intended purpose.

*Why not just trust the Proxy Advisory Service Benchmark policies to determine our votes for us?*

Many public fiduciaries disagree with the benchmark recommendations of Proxy Advisory Services. Some seem these services as insufficiently aligned with the ESG movement. That is not our view. More recently an anti-ESG backlash has arisen and many have become more vocal in expressing the view that the services are overly aligned with ESG. While the latter have had some success in advocating for their polices in the process of forming Benchmark policies, nevertheless thus far they do not see those policies as fulfilling their needs. For example proxy services have not offered support for proposals that seek to counter ESG until now.

This holds true for all available options presented by these services, even the "Board Aligned" options which, while less favorable to ESG than other guidelines on offer, still do support ESG proposals from management (for example anti-fossil fuel proposals); oppose proposals from ESG skeptical points of view, as well as penalize boards for failing racial and gender diversity criteria.

*How are Bowyer Research Proxy Voting Policies Different?*

Bowyer Research Custom Guidelines evaluate every proposal through the standard of a narrowly focused definition of pecuniary benefit to the investor. This translates into general opposition to ESG proposals whether from shareholders of management. It does how, however, automatically vote against everything ESG. For example, data often point to the importance of governance factors (the G in ESG) as being relevant to shareholder interests. As a general rule, these policies are extremely skeptical of the E and S proposals, but less so of G proposals. In fact the guidelines are very tough on management in regards to governance issues. Examples would include any attempt to weaken shareholder rights or to reward CEOs with high salaries even when shareholder returns do not merit it. We believe that in proper corporate governance, CEOs should work for boards and boards should work for shareholders. We also have a 'no-excuses' policy on the reelection of board members when companies severely underperform their peer group—if the company severely underperformed its peer group, we vote against reelection of the board. From this standpoint, these policies vary significantly from management recommendations (though not necessarily from board-aligned policies in every case).

*Is this arrangement beneficial to ISS?*

Yes, the objective is a win/win. The top two services have 97% market share. It is not practical to offer solutions without working with the existing market leaders. And it is not practical to expect those firms to participate unless they benefit as well. This is the essence of capitalism, exchanges in which both parties win. This option responds to customer demand and offered something the marketplace wanted, but which had not previously been readily available.

*Did ISS write or contribute to these policies?*

No, this document was created without policy input from ISS. It represents Bowyer Research's point of view as well as BR's estimation of the needs expressed by a wide array of public and private fiduciaries which are not aligned with the ESG movement and stakeholder capitalism. There was cooperation between Bowyer Research and ISS in that the policies were written in a way which handshakes well with ISS's existing coding and implementation system, which allowed us to structure the guidelines in a way intended to minimize the likelihood of misunderstanding of the policies voting intent.

*How do these policies differ from a "board aligned" or "management aligned" approach?*

First it is important to understand the distinction between universally voting with board recommendations on the one hand and proxy advisory policies which are described as board or management aligned on the other. "Board aligned" policies do not actually always align with board recommendations. For example both major proxy advisors impose penalties in the form of adverse votes in cases in which the advisor deems the board insufficiently diverse according to race and gender (and in the case of one of the advisors "gender identity"). In addition, board aligned policies, while they default towards siding with management on proposals regarding disclosure of environment and social factors, nevertheless "In those circumstances where it is widely considered that greater disclosure will directly enhance or protect shareholder value and is reflective of a clearly established reporting standard in the market, the Global Board-Aligned Policy will generally recommend in support of such proposals." In other words, board aligned policies may possibly vote against the board on environment and social disclosure proposals based on industry standard practices. However, highly ESG-skeptical fiduciary entities may feel that industry standards have been overly influenced by ESG activists. Examples where Bowyer Research varies from board aligned policies based on “best practices” include support for or against board members; CEO pay, as well as mergers and acquisitions. Board aligned policies tend to follow “best practices” in corporate governance, but the problem is that such policies may have been disproportionately influenced by activists and academics often lacking skin in the game and often lack vigorous support in the financial data. Bowyer Research guidelines tend to take a more market driven approach. Adverse board votes are based on poor stock performance, not on alleged best practices.

Second, it is important to understand that boards oppose shareholder proposals over 90% of the time and this includes proposals from groups which are attempting to counter ESG influence in the boardroom. Typically these proposals come from conservative advocacy groups or asset managers, but often are designed to depoliticize the process. Thus far board-aligned policies have opposed all such counter-ESG proposals from outside the traditional "socially responsible" investing community.

Third, board aligned policies support pro-ESG proposals from the management team such as Net Zero commitments or Say on Climate proposals. Our policy is to oppose these proposals. We do not believe that companies ought to make even non-binding commitments to decarbonization in an uncertain future.

*Do these policies push conservative ideology onto companies?*

No, the approach is non-political and focused narrowly on pecuniary benefit to investors. This is not an attempt to move companies to the right, but rather an attempt to move them to neutral. That having been said, the guidelines do tend to support proposals from conservative groups, but only when those proposals themselves are focused on getting companies away from politics.

*Why do these voting instructions sometimes seem to support proposals that sound like they are coming from the left?*

Because often conservative groups that are promoting depoliticization use titles that mimic some of the language the left has used in the past. They do this because using similar language to past proposals (which have been upheld by the SEC) is estimated to help these new proposals also be upheld by the SEC based on past precedent. So, the language of “diversity” is used to discourage companies from discriminating based on viewpoint, which would not be fiduciary. The language of “racial equity audits” is used to examine whether companies have been engaged in illegal reverse discrimination or to call into question a travel subsidy offered only if the employee is

no longer pregnant when she returns. BR looks carefully at the details to make such distinctions clear.

*Is this offered to private asset managers that public fiduciaries use?*

Not at this time. This would only be available currently to the pension plans (or other similar public fiduciaries), not to their private asset managers. As such it is only applicable in situations in which the public fiduciary entity directly owns the underlying shares.

*Why not make this available to everyone?*

That is under consideration for later, but there are some practical challenges in implementing something like that in such a tight frame as would be required for use in 2024. BR has some existing contractual relationships with private clients that do not allow it to freely share these policies. Those contracts, however, do allow for these instructions to be made available to government funds.

*Why are these instructions so detailed?*

They are detailed in order to minimize the possibility that the clients' wishes will be misunderstood, and also to deal with the rapidly increasing variety of new types of proposals.

*Do you have research support for your positions?*

BR has an extensive library of white papers (currently over 300 of them) supporting the positions represented in the voting instructions.