# Exhibit 21

OKLAHOMA HOUSE OF REPRESENTATIVES

COMMITTEE ON GOVERNMENT OVERSIGHT

HEARING

MARCH 4, 2025

https://sg001-harmony.sliq.net/00283/harmony/en/
PowerBrowser/PowerBrowserV3/20260807/-1/54984?
startposition=20250304162004&mediaEndTime=
20250304163644&viewMode=2

(Excerpt 4:20:00 - 4:36:44)

Job No.: 8382028

Pages: 1 - 22

Transcribed by: Jackie Scheer

C O N T E N T S


| ADOPTION OF THE PCS | PAGE |
|---|---|
| Re: Bill 1170 | 3 |
| STATEMENT | |
| By Representative Lepak | 3 |
| QUESTIONS Re: Bill 1170 | 4 |
| VOTE | 20 |
| BILL PASSES | 20 |

P R O C E E D I N G S

REPRESENTATIVE LEPAK: -- so we should do that.

VICE CHAIR HAYS: Okay. We'll adopt the PCS --

REPRESENTATIVE LEPAK: -- and it includes everything that was in the recommendation.

VICE CHAIR HAYS: Got it. So without further objection -- and without any objection, we will adopt the PCS. You are now recognized to present House Bill 1170.

REPRESENTATIVE LEPAK: Thank you, Members. The PCS was filed after the policy hearing because it dropped some unnecessary duplicative language suggested by TRS. I can -- it's not there anymore but -- but that is what it was.

1170 was passed by the House in two different versions during the 59th legislature. It addresses a fiduciary's responsibility vis-a-vis our state pensions,

which as you know are teachers, police, fire, state employees, law enforcement, justices, and judges. And essentially it clarifies the non-pecuniary factors, such as the political or ideological factors shouldn't be a guide or should not guide a fiduciary's discretionary authority regarding investment device, proxy voting, plan administration, et cetera. Proxy services hired will be required to provide such a commitment in writing as need be.

Yield to questions.

VICE CHAIR HAYS: Member yields. Will we have any questions?

Representative Kelley, you are recognized for a question.

REPRESENTATIVE KELLEY: Thank you, Mr. Chairman.

Chairman Lepak, is -- is there an issue now with one of the systems that caused this bill?

REPRESENTATIVE LEPAK: With one of the

systems -- thank you for the question. Not specifically, no. I've -- I learned about this several years ago, independent of any activity here in the state.

VICE CHAIR HAYS: You are recognized for a follow-up.

REPRESENTATIVE KELLEY: Are you aware of how the proxy voting is currently being handled by the systems?

REPRESENTATIVE LEPAK: Thanks for the question. Well, there's a couple of different ways but if there's something specific, I'd be happy to -- to try to answer it, but what -- what's your context?

VICE CHAIR HAYS: You're recognized to clarify.

REPRESENTATIVE KELLEY: Thank you.

I guess my -- what I'm trying to get at is do you have any idea how many hundreds of thousands of proxies are voted by the systems on an annual basis?

REPRESENTATIVE LEPAK: Oh, I see. I

don't have a number for you. We could probably get that. I'm sure the -- the systems would be happy to provide such a number. There's a couple of different levels of -- of work here. Think about the big, you know, ISS, Glass Lewis. One of them actually came to meet with us, and I believe it was the teachers' -- teachers' system that brought them in, I can't remember, a couple years ago on a different matter, a different bill. And pretty much made it clear they could structure their service to our systems in any way we would ask for it. So if we were to ask -- my interpretation was if we were to direct them not to invest funds a certain way, you know, with organizations that do ESG scoring or have signed on to some, you know, net zero pact or something like that, that they could structure it for us and would be happy to -- I mean, that's the interpretation I had with them.

If you -- you may be referring to --

well, let me just stop there. I don't wanna assume what you're asking.

REPRESENTATIVE KELLEY: No, I mean, you're right. There -- there are two main firms that -- that do this and where my question is --

VICE CHAIR HAYS: You're recognized for your final follow-up.

REPRESENTATIVE KELLEY: Yeah, I'm sorry. Thank you, Mr. Chairman.

My question is simply is there a problem now, do we believe that any of our state systems are currently advocating for voting proxies for any other reason but pecuniary factors?

REPRESENTATIVE LEPAK: Thank you for the question. I don't know that I can say that. I think -- so if you -- if you rewind a couple of years to another bill that passed, the Energy Discrimination Elimination Act, which is currently been challenged in a court and is sitting before the Supreme Court, you

as you know, sitting on the board that this is where the treasurer creates a list of companies he believes are -- are using state funds for purposes other than what they should be. In other words, for some political or ideological purpose. If you're referring to that, then, yes, there are some firms listed there that in the treasurer's view fall into that category.

So depending on the system you're in, you may or may not be invested in them and -- and are required to divest (fade out) those firms over a period of time. So -- but -- but independent of that, do I believe that our boards are -- are acting with anything other -- no. I don't think there's an intent there to do that. However, they -- there may be some investment or some proxy service, and all this really suggesting is go find out and then make your decision.

REPRESENTATIVE KELLEY: Thank you, sir.

REPRESENTATIVE LEPAK: At least that's

the way I look at it.

VICE CHAIR HAYS: Representative Bennett, you are recognized for a question.

REPRESENTATIVE BENNETT: Thank you, Mr. Vice Chairman.

Okay. This legislation, if I -- if I understand correctly, is meant to say that -- that you're trying to protect us from making political investments, and in doing that, you're saying that, for example, furthering environmental, social, political, or ideological goals -- isn't this legislation political then?

REPRESENTATIVE LEPAK: Thank you for the question. No. What it's saying is go -- you -- you have a specific purpose. This is just -- this is limited to pension so let's move away from the EDEA and -- and broader scope there. It's limited to pensions. You have a specific purpose. It's addressed constitutionally. This clarifies what some of that means is -- is all this does. But is

it political, no. It's saying don't use our funds and invest because of some agenda and -- and everybody wants to talk about, you know, ESG, so let's kind of throw that out there.

If you're -- if you're using a fund that uses ESG scoring to determine where they're gonna put their money, there's two problems with that. One, it's not based on the numbers that you -- you're looking for, the returns you're looking for. But, secondly, and it's starting to bear out in the -- today, those turned out to be not very great investments and you're not doing your -- your clients, essentially, every retiree or potential retiree that is in one of these systems, doing right by using their dollars that way. So -- so it's the exact opposite. It's -- it's intended to ensure they're not being used that way.

VICE CHAIR HAYS: You're recognized for a follow-up.

REPRESENTATIVE BENNETT: Thank you Mr. Chairman.

Okay. Well, I think that's kind of shortsighted, with all due respect. Some investments may -- may seem today to be -- and this is so silly, but I'm thinking about it in my mind, QR codes. For some reason the first time we tried them as a society they didn't take off. Then COVID happened and no touch menus and all that, still frustrating to me, but they're everywhere. They were on my Braum's receipt at lunch today so now you know what I had for lunch. It was the double, it was the number two.

And so all that's to say that sometimes technology's advanced pretty rapidly, and I worry that when we put legislation in like this, it hinders our ability to take advantage of that in the long term. Why -- why can we not just rely on the money managers that we have to be making the best fiduciary decisions for us? It seems

counter-intuitive to that to set up sort of arbitrary barriers to them being able to do their -- their jobs.

REPRESENTATIVE LEPAK: Thank you. Well, if what you're -- if what you're thinking is that I -- take green energy. You can't invest in green energy because of what it is. That's not what this is. In fact, if you are applying the standards of a -- a reasonable -- and I forget the language that's in here, but basically -- I wanna say prudent man, that's not the language, but I'm gonna stumble with this.

You can -- you can incidentally consider these factors if they present economic risk or opportunities that qualified investment professionals would treat as material economic considerations under generally accepted investment theories. So -- so if your suggestion that, well, we can't invest in green energy, for example, that's -- that's not true. But it has to be under

these conditions. In other words, you're gonna go get the return within the guidelines that the plan and your judgment as a -- as a prudent investor takes you there.

And I'll give you an example. I -- I was at a -- in my personal life, was -- was at a meeting of somebody I use for financial guidance who indicated he had invested in a company he never thought he would invest in because of -- I think they were a wind company. But they're also one of the biggest utility providers in the country and -- and their returns on that part of their business would justify doing it. So it -- you see what I'm saying? It -- it doesn't mean you don't. It means you gotta go evaluate it within the -- the -- the constraints and the -- the -- the target of the plan as opposed to these other factors. And -- and because of that, I don't think it's gonna be that hard to -- to comply with if it's passed.

VICE CHAIR HAYS: You're recognized for your final follow-up.

REPRESENTATIVE BENNETT: In one or two sentences, a response.

Then -- then what -- then what's the point of this if -- I mean, that seems like that would -- we would be firing our money managers if they were doing anything else right now than -- than that, you know what I mean? So do you not agree that this seems arbitrary, given the fact that I would assume -- I would hope that our money managers, Teacher Retirement Systems, our pension funds, whatever they are, are just making the best decisions, regardless of -- of -- of politics.

REPRESENTATIVE LEPAK: Well, thank you for the question but I -- I -- I wouldn't agree with that. There's room for disagreement on this thing, as evidenced by the other law I was talking about. There was judgment there that some entities fell out of

bounds and we were invested in those. I -- I -- I don't wanna make this a big announcement, but one of the biggest, baddest ones that everybody holds up as an example came to see me last week. They have pulled back and withdrawn from some of the initiatives that they were criticized for being a part of, and when I said, well, would you put in writing, some sort of affidavit that you'll vote our shares and our funds the way we would ask you to do, it was, like, absolutely.

So I -- I think these kinds of bills that are going on, being run in other states, and some of the legal actions that have been taken, some of the divestment actions that have been taken, are having an affect out there and bringing things back into what I would consider balance with what we really want with our investments. But that doesn't mean we shouldn't put something like this in place to make sure it stays that way.

VICE CHAIR HAYS: Representative Fugate, you're recognized to answer -- ask a question.

REPRESENTATIVE FUGATE: Thank you. Before I do, Mr. Chairman, I'm just taking notice of the time. There's another committee, the Appropriations and Budget Committee that has now started. There are a number of members of this committee that have obligations on that committee. I'm wondering if this body might be willing to lay this bill over in the hopes that the chair would pick it up as a first item on Thursday's meeting.

CHAIR WEST: I -- I think we're at the final questions on this bill, so let's go ahead and finish these questions and -- and then we'll lay the remaining bill over.

VICE CHAIR HAYS: You're recognized.

REPRESENTATIVE FUGATE: Thank you, Mr. Chairman, I appreciate that.

The only question I had in regard to

this bill relates to the language about not being allowed to take into consideration political concerns, and I'm wondering about that and -- and perhaps I'm framing this incorrectly and I'll defer to you, Mr. Chairman, for your expertise on the pension side of things. But we had language earlier today where we prohibited the state from investing in places that might be opposed to U.S. interests. And does this bill then say that the pensions can't take notice of that?

REPRESENTATIVE LEPAK: Would you rephrase that question? They can't take notice of?

REPRESENTATIVE FUGATE: So we basically said that we couldn't invest in China and other places. But this language says that we can't take notice of those specific political concerns, and I'm just trying to reconcile the two in my head.

REPRESENTATIVE LEPAK: Thank you. Well,

it's a good question. I think some of this will play out over time. I think the bill author at that point made when questions similarly said something about national security interest, and I would think that -- that that might trump all, no pun intended. But I don't see them as inconsistent.

VICE CHAIR HAYS: Seeing no further questions, do we have a motion?

REPRESENTATIVE LEPAK: But -- Mr. Chairman, I'm sorry. Could I -- could I add a little bit to that last answer?

VICE CHAIR HAYS: As the representative once said, you're welcome to one or two lines.

REPRESENTATIVE LEPAK: Thank you.

I think that kind of a foreign divestment bill, if I wanna call it that, recognizes that there are unique risks related to the investments made, and it makes them incompatible with what I'll call the exclusive purpose focus in our constitution.

I could read that to ya but I won't bore you with that. Thank you.

VICE CHAIR HAYS: Thank you, Representative.

Do -- do you have a follow-up? Yes, you have a follow-up, go ahead, Representative.

REPRESENTATIVE FUGATE: Thank you, Mr. Chairman.

I -- I might argue the opposite side of that, though, is that those places are oftentimes places where you're looking for growth, and so that seems like in this context of this bill would be something you would want to do, no?

REPRESENTATIVE LEPAK: Thank you. Well, it depends on what the -- the -- the targets in the individual plans are and how they want to invest those funds in terms of whether it's growth or value and all that stuff. But you could also say, you know, with the current administration we should see dramatic growth here, and there may be better

investments at home than abroad. That will -- remains to be seen. Thank you.

VICE CHAIR HAYS: Do we have a motion?

MALE VOICE: Do pass.

VICE CHAIR HAYS: Have a do pass and have a second?

Seeing a do pass and a second, will there be any debate?

Seeing no debate, please open the queue for a vote.

Seeing all members present and voted, please close and declare the vote.

THE CLERK: Twelve aye, three nay.

VICE CHAIR HAYS: Representative Lepak, with 12 aye and three nay, we'll declare your bill as passed and moving on to the floor.

As of right now, we will lay over your bill, House Bill 1120 till Thursday morning at 9:30.

REPRESENTATIVE LEPAK: Thank you, Mr. Chairman. I'll be ready.

VICE CHAIR HAYS: 10:30, I'm sorry.

MALE VOICE: Yes, Members. There -- there will be an agenda. I'll be turning that into staff this evening, so be watching for your e-mail for the Thursday committee meeting. We are adjourned.

(The relevant portion of the hearing was concluded.)

CERTIFICATE OF TRANSCRIBER

I, Jackie A. Scheer, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding; that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to the case and have no interest, financial or otherwise, in its outcome.



JACKIE A. SCHEER

AUGUST 11, 2026