IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| INSTITUTIONAL SHAREHOLDER SERVICES INC., *Plaintiff,* v. GENTNER DRUMMOND, in his official capacity as the Oklahoma Attorney General, *Defendant.* | No. 5:26-cv-02111-PRW |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Submitted by:

GARRY M. GASKINS, II, OBA #20212
*Solicitor General*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Garry.Gaskins@oag.ok.gov

COUNSEL FOR DEFENDANT

September 16, 2026

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 2

A. The Proxy Advisor Market. ........................................................................................ 2

B. Why H.B. 4429? ........................................................................................................ 3

C. When Does H.B. 4429 Apply? ................................................................................... 4

D. What does H.B. 4429 require? .................................................................................. 5

E. What happens if a proxy advisor violates H.B. 4429? ................................................. 7

ARGUMENT ........................................................................................................ 7

I. ISS Does Not Have a Likelihood of Success on the Merits on Its Freedom of Speech Claim Because H.B. 4429 Does Not Violate the First Amendment. ............................. 8

A. H.B. 4429 does not discriminate based on viewpoint and content. ..................... 8

B. The Kansas and Indiana decisions do not warrant the same result here. .......... 10

C. H.B. 4429 regulates commercial speech about proxy statements which is afforded the least protection under the law. ...................................................... 11

i. H.B. 4429 passes rational basis review under *Zauderer*. ............................. 14

ii. H.B. 4429 passes intermediate review under *Central Hudson*. ................... 16

D. H.B. 4429's compelled disclosures are not unconstitutional. ............................. 18

II. ISS Does Not Have a Likelihood of Success on the Merits of Its Claims That H.B. 4429 Is Unconstitutionally Vague and Unconstitutionally Extraterritorial. ................. 19

A. H.B. 4429 is not unconstitutionally vague. ........................................................ 19

B. H.B. 4429 is not unconstitutionally extraterritorial. ........................................... 22

III. ISS Cannot Establish the Additional Requirements for a Preliminary Injunction. ..... 23

IV. If the Court Finds Any Portion of H.B. 4429 Unconstitutional, It Must Be Severed and the Remainder of the Statute Must Remain Valid. ................................................. 23

CONCLUSION ........................................................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. of Health Care Sharing Ministries v. Conway*,
No. 24-CV-01386-GPG-STV, 2025 WL 315389 (D. Colo. Jan. 13, 2025)....................13

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012) ....................................................................................8

*Barr v. Am. Ass'n of Pol. Consultants*,
591 U.S. 610 (2020).....................................................................................................23

*Bd. of Trs. of the State Univ. of N.Y. v. Fox*,
492 U.S. 469 (1989)............................................................................................. 17, 18

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980)............................................................................................. 16, 17

*Chamber of Com. of the U.S. v. SEC*,
85 F.4th 760 (5th Cir. 2023) ........................................................................................18

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
596 U.S. 61 (2022)....................................................................................................9, 10

*CTS Corp. v. Dynamics Corp. of Am.*,
481 U.S. 69 (1987).......................................................................................................22

*Does 1-11 v. Bd. of Regents of Univ. of Colo.*,
100 F.4th 1251 (10th Cir. 2024) ....................................................................................8

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
472 U.S. 749 (1985)......................................................................................... 11, 12, 13

*Dunagin v. City of Oxford*,
718 F.2d 738 (5th Cir. 1983).........................................................................................12

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012).....................................................................................................19

*Ill. ex rel. Madigan v. Telemarketing Assocs., Inc.*,
538 U.S. 600 (2003).....................................................................................................17

*ISS v. Kobach*,
No. 2:26-cv-02254, 2026 WL 1815236 (D. Kan. June 24, 2026) ............................ 10, 11

*ISS v. Rokita*,
No. 1:26-cv-00717, 2026 WL 1847882 (S.D. Ind. June 26, 2026).................................10

*Leavitt v. Jane L.*,
518 U.S. 137 (1996)........................................................................................................23

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024)........................................................................................................18

*Maryland v. King*,
567 U.S. 1301 (2012) (Roberts, C.J., in chambers) ........................................................23

*Munaf v. Geren*,
553 U.S. 674 (2008)..........................................................................................................7

*Nat'l Ass'n of Mfrs. v. SEC*,
105 F.4th 802 (5th Cir. 2024) ..........................................................................................2

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018)........................................................................................................16

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023)........................................................................................................22

*Ohralik v. Ohio State Bar Ass'n*,
436 U.S. 447 (1978)................................................................................................ 1, 12, 13

*Okla. Corr. Prof'l Ass'n v. Jackson*,
280 P.3d 959 (Okla. 2012) ..............................................................................................24

*Paris Adult Theatre I v. Slaton*,
413 U.S. 49 (1973)..........................................................................................................13

*R.J. Reynolds Tobacco Co. v. FDA*,
96 F.4th 863 (5th Cir. 2024) ..........................................................................................16

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)..........................................................................................................9

*Rosenbloom v. Metromedia, Inc.*,
403 U.S. 29 (1971)..........................................................................................................13

*Schrier v. Univ. of Colo.*,
427 F.3d 1253 (10th Cir. 2005) ........................................................................................8

*SEC v. AT&T, Inc.*,
626 F. Supp. 3d 703 (S.D.N.Y. 2022) .......... 13, 14

*SEC v. City of Rochester*,
731 F. Supp. 3d 455 (W.D.N.Y. 2024) .......... 14

*SEC v. Wall St. Publ'g Inst., Inc.*,
851 F.2d 365 (D.C. Cir. 1988) .......... 11, 13

*State v. EPA*,
989 F.3d 874 (10th Cir. 2021) .......... 8

*Thomas v. Collins*,
323 U.S. 516 (1945) .......... 12

*United States v. Wenger*,
427 F.3d 840 (10th Cir. 2005) .......... 14, 17

*Upton's Naturals Co. v. Stitt*,
No. CIV-20-938-F, 2020 WL 6808784 (W.D. Okla. Nov. 19, 2020) .......... 14

*Vidal v. Elster*,
602 U.S. 286 (2024) .......... 18

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) .......... 19, 21

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 8, 23

*Wyoming Gun Owners v. Gray*,
83 F.4th 1224 (10th Cir. 2023) .......... 19

*Zauderer v. Off. of Disciplinary Couns.*,
471 U.S. 626 (1985) .......... 1, 14, 15, 16, 17, 18

**Statutes and Regulations**

15 U.S.C. § 77aa .......... 18

15 U.S.C. § 78l .......... 18

17 C.F.R. § 240.14a-6 .......... 11

17 C.F.R. § 240.14a-101 .......... 11

Okla. Stat. tit. 75, § 11a .......... 24

Proxy Advisor Transparency Act,
Okla. H.B. 4429, 60th Leg., 2d Reg. Sess. (2026) ........................................... 1–11, 13–24

## INTRODUCTION

ISS asks this Court to enjoin a disclosure statute before it takes effect on the strength of three preliminary rulings from other district courts, one of which rested on a concession the defendant made that Oklahoma does not make. H.B. 4429 does not tell ISS what to recommend. It does not tell ISS what to say about any proposal, whether to consider environmental, social, or governance factors, or which of its clients' chosen policies it may administer. It prohibits nothing. When a proxy advisor recommends a vote against company management, the Act requires the advisor to tell the client one fact: whether that recommendation rests on a written financial analysis, as the Act defines that term. The advisor may state that fact in words of its own choosing and surround it with whatever explanation it likes.

That is a securities disclosure, and it belongs to a category of regulation the Supreme Court recognized long before ISS existed. ISS is an investment adviser registered with the Securities and Exchange Commission. It sells voting advice to fiduciaries who vote other people's shares. The exchange of information about securities and corporate proxy statements has never enjoyed the protection afforded political debate. *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978). Disclosure requirements in that field are judged under *Zauderer*, and H.B. 4429 satisfies that standard twice over. It compels a factual statement that is reasonably related to preventing deception.

ISS's principal answer is that the Act discriminates by viewpoint because its duties apply only when ISS disagrees with management. But management's position is a reference point, not a message the State prefers. Oklahoma takes no side in any shareholder vote. The

disclosure is identical whether the dissenting recommendation rests on a climate policy, a faith-based policy, or a governance judgment about an auditor, and an advisor that sides with management owes nothing regardless of its reasons. Federal proxy regulation has keyed heightened disclosure to opposition for decades, and no court has supposed that the Exchange Act discriminates by viewpoint. The Kansas and Indiana courts reached a different conclusion, but neither court tested the framework this brief presents.

ISS's remaining claims fare no better. ISS frames its vagueness challenge as applied to ISS, and ISS's own declarant has resolved it: ISS says it does not prepare, and cannot prepare, the written financial analysis the Act describes, so ISS knows exactly which disclosure the Act requires of it. And the Act reaches advice about Oklahoma companies and advice given to persons in Oklahoma, which is the ordinary and permissible scope of a state consumer-protection law.

A preliminary injunction is an extraordinary remedy reserved for a movant whose right to relief is clear and unequivocal. ISS has not made that showing, and the motion should be denied.

## BACKGROUND

In the 2026 regular session, the Oklahoma Legislature passed House Bill 4429, also known as the "Proxy Advisor Transparency Act" ("H.B. 4429" or the "Act").

### A. The Proxy Advisor Market.

Shareholders of public companies generally have the right to vote on issues of corporate governance during shareholder meetings. *Nat'l Ass'n of Mfrs. v. SEC*, 105 F.4th 802, 806 (5th Cir. 2024). However, "[m]ost shareholders—including institutional investors like

hedge funds and mutual funds—do not attend shareholder meetings in person." *Id.* "They instead vote by proxy." *Id.* "[I]nstitutional investors and investment advisers are accountable for 'voting in potentially hundreds, if not thousands, of shareholder meetings and on thousands of proposals that are presented at these meetings each year, with the significant portion of those voting decisions concentrated in a period of a few months.'" *Id.* (citation omitted). "During this period, they often need assistance managing the voting process, which otherwise might be unmanageable." *Id.* at 806–07. Proxy advisors provide such assistance.

"Proxy firms research matters subject to vote and advise clients how to vote on these matters[.]" *Id.* at 807. "With institutional investors and investment advisers relying so extensively on them, proxy firms 'have become uniquely situated in today's market to influence, and in many cases directly execute, [their clients'] voting decisions.'" *Id.* (citation omitted).

"As these firms have continued to grow in influence, however, certain concerns have emerged about their practices." *Id.* Notably, "the proxy advice market is effectively a duopoly, because two firms, Institutional Shareholders Services (ISS) and Glass Lewis, control roughly 97% of the market." *Id.* "Investors, registrants, and others have questioned the accuracy of the information and the soundness of the advice that proxy firms provide in this duopolistic market, and they complain about the proxy firms' unwillingness to engage with issuers to correct errors." *Id.* "Attention has also been drawn to potential conflicts of interest arising from proxy firms' provision of consulting services to the same registrants about which they provide voting advice." *Id.*

**B. Why H.B. 4429?**

It goes without saying that "[w]hen shareholders hire professionals to manage investments, they expect that the service will be performed in their financial interest[.]" H.B. 4429 § 2(1). And the recipients of proxy voting advice are often such professionals who owe their clients a fiduciary duty in investing and voting on their behalf. This is why H.B. 4429 requires disclosures to "each shareholder *or entity or other person acting on behalf of a shareholder*[.]" § 4(A)(1), (B)(1) (emphasis added). And proxy voting advice is often provided for hundreds or thousands of shareholder votes each year based on policies that do not explain whether or how the policy provisions will maximize returns for investors for any particular vote. § 2(2)–(3). "Proxy advisors in their benchmark policies have recommended votes based on environmental, social, or governance (ESG) investing; diversity, equity, or inclusion (DEI); and social credit and sustainability scores, despite having proxy voting policies claiming that the purpose of the policy's recommendations is maximizing, increasing, or protecting shareholder value[.]" § 2(3). In other words, proxy advisors have prioritized their own social policy goals over the financial returns of their clients. H.B. 4429 is aimed at preventing fraudulent and deceptive trade practices by "[r]equiring proxy advisors to provide clear, factual disclosures" regarding their vote recommendations. § 2(4).

**C. When Does H.B. 4429 Apply?**

H.B. 4429 requires certain disclosures when a proxy advisor "makes a recommendation against company management on a company proposal or a proxy proposal, or makes a default recommendation or policy involving votes against company management on company proposals or proxy proposals." H.B. 4429 § 4(A), (B). H.B. 4429's disclosure requirements are

further limited to proxy advisor services provided in connection with or in relation to a company or to any person in the state of Oklahoma. H.B. 4429 § 3(7). Charitable organizations are also excluded if the organization's gross annual revenue from proxy advisory services is less than $250,000.00, and if applicable, each affiliated group of the organization has a combined gross annual revenue from proxy advisory services that is less than $250,000.00. § 3(7)(e).

**D. What does H.B. 4429 require?**

H.B. 4429 is designed to prevent deception about whether a proxy advisor has recommended any particular vote based on maximizing returns for investors. It does not restrict what a proxy advisor can say to its client in any way. And, importantly, it does not require that a proxy advisor make voting recommendations that are in the financial interests of shareholders. Rather, it is designed to provide shareholders with factual disclosures about the basis of a proxy advisor's recommendations.

When a proxy advisor "makes a recommendation against company management on a company proposal or a proxy proposal" or makes a default recommendation or policy that essentially does the same, H.B. 4429 § 4(A), (B), the Act requires one of two different sets of disclosures depending on whether the recommendation is based on a statutorily defined "written financial analysis."

The Act defines a written financial analysis as a "written document" that:

a. analyzes the expected short-term and long-term financial benefits and costs to the company of implementing a company proposal or proxy proposal,

b. concludes what vote or course of action is most likely to positively affect shareholder value, and

c. explains the methods and processes used to prepare the analysis, including the experience and geographic location of the personnel who formed the recommendation.

H.B. 4429 § 3(10).

If the recommendation against company management *is* based on the statutorily defined written financial analysis, the proxy advisor shall provide a "clear and conspicuous disclosure" to shareholders that:

a. identifies the service being provided,

b. identifies the recommendation or policy at issue,

c. states that the proxy advisor has made the recommendation or policy based on a written financial analysis meeting that definition, and

d. states that the analysis is available upon request.

H.B. 4429 § 4(B)(1).

Additionally, the proxy advisor must "[m]ake such analysis available within a reasonable time to any recipient of the proxy advisory service upon request;" and, for certain proxy advisor services, "provide a copy of such analysis to the board of directors of each company that is the subject of the service." H.B. 4429 § 4(B)(2)–(3).

If the recommendation against company management *is not* based on the statutorily defined written financial analysis, the proxy advisor shall provide a "conspicuous disclosure" to shareholders that:

a. identifies the service being provided,

b. identifies the recommendation or policy at issue, and

c. states that the proxy advisor has made the recommendation or policy without doing so based on a written financial analysis regarding the impact of that recommended action on company investors meeting that definition.

H.B. 4429 § 4(A)(1).

Additionally, for certain services, the proxy advisor must also send a copy of the disclosure to the board of directors of each company that is the subject of the service. H.B. 4429 § 4(A)(2).

Lastly, while such services are being provided, the proxy advisor must "publicly and conspicuously disclose on the home or front page of the proxy advisor's website a statement that the advisor's proxy advisory services include one or more services that include recommendations or policies against company management on company proposals or proxy proposals that are not made based on a written financial analysis." H.B. 4429 § 4(A)(3). The statutory definition of "written financial analysis" is also included in the disclosure. *Id.*

Notably, for either set of disclosures, H.B. 4429 does not prescribe a particular form of disclosure and the proxy advisor is free to add additional comment or explanation.

**E. What happens if a proxy advisor violates H.B. 4429?**

A violation of the Act is a "deceptive trade practice" under Oklahoma law and is actionable under the enforcement provisions of that statute. § 5(A). Further, the Attorney General may exercise all investigative powers under any applicable law related to deceptive practices if the Attorney General has reason to believe a violation has occurred or is about to occur. *Id.* Additionally, any person aggrieved by a violation of the Act may bring an action seeking a declaratory judgment or injunctive relief against a proxy advisor who violates the Act. § 5(B). *Id.*

## ARGUMENT

A preliminary injunction is not proper here. A preliminary injunction is an "extraordinary and drastic remedy" that "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–690 (2008) (citations omitted). To obtain it, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). For the injunction to issue, "the right to relief must be clear and unequivocal." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (citation omitted). Courts disfavor preliminary injunctions "that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *State v. EPA*, 989 F.3d 874, 883–84 (10th Cir. 2021) (citation omitted). This type of injunction "must be more closely scrutinized." *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012) (citation omitted).

Citing *Does 1-11 v. Board. of Regents of University of Colorado*, 100 F.4th 1251, 1268 (10th Cir. 2024), ISS argues that Oklahoma bears the burden on the "ultimate question" of constitutionality. Doc. 12 at 7. However, this burden shift does not happen unless ISS first carries its burden to show that H.B. 4429 burdens protected speech. *See Does 1-11*, 100 F.4th at 1268. Only then does the burden shift to Oklahoma to satisfy the relevant level of scrutiny. *Id.* In other words, a burden shift presupposes that H.B. 4429 burdens protected speech.

## I. ISS Does Not Have a Likelihood of Success on the Merits on Its Freedom of Speech Claim Because H.B. 4429 Does Not Violate the First Amendment.

### A. H.B. 4429 does not discriminate based on viewpoint and content.

ISS attempts to leverage strict scrutiny review by arguing that H.B. 4429 discriminates based on viewpoint and content. But this argument fails. H.B. 4429 is content and viewpoint neutral.

A regulation of speech is content based under the First Amendment "if it 'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). However, a regulation is not content based simply because it requires reading the speech at issue. *Id.* For example, in *City of Austin*, the Supreme Court upheld a city code provision prohibiting the digitization of off-premise signs (signs that promote ideas, products, or services located elsewhere) but not the digitization of on-premise signs (those that promote or identify things located onsite). *Id.* at 65–67. Though the code at issue required an examination of speech, it was in service of drawing neutral, location-based lines and it was "agnostic as to content." *Id.* at 69.

Here, H.B. 4429 addresses no particular message. As in *City of Austin*, the "substantive message itself is irrelevant to the application of the provisions." *Id.* at 71. And even though H.B. 4429 "require[s] some evaluation of the speech," that does not make it content-based, since it does not "single out any topic or subject matter for differential treatment." *Id.* at 71–72. H.B. 4429 simply defers to those with the most information about the company and requires certain disclosures when a proxy advisor makes an opposing recommendation.

However, the viewpoint of company management and proxy advisors may vary on a host of subjects for a host of different reasons, making the subject and viewpoint of proxy advisor speech irrelevant.

Oklahoma does not seek to punish speech about any particular subject or with any particular viewpoint, but to prevent deception when a proxy advisor presents itself as speaking in shareholder financial interest based on an objective analysis when in fact its recommendations are based on subjective, non-financial considerations. H.B. 4429's disclosure duty would be triggered by "anti-ESG" proxy advisors and "pro-ESG" proxy advisors alike. In either case, if the advisor opposes management, it must disclose whether it based its recommendations on written financial analysis and, if so, provide that analysis. Imposing a duty to disclose to prevent deception is a proper regulation of commercial speech and does not offend the First Amendment.

**B. The Kansas and Indiana decisions do not warrant the same result here.**

ISS builds its motion on *ISS v. Kobach*, *ISS v. Rokita*, and a one-line text order from the Western District of Texas. Doc. 12 at 1, 8–9, 14, 18–20, 25. None of those rulings binds this Court, and none engaged the argument on which this response rests. The Texas order contains no reasoning and addressed a materially different statute, one that keyed its disclosure duty to the advisor's use of specified nonfinancial factors rather than to the fact of a dissenting recommendation. The Kansas and Indiana decisions are preliminary rulings on preliminary records. They deserve the respect owed to any thoughtful district court opinion, but no more.

*Kobach* is the decision ISS features because it arose within this Circuit, and it is the one that carries the least weight here. Kansas told the district court that it "would not argue that

SB 375 satisfies strict scrutiny" if the court found the statute viewpoint-based. *Kobach*, 2026 WL 1815236, at *8. That concession decided the case, and the court said as much when it described Kansas's position as "wise and well taken." *Id.* Oklahoma makes no such concession.

The Kansas court in *Kobach* got it wrong because it conflated a neutral reference point trigger (disagreement with management) with a viewpoint the state preferred. *See City of Austin,* 596 U.S. at 69. The federal proxy rules have drawn the same against-management line for decades. *See* 17 C.F.R. § 240.14a-6(a); Schedule 14A (17 C.F.R. § 240.14a-101), Items 4(b), 5(b). However, as explained in detail below, even if the Court views the line as content-based, a securities disclosure does not draw strict scrutiny. Moreover, the commercial speech analysis in *Kobach* asked whether ISS's recommendations were advertisements, which is the wrong question when dealing with a securities disclosure. 2026 WL 1815236, at *9; *SEC v. Wall St. Publ'g Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988) ("Speech relating to . . . securities . . . forms a distinct category of communications in which the government's power to regulate is at least as broad as with respect to the general rubric of commercial speech."). This Court therefore writes on a clean slate. The Tenth Circuit has not addressed a proxy-advisor disclosure statute, and the only in-circuit decision rested on a litigating position Oklahoma has not taken.

### C. H.B. 4429 regulates commercial speech about proxy statements which is afforded the least protection under the law.

H.B. 4429 does not regulate speech based on content and viewpoint as ISS claims, but this Court need not decide the issue. Even if H.B. 4429 were a content-based regulation of speech, it regulates commercial disclosures related to securities, and thus, would still not warrant strict or even intermediate scrutiny.

The Supreme Court has "long recognized that not all speech is of equal First Amendment importance." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758 (1985). In other words, "certain kinds of speech are less central to the interests of the First Amendment than others." *Id.* at 758 n.5. For example, "[o]bscene speech and 'fighting words' long have been accorded no protection." *Id.* And "the most prominent example of reduced protection for certain kinds of speech concerns commercial speech." *Id.* Such speech, the Supreme Court has noted, "occupies a 'subordinate position in the scale of First Amendment values.'" *Id.* (quoting *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456 (1978)). "Accordingly, it may be regulated in ways that might be impermissible in the realm of noncommercial expression." *Id.* "[U]nlike other areas of First Amendment protection, the commercial speech doctrine is concerned primarily with the level and quality of information reaching the listener." *Dunagin v. City of Oxford, Miss.*, 718 F.2d 738, 752 (5th Cir. 1983).

Notably, in addition to "commercial speech," the Supreme Court, in *Ohralik*, listed several examples of communications that are regulated without offending the First Amendment: "*the exchange of information about securities, corporate proxy statements*, the exchange of price and production information among competitors, and employers' threats of retaliation for the labor activities of employees[.]" *Ohralik*, 436 U.S. at 456 (citations omitted) (emphasis added). "Each of these examples illustrates that the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." *Id.* Indeed, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id.* (citation omitted).

By contrast, "similar regulation of political speech is subject to the most rigorous scrutiny." *Dun & Bradstreet,* 472 U.S. at 758 n.5. For example, "while the power of the State to license lawyers, psychiatrists, and public school teachers—all of whom speak for a living—is unquestioned, [the Supreme] Court has held that a law requiring licensing of union organizers is unconstitutional under the First Amendment." *Id.* (citing *Thomas v. Collins,* 323 U.S. 516 (1945)). Additionally, "the determinant whether the First Amendment applies to state libel actions is whether the utterance involved concerns an issue of public or general concern." *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 44 (1971) (opinion of Brennan, J.).

The speech at issue in this case is not political speech. H.B. 4429 regulates disclosures related to proxy statements and, as such, is afforded the least protection under the law. Indeed, "regulation of the exchange of information regarding securities is subject only to limited First Amendment scrutiny." *Wall St. Publ'g*, 851 F.2d at 373. "Speech relating to . . . securities . . . forms a distinct category of communications in which the government's power to regulate is at least as broad as with respect to the general rubric of commercial speech." *Id.*; *see Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 64 (1973); *Ohralik*, 436 U.S. at 456; *Dun & Bradstreet*, *Inc.*, 472 U.S. at 758 n.5; *see also SEC v. AT&T, Inc.*, 626 F. Supp. 3d 703, 743 (S.D.N.Y. 2022); *All. of Health Care Sharing Ministries v. Conway*, No. 24-CV-01386-GPG-STV, 2025 WL 315389, at *32 (D. Colo. Jan. 13, 2025) ("in the securities context, courts generally uphold compelled disclosure requirements under deferential rubrics").

The court in *SEC v. AT&T, Inc.* explained:

> [D]efendants' suggestion that all content-based regulations must satisfy strict scrutiny overlooks the significant body of decisions involving laws and regulations mandating affirmative disclosures of information, particularly for … participants in the securities industry. These disclosure provisions are explicitly

> content based. They require the disclosure of certain content … and do not require the disclosure of others …. Yet these have routinely withstood First Amendment challenges without any suggestion that strict, or even intermediate, scrutiny applied. As the District of Columbia Circuit has recognized, "Speech relating to … securities forms a distinct category of communications." (citation omitted). "If [such] speech … were totally protected, any regulation of the securities market would be infeasible—and that result has long since been rejected." (citation omitted).

*AT&T, Inc.*, 626 F. Supp. 3d at 743 (quoting *Wall St. Publ'g*, 851 F.2d at 373). Notably, the court went on to reject the idea that the speech at issue—compelled disclosures of nonpublic information by securities issuers—was, technically speaking, commercial speech and lumped it in broadly with "information about securities" and "corporate proxy statements," nevertheless warranting the lowest level of rational basis review. *Id.* at 744. Thus, whether the speech H.B. 4429 regulates is commercial speech or information about corporate proxy statements, or both, it warrants only rational basis review.

**i. H.B. 4429 passes rational basis review under *Zauderer*.**

For informational disclosure requirements on commercial speech, the applicable standard of review is the deferential rational basis test under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985). Notably, courts have applied *Zauderer* to a wide range of commercial disclosure requirements beyond traditional advertising, including food labeling, *see Upton's Naturals Co. v. Stitt*, No. CIV-20-938-F, 2020 WL 6808784, at *3 (W.D. Okla. Nov. 19, 2020), and SEC municipal advisor disclosure rules, *SEC v. City of Rochester*, 731 F. Supp. 3d 455, 471 (W.D.N.Y. 2024).

Under *Zauderer*, disclosure requirements for commercial speech are valid so long as they require "purely factual and uncontroversial information" and are "reasonably related to the State's interest in preventing deception of consumers." 471 U.S. at 651. As the Tenth

Circuit explained, *Zauderer* "eases the burden" for a regulation that "requires disclosure only of factual and uncontroversial information and is not unduly burdensome." *Wenger*, 427 F.3d at 849. Indeed, "[i]n assessing disclosure requirements, *Zauderer* presumes that the government's interest in preventing consumer deception is substantial, and that where a regulation requires disclosure only of factual and uncontroversial information and is not unduly burdensome, it is narrowly tailored." *Id.*

H.B. 4429 requires purely factual and uncontroversial disclosures. The disclosures require proxy advisors to state a simple binary fact: whether the recommendation against company management is based on a written financial analysis that meets certain statutory criteria or not. H.B. 4429 does not mandate the form for the disclosures or limit what Plaintiff can say in defense of its advice. Nothing in H.B. 4429 requires false or controversial speech within the meaning of *Zauderer*.

Further, the disclosure requirements of H.B. 4429 are reasonably related to the State's interest in preventing deception of consumers. Oklahoma has a legitimate state interest in protecting Oklahoma consumers from fraud and deception. More specifically, Oklahoma has a legitimate interest in ensuring participants in the proxy services market are not deceived as to the rationale behind the advice they receive.

Lastly, none of the required disclosures under H.B. 4429 are unduly burdensome. Plaintiff is free to craft its disclosures however it likes and make clear that the views in its disclosures belong to the State of Oklahoma. Additionally, Plaintiff is free to tell its clients that it is merely doing what the clients have asked of it and has considered nonfinancial factors at the client's direction or to demonstrate that voting based on nonfinancial factors is in the best

financial interests of the client. Importantly, the State need not select the "least restrictive means" to address a problem but rather must only take an approach that is "reasonably related" to it. *Zauderer*, 471 U.S. at 651 & n.14.

ISS argues that "even if ISS' speech were commercial, it would not trigger the relaxed *Zauderer* standard, which is 'limited to purely factual and uncontroversial information.'" Doc. 12 at 19 (citation omitted). ISS claims H.B. 4429 would force ISS to make "'confusing or deceptive statements' based on the State's … definition of 'financial analysis.'" *Id.* (citation omitted). However, H.B. 4429 requires a mere factual disclosure about whether ISS's advice is based on certain financial criteria or not. A factual disclosure does not reflect an opinion merely because it compels a speaker to convey information contrary to its interests. That is why, for example, the government can compel cigarette manufacturers to include graphic warnings condemning their own products on every cigarette package. *R.J. Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 882 (5th Cir. 2024). Companies would, presumably, prefer not to tell every customer that considers purchasing their products that the product can lead to serious health conditions. *Id.* at 873. But the First Amendment does not give them a right to conceal that information from customers. *Id.* at 887.

ISS relies on *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018) (*NIFLA*) to argue that the *Zauderer* standard does not apply here. But *NIFLA* is readily distinguishable. In *NIFLA*, a California law required crisis pregnancy centers to disseminate government notices regarding family planning services provided by the state, including abortion. The Court held that *Zauderer* was inapplicable because (1) "the notice in no way relate[d] to the services that the [pregnancy centers] provide[d]," and (2) the notice concerned the controversial topic

of abortion. *Id.* at 769. Here, the required disclosures are directly related to ISS's services, the compelled statement is true or false by reference to a statutory definition, and ISS may supplement it.

**ii. H.B. 4429 passes intermediate review under *Central Hudson*.**

Even if *Zauderer* did not apply, commercial speech that is not in the realm of disclosure requirements enjoys lesser, intermediate-scrutiny protection under the *Central Hudson* framework. *See Zauderer*, 471 U.S. at 637.

Under *Central Hudson*, first, the court must determine whether the commercial speech (1) concerns unlawful activity, or (2) is misleading. If the answer to either of those questions is yes, then that commercial speech is not protected by the First Amendment at all. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980).

If the commercial speech does pertain to lawful activity and is not misleading, then the court must determine "whether the asserted governmental interest is substantial." *Id.* Next, the court "must determine whether the regulation directly advances the governmental interest asserted" and whether the regulation "is not more extensive than necessary to serve that interest." *Id.* Notably, however, this standard does not require that a restriction be the "single best disposition" or "least restrictive means" of achieving that end but rather requires a "fit" between the "ends and the means" that is "reasonable" and "in proportion to the interest served." *Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989).

Shareholders and those who act on their behalf can be misled when proxy advisors claim on their websites to maximize shareholder value but provide voting recommendations that are not grounded in financial analysis. Under *Central Hudson*, such misleading commercial

speech is provided no First Amendment protection at all. 447 U.S. at 566. Further, "[i]t is undisputed that the government has an interest in protecting consumers from being misled." *Wenger*, 427 F.3d at 850 (citing *Ill. ex rel. Madigan v. Telemarketing Assocs.,* 538 U.S. 600, 612 (2003)). And the disclosure requirements of H.B. 4429—disclosure of whether or not a statutorily defined financial analysis was done—are "reasonable" and "in proportion to the interest served." *Bd. of Trs.*, 492 U.S. at 480.

**D. H.B. 4429's compelled disclosures are not unconstitutional.**

ISS claims that H.B. 4429 is "independently unconstitutional" for "compelling" speech. Doc. 12 at 11. However, H.B. 4429's disclosure requirements do not unconstitutionally compel speech. In the realm of commercial speech, there are "material differences between disclosure requirements and outright prohibitions on speech," and disclosure requirements warrant lesser scrutiny than prohibitions. *Zauderer,* 471 U.S. at 650. Indeed, "the First Amendment interests implicated by disclosure requirements are substantially weaker than those at stake when speech is actually suppressed." *Id.* at 651 n.14.

Disclosure requirements are commonplace in the securities industry, and routinely upheld. For example, in *Chamber of Commerce v. SEC*, the Fifth Circuit rejected a First Amendment challenge to an SEC rule requiring companies to "report day-to-day share repurchase data once a quarter and to disclose the reason why the issuer repurchased shares of its own stock." 85 F.4th 760, 766 (5th Cir. 2023). And year after year, companies file an array of reports and other disclosures that the SEC has mandated since the 1930s. *See, e.g.*, 15 U.S.C. §§ 77aa, 78l; *see also Macquarie Infrastructure Corp. v. Moab Partners, LP*, 601 U.S. 257, 260 (2024). Those settled requirements show a long history and tradition that supports mandatory commercial

disclosures in the securities industry. *Cf. Vidal v. Elster*, 602 U.S. 286, 301 (2024) ("[I]n evaluating a solely content-based trademark restriction, we can consider its history and tradition, as we have done before when considering the scope of the First Amendment.").

## II. ISS Does Not Have a Likelihood of Success on the Merits of Its Claims That H.B. 4429 Is Unconstitutionally Vague and Unconstitutionally Extraterritorial.

### A. H.B. 4429 is not unconstitutionally vague.

H.B. 4429's provisions and standards are clear and do not enable arbitrary enforcement. Under the void-for-vagueness doctrine, a law is unconstitutional if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Notably, "perfect clarity and precise guidance have never been required." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).

ISS claims that H.B. 4429 is vague in various hypothetical applications. But ISS's speculation about possible vagueness in hypothetical situations not before the Court will not suffice. The vagueness doctrine requires only "that statutory commands provide fair notice to the public." *Wyoming Gun Owners v. Gray*, 83 F.4th 1224, 1233 (10th Cir. 2023). H.B. 4429 does so.

ISS claims that the law's triggers are not "clearly defined." Doc. 12 at 21. However, a proxy advisor's obligations are triggered by a single, determinate event: when the advisor makes a "recommendation against company management on a company proposal or a proxy proposal." H.B. 4429 § 4(A). ISS's hypothetical questions about situations where company management takes no position or when ISS recommends abstaining do not make the law invalid.

ISS also alleges that it is unclear as to whether only advice against management on a particular proposal triggers the law, or whether ISS's broader services also trigger the law. Doc. 12 at 21–22. But the law is quite clear that only a "recommendation," not the general provision of services, triggers the disclosures at issue. And the term "recommendation against company management" clearly refers to a recommendation to *vote* differently from the vote recommended by company management. *See* H.B. 4429 § 4(A).

ISS also claims that when H.B. 4429 applies, it leaves "substantial uncertainty" about how to comply. Doc. 12 at 22. ISS asserts ambiguity in H.B. 4429's provisions concerning the "written financial analysis," even though the law supplies a clear and detailed statutory definition. H.B. 4429 § 3(10). First, it complains that the phrases "short-term and long-term" are "undefined." Doc. 12 at 22. However, ISS rephrases this language as short and long term "horizons," which it claims "differ between investors." *Id.* But the statutory language is clear, and it does not use the vague term "horizons." The required written financial analysis requires the proxy advisor to analyze the expected "short-term and long-term *financial benefits and costs* to the company" of implementing a proposal. H.B. 4429 § 3(10)(a). Financial benefits and costs of the subject company cannot "differ between investors."

Next, ISS complains that it is not clear whether "quantification" is required or whether qualitative factors may be accounted for. Doc. 12 at 22. Nothing in the definition of written financial analysis mandates any quantification. It requires only an analysis of expected short- and long-term benefits and costs, a conclusion as to which vote is "most likely" to positively affect shareholder value, and an explanation of the methods by which the recommendation was generated. H.B. 4429 § 3(10). If the benefits cannot be quantified, or if shareholder benefit

is ambiguous or indeterminate, an analysis which states as much would satisfy the law's requirements. Further, H.B. 4429 does not restrict any speech. Proxy advisors are free to discuss any qualitative issues as well. And ISS's own declarant confirms that ISS does not prepare such an analysis, Goldstein Decl. ¶ 44, so ISS knows which disclosure the Act requires of it.

Lastly, ISS claims that "other compliance questions abound." Doc. 12 at 22. But each purported issue does not hinder compliance. For example, ISS asks whether the "conspicuous disclosure" language found in § 4(A)(1) is different from the "clear and conspicuous disclosure" language found in § 4(B)(1). Doc. 12 at 23. However, these provisions refer to different disclosures to be issued in different situations, and the content of the required disclosures is outlined in detail. § 4(A)(1), (B)(1). ISS also claims to be confused about whether a disclosure is required for each recommendation or whether general language may be added to the last page of a report. Doc. 12 at 23. This is a non-issue; no matter where the disclosure is placed, it simply must be conspicuous. ISS also questions how much information it must give to identify the "service being provided" to each client and to identify the recommendation or policy at issue. Doc. 12 at 22. This simply requires identification of the proposal at issue and the proxy advisor's recommendation or policy regarding that proposal. ISS also asks how much time is "reasonable time." But "reasonable" is a widely used legal standard not generally considered to be vague. Again, perfect clarity and precise guidance are not required. *Ward*, 491 U.S. at 794. These so-called issues do not deprive ISS of fair notice of what the Act requires.

Because H.B. 4429's terms are not vague, it does not invite arbitrary enforcement. The Act's fundamental requirement is disclosure, namely, whether the proxy advisor performed a

written financial analysis or not. Because H.B. 4429 requires a disclosure either way—either providing the written financial analysis or stating that no such analysis was performed—enforcement would be practicable only if the advisor fails to disclose.

**B. H.B. 4429 is not unconstitutionally extraterritorial.**

ISS misunderstands the dormant Commerce Clause doctrine, which prohibits states from using their laws "to discriminate purposefully against out-of-state economic interests." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 364 (2023). H.B. 4429 does not discriminate against out-of-state entities. The law applies equally to proxy advisors in and out of Oklahoma who advise Oklahoma consumers or give advice concerning Oklahoma companies. Thus, H.B. 4429 does not offend the "antidiscrimination principle [that] lies at the 'very core' of [the] dormant Commerce Clause." *Id.* at 369 (citation omitted). And the Supreme Court has squarely rejected the contention that such a law offends the Constitution just because it has the "practical effect of controlling commerce outside the State." *Id.* at 371 (citation omitted); *see also CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69 (1987) (upholding state regulation of shareholder voting against Commerce Clause challenge).

Moreover, the Due Process Clause is not offended because Oklahoma is not regulating or controlling activities wholly beyond its boundaries, as ISS suggests. Doc. 12 at 24. H.B. 4429 applies to proxy advisors who provide proxy advisory services "that are provided in connection with or in relation to a company or are provided to any person *in this state*." H.B. 4429 § 3(7) (emphasis added). Oklahoma's regulation of proxy advice about Oklahoma companies and for Oklahoma clients is wholly appropriate.

## III. ISS Cannot Establish the Additional Requirements for a Preliminary Injunction.

Setting aside the likelihood of success on the merits, to be entitled to an injunction, a plaintiff must also establish "that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiff will not suffer irreparable harm absent an injunction. For the reasons discussed above, Plaintiff will not suffer deprivation of any constitutional right if the Court denies Plaintiff's Motion. Further, compliance with H.B. 4429's disclosure requirements is feasible.

Finally, an injunction would not be in the public interest. The government, on the other hand, will suffer irreparable harm if a duly enacted state law is enjoined. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (citation omitted). Nor would it be in the public's interest to have a consumer protection law meant to prevent fraud be enjoined as unenforceable.

## IV. If the Court Finds Any Portion of H.B. 4429 Unconstitutional, It Must Be Severed and the Remainder of the Statute Must Remain Valid.

Were the Court to find any portion of H.B. 4429 unconstitutional, it should sever that portion and leave the valid components in place. This is the U.S. Supreme Court's "decisive preference," *Barr v. Am. Ass'n of Pol. Consultants*, 591 U.S. 610, 626 (2020) (plurality opinion)—and a preference shared by Oklahoma law. When a federal court considers the constitutionality of a state statute, it applies the state's law of severability. *See Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam) ("Severability is of course a matter of state law.").

Under Oklahoma law, "[i]f any provision or application of [an] act is found to be unconstitutional and void, the remaining provisions or applications of the act shall remain valid." OKLA. STAT. tit. 75, § 11a(1). This Oklahoma severability statute "is a general provision creating a presumption that if one portion of a statutory provision should fail, the balance should retain its validity." *Okla. Corr. Prof'l Ass'n v. Jackson*, 280 P.3d 959, 965 (Okla. 2012). The statute requires a determination "whether: a) the purpose of the statute would be significantly altered by severing the offending language; b) the Legislature would have enacted the remainder of the statute without the offending language; and c) the non-offending language is capable of standing alone." *Id.* Thus, if this Court finds a substantial likelihood that any portion of H.B. 4429 is unconstitutional, it must sever that portion and leave the remaining portions intact if possible.

**CONCLUSION**

Defendant respectfully requests that this Court deny the motion for preliminary injunction.

Respectfully submitted,

*s/ Garry M. Gaskins, II*

GARRY M. GASKINS, II, OBA #20212
*Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
*Counsel for Defendant*