**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| INSTITUTIONAL SHAREHOLDER SERVICES, INC.,<br>Plaintiff,<br>v.<br>GENTNER DRUMMOND,<br>Defendant. | Case No. CIV-26-2111-PRW |
| GLASS, LEWIS & CO., LLC,<br>Plaintiff,<br>v.<br>GENTNER DRUMMOND,<br>Defendant. | Case No. CIV-26-2382-PRW |

# ORDER

Before the Court are Plaintiff Institutional Shareholder Services, Inc.'s ("ISS") Motion for Preliminary Injunction (No. CIV-26-2111, Dkt. 12) and Plaintiff Glass, Lewis & Co., LLC's ("Glass Lewis") Motion for Preliminary Injunction (No. CIV-26-2382, Dkt. 8). Plaintiffs seek to preliminarily enjoin Defendant Gentner Drummond, in his official capacity as Attorney General of Oklahoma, from enforcing the challenged requirements of H.B. 4429 against them. For the reasons below, the Court **GRANTS** the Motions to the extent stated in this Order.

### *Background*

The following findings are made solely for purposes of resolving the preliminary-injunction motions. Where material, the Court distinguishes the parties' allegations from facts established by the preliminary injunction record.

**I. H.B. 4429**

On May 1, 2026, Oklahoma's Governor signed into law H.B. 4429,[1] known as the Proxy Advisor Transparency Act ("the Act").[2] The Act applies to any "proxy advisor," which it defines as a "person who, for compensation, provides a proxy advisory service to shareholders of a company or to other persons with authority to vote on behalf of shareholders of a company."[3] In turn, "[p]roxy advisory service" is defined to mean (a) "advice or a recommendation on how to vote on a proxy proposal or company proposal"; (b) "proxy statement research and analysis regarding a proxy proposal or company proposal"; (c) "a rating or research regarding corporate governance at one or more companies"; and (d) "development of proxy voting recommendations or policies, including establishing default recommendations or policies."[4] "Company proposal[s]" and "[p]roxy

[1] *Oklahoma House Bill 4429*, LegiScan, https://legiscan.com/OK/bill/HB4429/2026 (last visited Oct. 30, 2026).

[2] H.B. 4429, § 1.

[3] *Id.* § 3(6).

[4] *Id.* § 3(7) (subject to an exception not relevant here). A "[d]efault recommendation or policy" is defined as "a system, set of rules, principles, or guidelines designed to assist with voting decisions on any company proposals or proxy proposals." *Id.* § 3(5).

proposal[s]" include proposals related to "director nominations or elections, executive compensation, corporate transactions…or company policy on any subject."[5]

The law also defines a "[w]ritten financial analysis" as "a written document that" (a) "analyzes the expected short-term and long-term financial benefits and costs to the company of implementing a company proposal or proxy proposal"; (b) "concludes what vote or course of action is most likely to positively affect shareholder value"; and (c) "explains the methods and processes used to prepare the analysis, including the experience and geographic location of the personnel who formed the recommendation."[6]

The law's operative provisions apply whenever a proxy advisor "makes a recommendation against company management on a company proposal or proxy proposal, or makes a default recommendation or policy involving votes against company management on company proposals or proxy proposals."[7] It imposes different obligations on proxy advisors depending on whether they make such a recommendation "based on a written financial analysis."[8]

If a proxy advisor makes a recommendation or default recommendation or policy against company management without basing it on a qualifying written financial analysis, the following obligations apply: The proxy advisor must, "[c]oncurrently with providing the proxy advisory service, include a conspicuous disclosure to each shareholder or entity

---

[5] *Id.* § 3(4), (8).

[6] *Id.* § 3(10).

[7] *Id.* § 4(A), (B).

[8] *Id.*

or other person acting on behalf of a shareholder receiving the proxy advisory service that" (a) "identifies the service being provided," (b) "identifies the recommendation or policy at issue," and (c) "states that the proxy advisor has made the recommendation or policy without doing so based on a written financial analysis regarding the impact of that recommended action on company investors that" complies with the Act's definition of a written financial analysis.[9] Additionally, the proxy advisor must "send…a copy of the disclosure…to the board of directors of each company that is the subject of the service" being provided, and "publicly and conspicuously disclose on the home or front page of the proxy advisor's website a statement that [their] services include one or more services that include recommendations or policies against company management…that are not made based on a written financial analysis" that complies with the Act's definition of a written financial analysis.[10]

If a proxy advisor makes a voting recommendation or default recommendation or policy against company management based on a written financial analysis, the proxy advisor must make a disclosure to shareholders and any entity or other person acting on behalf of a shareholder that is substantially similar to the above-mentioned disclosure, except that the proxy advisor must state that it "has made the recommendation or policy based on a written financial analysis" that complies with the Act's definition of a written

[9] *Id.* § 4(A)(1).

[10] *Id.* § 4(A)(2)–(3). The proxy advisor is not required to send a copy of the disclosure to the board of directors when developing proxy voting recommendations. *Id.*

financial analysis, and "stat[e] that the analysis is available upon request."[11] The proxy advisor must also "[m]ake such analysis available within a reasonable time to any recipient of the proxy advisory service upon request," and "provide a copy of such analysis to the board of directors of each company that is the subject of the service."[12]

The Act provides that a violation of its substantive requirements constitutes a deceptive trade practice under state law that may be investigated and prosecuted by Oklahoma's Attorney General. Additionally, "any person aggrieved by a violation of" the Act may bring an action seeking a declaratory judgment or injunctive relief against a proxy advisor, and must provide notice of the action to the Attorney General, who has a right to intervene in the action.[13] The Act goes into effect on November 1, 2026.[14]

## II. Plaintiffs and their claims

### a. Proxy advisory services generally

At shareholder meetings, shareholders may vote directly or authorize others to vote on their behalf. The matters submitted for a vote include director elections, proposals submitted by management or shareholders, and other matters requiring shareholder approval.[15] Issues vary in complexity and cover a range of topics, including but not limited

---

[11] *Id.* § 4(B)(1).

[12] *Id.* § 4(B)(2)–(3). The proxy advisor is not required to provide a copy of the analysis to the board of directors when developing voting recommendations or policies. *Id.*

[13] *Id.* § 5.

[14] *Id.* § 7.

[15] ISS's Compl. (No. 26-2111, Dkt. 1), at ¶¶ 22–23; Glass Lewis's Compl. (No. 26-2382, Dkt. 1), at ¶¶ 39–40; Goldstein Decl. (No. 26-2111, Dkt. 12-2), at ¶ 6.

to issues of corporate governance, executive compensation, disclosure and transparency factors, and risks to the company from environmental and social factors.[16] The company distributes information to shareholders about these matters in advance in the form of a "proxy statement," in which company managers may weigh in on shareholder proposals,[17] although their interests often differ from those of shareholders in many areas.[18]

Because certain institutional investors—such as pension plans, asset managers, and mutual funds—own vast stock holdings across multiple companies, they may be required to cast thousands of votes on many different proposals each year. Accordingly, institutional investors rely on proxy advisors, who conduct research and analysis about company and shareholder proposals and provide voting advice in accordance with the investor's selected criteria and priorities, to help them navigate these votes.[19] A proxy advisor's reports and recommendations are referred to as "proxy papers."[20]

[16] ISS's Compl. (No. 26-2111, Dkt. 1), at ¶¶ 24–25; Glass Lewis's Compl. (No. 26-2382, Dkt. 1), at ¶¶ 41–42; Goldstein Decl. (No. 26-2111, Dkt. 12-2), at ¶ 6; Wieck Decl. (No. 26-2382, Dkt. 8-30), at ¶¶ 8, 14, 31.

[17] ISS's Compl. (No. 26-2111, Dkt. 1), at ¶ 23; Glass Lewis's Compl. (No. 26-2382, Dkt. 1), at ¶¶ 40, 43–44; Wieck Decl. (No. 26-2382, Dkt. 8-30), at ¶¶ 31, 34; *see also* 17 C.F.R. § 240.14a-8(m)(1) (stating that a "company may elect to include in its proxy statement reasons why it believes shareholders should vote against [a shareholder's] proposal").

[18] *See* Michael C. Jensen & William H. Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure*, 3 J. Fin. Econ. 305 (1976).

[19] ISS's Compl. (No. 26-2111, Dkt. 1), at ¶¶ 5, 13–15, 26; Glass Lewis's Compl. (No. 26-2382, Dkt. 1), at ¶ 45; Goldstein Decl. (No. 26-2111, Dkt. 12-2), at ¶¶ 9, 14–15.

[20] Glass Lewis's Compl. (No. 26-2382, Dkt. 1), at ¶ 58; Wieck Decl. (No. 26-2382, Dkt. 8-30), at ¶ 16.

**b. ISS**

Plaintiff ISS is a proxy advisor that sophisticated institutional investors hire to provide information, advice, and recommendations on how to cast their shareholder votes.[21] ISS's voting advice often includes many pages of financial information and analysis, although many issues do not lend themselves to financial quantification and ISS does not purport to quantify or model the financial impact of a particular vote on stock value.[22] ISS has no financial interest in the outcome of any shareholder vote.[23] The company provides its services to several clients in Oklahoma.[24]

For each vote, ISS provides its clients with reports about the votes at issue and makes recommendations according to criteria that are selected by its clients to fit their specific needs and priorities.[25] ISS offers three different types of voting policies.[26] These include (1) client-specific "Custom Policies" that are designed by clients in order to address

[21] ISS's Compl. (No. 26-2111, Dkt. 1), at ¶ 1; Goldstein Decl. (No. 26-2111, Dkt. 12-2), at ¶¶ 5–6.

[22] ISS's Compl. (No. 26-2111, Dkt. 1), at ¶ 57; Goldstein Decl. (No. 26-2111, Dkt. 12-2), at ¶ 44.

[23] ISS's Compl. (No. 26-2111, Dkt. 1), at ¶ 28; Goldstein Decl. (No. 26-2111, Dkt. 12-2), at ¶¶ 20, 33.

[24] ISS's Compl. (No. 26-2111, Dkt. 1), at ¶ 14; Goldstein Decl. (No. 26-2111, Dkt. 12-2), at ¶ 15.

[25] ISS's Compl. (No. 26-2111, Dkt. 1), at ¶ 2; Goldstein Decl. (No. 26-2111, Dkt. 12-2), at ¶¶ 5, 18–20.

[26] ISS's Compl. (No. 26-2111, Dkt. 1), at ¶ 35; Goldstein Decl. (No. 26-2111, Dkt. 12-2), at ¶ 21.

their unique needs and preferences;[27] (2) the "Benchmark Policy," which outlines voting considerations and criteria for common shareholder meetings and provides general voting recommendations against what the company deems to be weak corporate governance policies;[28] and (3) "Thematic Policies," which "evaluate governance issues from a variety of specific perspectives" and include a "Catholic Faith-Based" policy, a board-aligned policy, a policy for public funds, and policies focused on sustainability, social responsibility, and climate change.[29] ISS's clients have a wide variety of policies and voting criteria, and ISS often provides different clients with different recommendations about the same issues.[30] The company's "Benchmark and Thematic policies each include particular issues on which ISS generally recommends voting against company management, such as voting against overboarded directors."[31]

ISS alleges that the Act violates the First Amendment by imposing viewpoint-discriminatory burdens on its speech because it applies only when ISS makes a voting recommendation against company management.[32] ISS also alleges that the Act

---

[27] ISS's Compl. (No. 26-2111, Dkt. 1), at ¶ 36; Goldstein Decl. (No. 26-2111, Dkt. 12-2), at ¶¶ 22–25.

[28] ISS's Compl. (No. 26-2111, Dkt. 1), at ¶¶ 39–40; Goldstein Decl. (No. 26-2111, Dkt. 12-2), at ¶¶ 26–30.

[29] ISS's Compl. (No. 26-2111, Dkt. 1), at ¶ 41; Goldstein Decl. (No. 26-2111, Dkt. 12-2), at ¶ 31.

[30] ISS's Compl. (No. 26-2111, Dkt. 1), at ¶ 46; Goldstein Decl. (No. 26-2111, Dkt. 12-2), at ¶¶ 18–20, 45.

[31] Goldstein Decl. (No. 26-2111, Dkt. 12-2), at ¶ 42.

[32] ISS's Compl. (No. 26-2111, Dkt. 1), at ¶¶ 9, 64.

unconstitutionally compels speech by requiring disclosures tied to the State's prescribed definition of a "written financial analysis."[33] Complying with that definition may force ISS to express conclusions it otherwise would not express, while the alternative disclosures, contends ISS, misleadingly disparage the analysis supporting its recommendations.[34]

ISS also alleges that the Act is unconstitutionally vague under the First Amendment and the Fourteenth Amendment's Due Process Clause in that it fails to provide fair notice regarding when, how, and to whom the company must make the required disclosures, and it allows arbitrary and discriminatory enforcement.[35]

Additionally, ISS alleges that the Act violates the dormant Commerce Clause and the Due Process Clause because it regulates ISS's proxy advice even when it takes place outside of Oklahoma and is directed at non-Oklahoma companies, and requires ISS to issue warnings to out-of-state clients and on its website.[36]

Attempting to comply with the Act will impose financial hardship on ISS by requiring it to develop systems to supply the required disclosures to the required entities and track information it does not currently collect. This would be expensive and require

---

[33] *Id.* at ¶¶ 9, 56.

[34] *Id.* at ¶¶ 9, 56–57, 70–72; Goldstein Decl. (No. 26-2111, Dkt. 12-2), at ¶¶ 45–47.

[35] ISS's Compl. (No. 26-2111, Dkt. 1), at ¶¶ 10, 78.

[36] *Id.* at ¶¶ 11, 89–94.

substantial additional personnel and resources.[37] ISS also contends that issuing the required statements would cause reputational harm.[38]

Finally, Defendant is likely to enforce the Act against ISS because Defendant has previously targeted proxy advisors for making recommendations based on environmental, social, and governance ("ESG") issues. Defendant's anti-ESG activities include (1) sending a demand letter to ISS and Glass Lewis stating that they may be violating their fiduciary duties to their clients and state consumer protection laws by prioritizing ESG initiatives,[39] (2) cosigning a similar letter targeting asset managers for relying on ISS's voting recommendations "without further analysis,"[40] (3) cosigning a letter to Congress criticizing a Department of Labor rule embracing the use of ESG factors in investment decisions and proxy voting,[41] and (4) joining a suit brought against investment management firms in part for their ESG practices.[42]

**c. Glass Lewis**

Plaintiff Glass Lewis is a proxy advisor that exclusively serves highly sophisticated institutional investors.[43] Glass Lewis's proxy advice often includes 30 to 70 pages of

---

[37] ISS's Compl. (No. 26-2111, Dkt. 1), at ¶ 59; Goldstein Decl. (No. 26-2111, Dkt. 12-2), at ¶ 52.

[38] Goldstein Decl. (No. 26-2111, Dkt. 12-2), at ¶¶ 49–51.

[39] Nov. 29, 2023 Letter from Defendant (No. 26-2111, Dkt. 12-36).

[40] Aug. 29, 2024 Letter from Defendant (No. 26-2111, Dkt. 12-37).

[41] Feb. 14, 2023 Letter from Defendant (No. 26-2111, Dkt. 12-38).

[42] *Texas v. BlackRock*, No. 6:24-cv-437-JDK, Dkt. 145 (E.D. Tex. Jan. 5, 2026).

[43] Glass Lewis's Compl. (No. 26-2382, Dkt. 1), at ¶¶ 45, 51; Wieck Decl. (No. 26-2382, Dkt. 8-30), at ¶¶ 4–5, 7–9.

financial analysis, including dense tables of quantitative and qualitative information. However, many proposals, such as whether to elect a nominee to the board of directors, are not susceptible to the same kind of quantifiable analysis.[44] Glass Lewis is paid regardless of its recommendation or the outcome of any vote, and it is paid prior to delivering its proxy advice.[45] Glass Lewis has at least one client with an Oklahoma mailing address. It also provides reports and recommendations on various companies that are either organized in Oklahoma or have their principal place of business in Oklahoma.[46]

Glass Lewis's recommendations are tailored to each client's specific voting policy. The company offers (1) a Benchmark Policy, which reflects Glass Lewis's views on how clients wish to create and preserve shareholder value;[47] (2) custom policies that allow Glass Lewis to focus on issues that are important to its clients and make recommendations that are aligned with their guidelines;[48] and (3) thematic policies, such as a Catholic policy, a policy focused on mitigating risks associated with climate change, and a corporate governance policy, which generally recommends in line with management on

---

[44] Glass Lewis's Compl. (No. 26-2382, Dkt. 1), at ¶ 62; Wieck Decl. (No. 26-2382, Dkt. 8-30), at ¶¶ 18–19, 25, 37.

[45] Glass Lewis's Compl. (No. 26-2382, Dkt. 1), at ¶ 60; Wieck Decl. (No. 26-2382, Dkt. 8-30), at ¶¶ 21–23.

[46] Glass Lewis's Compl. (No. 26-2382, Dkt. 1), at ¶¶ 12, 52, 54–56; Wieck Decl. (No. 26-2382, Dkt. 8-30), at ¶¶ 5–6.

[47] Glass Lewis's Compl. (No. 26-2382, Dkt. 1), at ¶ 66; Wieck Decl. (No. 26-2382, Dkt. 8-30), at ¶ 35.

[48] Glass Lewis's Compl. (No. 26-2382, Dkt. 1), at ¶ 69; Wieck Decl. (No. 26-2382, Dkt. 8-30), at ¶¶ 28–31.

environmental and social issues.[49] Glass Lewis may provide different recommendations to different clients, depending on each client's chosen voting policy.[50] It routinely provides advice that goes against the view of company management.[51]

Glass Lewis alleges that the Act is unconstitutional under the First Amendment because it is viewpoint-discriminatory and content-based in that it applies only when Glass Lewis makes a recommendation against company management. Glass Lewis also alleges that the Act unconstitutionally compels speech by requiring disclosures tied to statutory criteria concerning expected financial costs and benefits and the effect on shareholder value. Glass Lewis alleges that the Act pressures it to express conclusions it otherwise would not express and requires statements that mischaracterize its business, denigrate the quality of its analysis, and Glass Lewis alleges it might compromise its client relationships.[52]

Glass Lewis also alleges that the Act is unconstitutionally vague under the First Amendment and the Fourteenth Amendment's Due Process Clause in that it uses ambiguous terms that leave Glass Lewis unable to understand what conduct is required to comply with the law and chills Glass Lewis's speech.[53]

---

[49] Glass Lewis's Compl. (No. 26-2382, Dkt. 1), at ¶ 70; Wieck Decl. (No. 26-2382, Dkt. 8-30), at ¶ 32.

[50] Glass Lewis's Compl. (No. 26-2382, Dkt. 1), at ¶ 123; Wieck Decl. (No. 26-2382, Dkt. 8-30), at ¶¶ 26, 29.

[51] Wieck Decl. (No. 26-2382, Dkt. 8-30), at ¶¶ 5, 40.

[52] Glass Lewis's Compl. (No. 26-2382, Dkt. 1), at ¶¶ 3–5, 107–11, 119–24; Wieck Decl. (No. 26-2382, Dkt. 8-30), at ¶¶ 25, 36–39, 50–56.

[53] Glass Lewis's Compl. (No. 26-2382, Dkt. 1), at ¶¶ 6, 140–49.

Finally, Glass Lewis alleges that the Act violates the dormant Commerce Clause by regulating its speech outside of Oklahoma's borders and burdening interstate commerce.[54]

Glass Lewis will suffer irreparable harm if the Act is not enjoined because the law requires it to attach self-disparaging and misleading warnings to its anti-management speech, which Glass Lewis contends will harm its credibility and reputation with its clients and prospective clients.[55] The Act would also force Glass Lewis to take sides on questions it would otherwise leave to its clients.[56] Additionally, complying with the Act would require Glass Lewis to incur substantial costs and divert significant time and resources away from its core business to develop the systems necessary to track the required disclosures.[57]

For the same reasons Defendant is likely to enforce H.B. 4429 against ISS, Defendant is also likely to enforce it against Glass Lewis.

Both Plaintiffs move to preliminarily enjoin Defendant from enforcing the Act against them.[58]

---

[54] *Id.* at ¶¶ 7, 151–60.

[55] Wieck Decl. (No. 26-2382, Dkt. 8-30), at ¶¶ 37, 44, 53–56.

[56] *Id.* at ¶¶ 37–39.

[57] *Id.* at ¶¶ 50–52.

[58] ISS's Mot. for Prelim. Inj. (No. 26-2111, Dkt. 12); Glass Lewis's Mot. for Prelim. Inj. (No. 26-2382, Dkt. 8).

### *Standard of Review*

A preliminary injunction is an "extraordinary remedy."[59] A party seeking a preliminary injunction must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities favors an injunction; and (4) an injunction is in the public interest.[60]

### *Legal Analysis*

## I. Likelihood of Success

On the present record, Plaintiffs are likely to succeed on their First Amendment challenge to the requirements imposed on them by § 4(A) and § 4(B) when their recommendations oppose company management. Because that conclusion supports the preliminary relief ordered below, the Court does not reach Plaintiffs' remaining constitutional challenges.[61]

---

[59] *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1245–46 (10th Cir. 2017) (citations and internal quotation marks omitted).

[60] *Id.*; *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013) (citation omitted).

[61] Defendant does not contest standing, but the Court independently considers its jurisdiction. Each Plaintiff intends to continue providing recommendations that oppose company management after the Act's effective date. Goldstein Decl. (No. 26-2111, Dkt. 12-2), at ¶ 42; Wieck Decl. (No. 26-2382, Dkt. 8-30), at ¶ 40. Those recommendations are arguably covered by § 4, and the record establishes a credible threat of enforcement by Defendant. *See* Letters from Defendant (No. 26-2111, Dkts. 12-36–38); *Texas v. BlackRock*, No. 6:24-cv-437, Dkt. 1 (E.D. Tex. Nov. 27, 2024). Plaintiffs therefore face a choice between altering their intended expression, undertaking the challenged compliance obligations, and risking enforcement. An injunction against Defendant's enforcement of the challenged requirements would redress the injuries attributable to that threatened enforcement. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159–65 (2014).

**a. Viewpoint Discrimination**

The First Amendment, made applicable to the States through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech."[62] And the Supreme Court has long held that "laws regulating speech based on its subject matter or communicative content are presumptively unconstitutional."[63] Content-based laws, which "appl[y] to particular speech because of the topic discussed or the idea or message expressed," "may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."[64]

"Government discrimination among viewpoints…is a more blatant and egregious form of content discrimination."[65] "Viewpoint discrimination occurs when the government singles out speech based on the specific motivating ideology or the opinion or *perspective* of the speaker,"[66] or "distinguishes between two opposed sets of ideas."[67] The Supreme Court has used the term "viewpoint discrimination" in a "broad sense."[68]

---

[62] U.S. Const. amend. I.

[63] *Chiles v. Salazar*, 607 U.S. 627, 640 (2026) (citation and internal quotation marks omitted).

[64] *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (citations omitted).

[65] *Id.* at 168–69 (citation and internal quotation marks omitted).

[66] *Utah Pol. Watch, Inc. v. Musselman*, 179 F.4th 1241, 1255 (10th Cir. 2026) (emphasis in original) (internal quotation marks omitted) (quoting *Reed*, 576 U.S. at 168).

[67] *Id.* (quoting *Iancu v. Brunetti*, 588 U.S. 388, 394 (2019)).

[68] *Matal v. Tam*, 582 U.S. 218, 243 (2017) (plurality op.) (citation and internal quotation marks omitted).

Because the Act burdens Plaintiffs' speech when they make a recommendation against company management, but does not burden Plaintiffs' speech when they make a recommendation in favor of company management, the law is viewpoint discriminatory.

Defendant argues otherwise, asserting that the law is viewpoint neutral because it applies irrespective of the "substantive message" of Plaintiffs' speech and uses Plaintiffs' opposition to company management as only a neutral reference point to determine when its disclosure requirements are triggered.[69] The views of company management and proxy advisors may diverge for a variety of reasons, Defendant argues, and the law makes no distinction between *those* viewpoints. For instance, the Act's disclosure duty would be triggered by both "anti-ESG" and "pro-ESG" messaging, as long as it is against company management.

Defendant relies on *City of Austin v. Reagan National Advertising of Austin, LLC*,[70] for support. There the Supreme Court addressed a First Amendment challenge to a municipal sign code that treated certain signs differently based on whether they advertised businesses, persons, activities, goods, products, or services that were located "on the site where the sign is installed," or "direct[ed] persons to any location not on that site."[71] The former (known as on-premises signs) were allowed to be digitized, while the latter (off-

---

[69] Def.'s Resp. (No. 26-2111, Dkt. 23), at 16, 18 (citation and internal quotation marks omitted); Def.'s Resp. (No. 26-2382, Dkt. 29), at 7, 14, 19 (citation and internal quotation marks omitted).

[70] 596 U.S. 61 (2022).

[71] *Id.* at 66 (citation omitted).

premises signs) were not allowed to be digitized.[72] The Court held that although the regulation "require[d] reading the sign at issue" to determine what kind of sign it was, the code's on-premises/off-premises distinction was facially content-neutral because it "require[d] an examination of speech only in service of drawing neutral, location-based lines," and the sign's "substantive message…[was] irrelevant to the application of the provisions."[73] Accordingly, the on-premises/off-premises distinction was not facially content-based merely because applying it required reading the sign. The Supreme Court remanded for further consideration rather than holding that the challenged provisions necessarily satisfied the First Amendment.[74]

But *City of Austin* does not help Defendant's case. In contrast to the sign code at issue there, the Act "trains directly on the content of [Plaintiffs'] speech."[75] The law does not merely require a reading of Plaintiffs' proxy materials in the service of drawing "neutral, location-based lines" or anything similar. Once the Act's coverage requirements are met, disagreement with management is a necessary condition for § 4's additional obligations. Whether an advisor has prepared a qualifying written financial analysis determines which obligations apply; it does not eliminate the disagreement-based trigger.

---

[72] *Id.*

[73] *Id.* at 69–71.

[74] *Id.* at 76–77.

[75] *Chiles*, 607 U.S. at 651; *see also Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 567 (2011) (explaining the difference between direct and incidental burdens on speech).

And Plaintiffs' opposition to company management does not cease to be a "viewpoint" within the meaning of the relevant case law merely because it does not necessarily indicate what side Plaintiffs have taken on a particular issue. To the contrary, the Supreme Court has stated that laws which apply "equally to…those arrayed on both sides of every possible issue" may still be viewpoint discriminatory.[76]

For example, in *Matal v. Tam*, the Court addressed a First Amendment challenge to a provision of the Lanham Act barring the registration of trademarks "which may disparage…persons…institutions, beliefs, or national symbols, or bring them into contempt, or disrepute."[77] In short, the provision denied federal registration to disparaging marks (it did not otherwise prohibit their use).[78] Justice Alito's plurality opinion explained that "[g]iving offense is a viewpoint," while Justice Kennedy's concurrence likewise concluded that the provision discriminated by viewpoint, notwithstanding its application across competing substantive positions.[79] All eight participating Justices agreed that the clause was unconstitutional, although they divided on portions of the reasoning.

The Tenth Circuit has also applied strict scrutiny in a similar context: In *Animal Legal Defense Fund v. Kelly*, the court held that a Kansas law which penalized lying in order to "acquire or otherwise exercise control over an animal facility…with the intent

[76] *Matal*, 582 U.S. at 243 (plurality op.); *id.* at 248–49 (Kennedy, J., concurring in part and concurring in the judgment).

[77] *Id.* at 227 (quoting 15 U.S.C. § 1052(a)).

[78] *Id.* at 225–26.

[79] *Id.* at 243 (plurality op.); *id.* at 248–49 (Kennedy, J., concurring in part and concurring in the judgment).

to…damage the enterprise conducted" at the facility was viewpoint-discriminatory.[80] The court explained that a "person who lies to acquire or exercise control over an animal facility intending to expose wrongdoing violates" the law while "a person who tells the same lie…intending to laud the facility…does not."[81] Thus, the law "places pro-animal facility viewpoints above anti-animal facility viewpoints."[82]

The relevant comparison under the Act is between recommendations addressing the same proposal at the same company. A recommendation agreeing with management triggers no additional obligations under § 4; a recommendation disagreeing with management triggers disclosure and, depending on the circumstances, publication or production requirements. Management's substantive position may change from one proposal to another, but the statutory preference remains constant. The Act favors agreement over disagreement.

The Court thus rejects Defendant's contention that the Act's burdening of both pro-ESG and anti-ESG recommendations makes it viewpoint neutral. Whatever management's position on a particular proposal, the Act burdens recommendations that oppose that position while leaving recommendations that support it free of those burdens. The statutory preference is for agreement with management, regardless of the underlying issue. The

---

[80] *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1224–25 (10th Cir. 2021) (quoting Kan. Stat. Ann. § 47-1827 (since amended)).

[81] *Id.* at 1233.

[82] *Id.*

Court accordingly concludes that Plaintiffs are likely to establish that § 4 discriminates by viewpoint.

**b. Commercial Speech**

Defendant contends that even if the Act discriminates by viewpoint, reduced scrutiny applies because it regulates commercial speech. Specifically, Defendant invokes *Zauderer v. Office of Disciplinary Counsel* or, alternatively, the intermediate scrutiny prescribed by *Central Hudson Gas & Electric Corp. v. Public Service Commission*. Neither argument persuades the Court that reduced scrutiny governs the challenged requirements.

*Central Hudson* prescribes intermediate scrutiny for restrictions on commercial speech that concerns lawful activity and is not misleading.[83] Under that standard, the government must identify a substantial interest, demonstrate that the restriction directly advances that interest, and establish a reasonable fit between its objective and the burden imposed. The fit need not be perfect, and the government need not employ the least restrictive means.[84] But the applicability of that standard depends first on whether the regulated expression is commercial speech.

Speech proposing a commercial transaction is the core example of commercial speech, but the classification requires consideration of the communication's nature and context.[85] Relevant considerations include whether "(1) it is concededly an advertisement, (2) it refers to a specific product, or (3) it is motivated by an economic interest in selling

[83] 447 U.S. 557, 564–66 (1980).

[84] *Id.*; *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989).

[85] *United States v. Wenger*, 427 F.3d 840, 846–47 (10th Cir. 2005).

the product."[86] These considerations are evaluated together; compensation or an economic motive alone does not establish that speech is commercial.

Plaintiffs are likely to establish that the challenged recommendations are noncommercial speech. Their recommendations are the informational service their clients purchase, not advertisements proposing the purchase of that service. Plaintiffs analyze proposals and provide voting advice according to criteria selected by their clients. The record establishes that Plaintiffs receive compensation from those clients for the challenged recommendations, rather than from issuers to promote particular securities. Their compensation for producing the recommendations does not, standing alone, transform that expression into commercial speech. Because the challenged requirements burden noncommercial recommendations, *Central Hudson* does not supply the governing standard.

Defendant's reliance on *Zauderer v. Office of Disciplinary Counsel* raises a related but distinct question. Under *Zauderer*, certain requirements to disclose "purely factual and uncontroversial information about the terms under which [one's] services will be available" receive reduced scrutiny when reasonably related to the State's interest in preventing consumer deception, provided the requirements are not unjustified or unduly burdensome.[87] *Zauderer* "eases the burden" of the *Central Hudson* test by "presum[ing] that the government's interest in preventing consumer deception is substantial, and that

---

[86] *Id.* (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983)).

[87] 471 U.S. 626, 651 (1985).

where a regulation requires disclosure only of factual and noncontroversial information and is not unduly burdensome, it is narrowly tailored."[88] Defendant contends that this reduced scrutiny applies because the required statements disclose whether an advisor based its recommendation on an analysis satisfying specified statutory criteria.

Plaintiffs respond that the statements misleadingly imply that their recommendations lack financial support whenever their analyses do not satisfy every element of the statutory definition. The Court need not resolve that dispute. Whether an advisor prepared an analysis satisfying specified criteria may be a factual question, and a disclosure does not become nonfactual merely because the underlying proposal concerns a controversial subject.

But even assuming that the required statements are factual and uncontroversial, that does not resolve the constitutional objection here. *Zauderer* does not supply a general rule of reduced scrutiny for every compelled statement that is factual and uncontroversial. And its commercial-disclosure rationale does not, without more, resolve a challenge to obligations imposed because of the viewpoint expressed in separate, noncommercial recommendations.[89] Here, § 4 imposes its additional obligations only when an advisor disagrees with management. An otherwise comparable recommendation supporting management triggers none of those obligations. The factual character of the required

[88] *Wenger*, 427 F.3d at 849.

[89] *Nat'l Inst. of Fam. & Life Advocates v. Becerra*, 585 U.S. 755, 768–70 (2018).

disclosure does not eliminate this distinction or change the noncommercial character of the recommendation that triggers it.

Defendant's argument that Plaintiffs' homepages constitute commercial advertising does not alter that conclusion. Even assuming that characterization is correct, the obligation to publish a homepage statement under § 4(A)(3) arises because an advisor has provided a recommendation opposing management without the specified written financial analysis. The challenge therefore concerns not merely a disclosure appearing in an advertisement, but an additional obligation imposed because of the viewpoint expressed in the advisor's underlying recommendation. The location of the compelled statement does not make that recommendation commercial speech.

Accordingly, Plaintiffs are likely to establish that the challenged requirements burden their protected, noncommercial recommendations based on viewpoint, and strict scrutiny applies. The Court need not decide whether every viewpoint-based regulation of commercial speech necessarily receives strict scrutiny. As an alternative ground, the Court explains below why the requirements would also fail intermediate scrutiny if the recommendations were commercial speech and *Central Hudson* supplied the governing standard.

**c. Securities Industry Regulations**

Defendant also contends that speech concerning "the exchange of information about securities [and] corporate proxy statements" is not afforded heightened protection under

the First Amendment even if it is not, technically speaking, commercial speech.[90] Defendant relies primarily on the Supreme Court's opinion in *Ohralik v. Ohio State Bar Association*,[91] and the D.C. Circuit's opinion in *S.E.C. v. Wall Street Publishing Institute*,[92] for support.

In *Ohralik*, the Supreme Court upheld the constitutionality of regulating in-person solicitation by lawyers.[93] The Court stated, in dicta, that "the exchange of information about securities" and "corporate proxy statements" were examples of "communications that are regulated without offending the First Amendment."[94] For the former statement, the Court relied on *SEC v. Texas Gulf Sulphur Co.*, which applied the federal securities laws' disclosure obligations to trading on material nonpublic information.[95] For the latter, the Court relied on *Mills v. Electric Auto-Lite Co.*, which held that plaintiffs challenging a merger obtained through a materially misleading proxy statement under § 14(a) of the Securities Exchange Act of 1934 do not need to prove that a particular misstatement or omission affected shareholders' votes in approving the merger, provided that the proxy

---

[90] Def.'s Resp. (No. 26-2111, Dkt. 23), at 8; Def.'s Resp. (No. 26-2382, Dkt. 29), at 6.

[91] 436 U.S. 447 (1978).

[92] 851 F.2d 365 (D.C. Cir. 1988).

[93] 436 U.S. at 449.

[94] *Id.* at 456 (citations omitted).

[95] 401 F.2d 833, 848 (2d Cir. 1968), *abrogated in part by Chiarella v. United States*, 445 U.S. 222 (1980) (rejecting the proposition that mere possession of such information, without a duty to disclose, is sufficient to establish liability under § 10(b)).

solicitation itself was essential to the accomplishment of the merger.[96] Neither opinion addressed the applicability of First Amendment principles to the relevant regulations.

In *Wall Street Publishing*, the SEC appealed the district court's refusal to enjoin a magazine's alleged violations of § 17(b) of the Securities Act of 1933. The D.C. Circuit rejected the district court's conclusion that the requested disclosure injunction necessarily constituted an unconstitutional prior restraint and remanded for further proceedings on the SEC's request. In doing so, the court declined to apply the commercial-speech framework, but held that the articles were nonetheless susceptible to regulation under "the federal government's broad powers to regulate the securities industry."[97] It stated that "[s]peech relating to the purchase and sale of securities…forms a distinct category of communications in which the government's power to regulate is at least as broad as with respect to…commercial speech."[98] For support, the court relied on Supreme Court decisions upholding the constitutionality of economic regulations with an "incidental effect on First Amendment freedoms,"[99] including antitrust laws and regulations affecting unfair labor practices and the securities market.[100]

---

[96] 396 U.S. 375, 384–85 (1970).

[97] *Wall Street Pub. Inst.,* 851 F.2d at 372 (citations omitted).

[98] *Id.* at 373.

[99] *Id.* at 372–73 (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 912 (1982) (citing labor and antitrust cases as examples)).

[100] *Id.* (citing *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617–20 (1969) (involving unfair labor practices); *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 61–62, 64 (1973) (citing cases involving federal securities laws and antitrust laws)).

Defendant also relies on dicta from a footnote in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,[101] quoting the same language from *Ohralik* referred to above, a New York district court opinion explaining that there is a "significant body of decisions" which have upheld "laws and regulations mandating affirmative disclosures of information…for public issuers and other participants in the securities industry,"[102] and a Colorado district court opinion stating that courts "generally uphold compelled disclosure requirements" in "the securities context…under deferential rubrics."[103]

None of these opinions persuades the Court that a lower tier of scrutiny is applicable, for several reasons. First, the fact that Plaintiffs' advice concerns securities does not itself identify the applicable level of First Amendment scrutiny. The Court does not question the government's authority to regulate securities transactions, issuer disclosures, conflicts of interest, and fraud. The question is whether that authority justifies reduced scrutiny of this statute's selective burdens on recommendations opposing management. And here the Act does not regulate only economic activity with an incidental effect on free speech. It instead regulates proxy voting advice, and it "imposes a burden based on the content of [Plaintiffs'] speech and the identity of the speaker" as a proxy advisor rather than incidentally as a result of regulating Plaintiffs' conduct.[104]

---

[101] 472 U.S. 749, 758 n.5 (1985) (plurality op.).

[102] *SEC v. AT&T, Inc.*, 626 F. Supp. 3d 703, 743 (S.D.N.Y. 2022).

[103] *All. of Health Care Sharing Ministries v. Conway*, No. 24-cv-01386-GPG-STV, 2025 WL 315389, at *32 (D. Colo. Jan. 13, 2025) (citing *Ohralik*, 436 U.S. at 456; *AT&T*, 626 F. Supp. 3d at 743; *Wall Street Pub. Inst.*, 851 F.2d at 373).

[104] *Sorrell*, 564 U.S. at 567.

Second, proxy voting advice is materially distinguishable from corporate proxy statements and the disclosure requirements considered in *Wall Street Publishing*. Plaintiffs are compensated for providing advice to their clients, but the present record does not establish that their compensation depends on securing a particular voting outcome or promoting a security on an issuer's behalf. That distinction supports treating the challenged recommendations as independent analysis rather than the issuer-compensated promotion addressed in *United States v. Wenger*.[105]

Finally, although *Wall Street Publishing* endorsed limited First Amendment scrutiny for securities-related communications, it did not establish that all securities regulation receives rational-basis review.[106] Nor did it address a statute selectively burdening independent voting recommendations because they oppose management. Exceptions to strict scrutiny are "few and narrowly drawn, and all share a long and well-recognized historical pedigree."[107] And even within those categories the Supreme Court has "sometimes still applied strict scrutiny when governments have sought to regulate speech based on viewpoint."[108] The authorities Defendant identifies do not establish a categorical exemption from ordinary First Amendment scrutiny for the independent voting

---

[105] *See Wenger*, 427 F.3d at 847–48.

[106] *See Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 372 (D.C. Cir. 2014) (citation omitted) (noting that *Wall Street Publishing* "never states that rational basis review governs securities regulations [and] suggests that the power to regulate securities might be roughly tantamount to the…power to regulate commercial speech"), *overruled on other grounds by Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014) (en banc).

[107] *Chiles*, 607 U.S. at 641 (citations omitted).

[108] *Id.* (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 392, 395–96 (1992)).

recommendations at issue here, much less an exemption permitting the State to impose additional burdens because those recommendations oppose management.

**d. Application of Strict Scrutiny and, Alternatively, *Central Hudson***

On the present record, Plaintiffs are likely to establish that the challenged requirements fail strict scrutiny. The Court also concludes that, even assuming the recommendations are commercial speech, the requirements fail *Central Hudson* for the reasons stated below.

Defendant's primary rationales in support of the law are that it promotes transparency and combats deceptive practices in the proxy voting industry. The legislative findings express concern that advisors may claim to maximize shareholder value while making recommendations for nonfinancial reasons without financial analysis. Section 2(5) also identifies an interest in enabling companies to provide information responsive to an advisor's recommendation.[109] Defendant's brief echoes these concerns, arguing that shareholders and proxy voters "can be misled when proxy advisors claim on their websites to maximize shareholder value but provide voting recommendations that are not grounded in financial analysis."[110]

Even assuming that these are compelling interests, the Act "is not drawn to serve [those] interest[s]."[111] "Rules that burden protected expression may not be sustained when the options provided by the State are too narrow to advance legitimate interests or too broad

---

[109] *See* H.B. 4429, § 2(2)–(5).

[110] Def.'s Resp. (No. 26-2111, Dkt. 23), at 24; Def.'s Resp. (No. 26-2382, Dkt. 29), at 23.

[111] *Sorrell*, 564 U.S. at 572.

to protect speech."[112] Section 4 leaves recommendations agreeing with management free of its additional obligations, while imposing those obligations on recommendations disagreeing with management. That differential treatment requires justification even when the advisor has prepared a qualifying written financial analysis.

First, the Act leaves recommendations supporting management outside § 4's additional requirements. Neither the legislative findings nor the evidence identified by Defendant establishes that otherwise comparable recommendations supporting management present materially less risk of the deception the State seeks to prevent.

The Act's coverage also extends beyond the mismatch between an advisor's representations and its actual methodology that Defendant identifies as a source of deception. The Act does not tie its obligations to a discrepancy between an advisor's representations and its actual methodology, to an identified misleading statement, or to a client's lack of information about the selected voting criteria. Instead, disagreement with management supplies the threshold distinction. The Court does not suggest that a preventive disclosure rule requires an individualized finding of deception in every application. The deficiency here is the insufficiently justified relationship between the asserted risk and the viewpoint-based classification.

The Court separately considers the interest identified in § 2(5): allowing companies to provide information responsive to an advisor's recommendation. That interest bears more directly on the board-delivery requirements than on the recipient disclosures or

---

[112] *Id.* at 574.

homepage statement. But it does not, without more, establish the necessity of the particular obligations imposed. The required board delivery concerns either the statutory disclosure or the qualifying financial analysis; the Act does not simply require notice of the advisor's recommendation and its rationale.

Defendant has not shown why the recipient disclosures and homepage statement are necessary to facilitate a company's response. As to the board-delivery requirements, Defendant has not shown why a more limited notice requirement would inadequately serve that interest or why the particular compelled disclosures and production duties are necessary. The Court therefore concludes, on the present record, that the company-response rationale does not demonstrate that the Act is narrowly tailored.

The Court reaches the same preliminary conclusion under *Central Hudson*. Assuming that Plaintiffs' recommendations constitute commercial speech that concerns lawful activity and is not misleading, preventing investor deception is a substantial interest. But Defendant has not demonstrated a reasonable fit between that interest and the challenged requirements. The duties turn on disagreement with management, apply without regard to whether the advisor's representations accurately describe its methodology, and extend to recommendations supported by the prescribed financial analysis. This does not require Oklahoma to use the least restrictive means. Rather, the mismatch identified above remains material under the less demanding requirement of reasonable tailoring.[113]

[113] *See Central Hudson*, 447 U.S. at 564–66; *Fox*, 492 U.S. at 480.

Plaintiffs have therefore shown a likelihood of establishing that the challenged § 4 requirements fail strict scrutiny and, alternatively, the scrutiny applicable under *Central Hudson*.

## II. Severability

Defendant briefly argues that if this Court finds any portion of the Act to be unconstitutional, it should sever that portion and leave the remainder intact. Under Oklahoma law, if "any provision or application of [an] act is found to be unconstitutional and void, the remaining provisions…shall remain valid."[114] However, the Court shall not sever the unconstitutional provisions if they "are so essentially and inseparably connected with, and so dependent upon, the void provisions that the court cannot presume that the Legislature would have enacted the remaining valid provisions without the void one; or…the remaining valid provisions…, standing alone, are incomplete and incapable of being executed in accordance with legislative intent."[115]

The Court considers severability to determine the appropriate scope of preliminary relief. Excising the language conditioning § 4's obligations on opposition to management would extend those obligations to recommendations that the Legislature expressly left unregulated. The condition appears in both operative subsections and determines the class of recommendations subject to the statutory scheme. In that context, the Court cannot

[114] 75 O.S. § 11a(1).

[115] *Id.*

presume that the Legislature would have enacted the materially broader regime resulting from the proposed deletion.

Nor would severing only one disclosure, publication, or production requirement cure the shared viewpoint-based trigger governing the remaining § 4 obligations. The Court therefore declines, for purposes of these motions, to preserve enforcement against Plaintiffs by deleting the condition or isolating individual § 4 duties. This conclusion does not foreclose reconsideration of severability on a fuller record at final judgment.

## III. The Remaining Factors

In First Amendment cases, "the likelihood of success on the merits will often be the determinative factor."[116] Defendant does not separately contest the remaining factors if Plaintiffs establish a likelihood of success on the merits, but the Court briefly addresses them and independently concludes that they weigh in favor of granting the injunction.

### a. Irreparable Harm

The second preliminary injunction factor is whether Plaintiffs have shown that they are likely to suffer irreparable harm absent preliminary relief. Each Plaintiff intends to provide covered recommendations after November 1, 2026, and has identified the communications and operational changes it would have to make to comply.[117] Absent relief, Plaintiffs would have to undertake the challenged speech obligations, alter or

[116] *Hobby Lobby*, 723 F.3d at 1145 (citation omitted).

[117] Goldstein Decl. (No. 26-2111, Dkt. 12-2), at ¶¶ 42–47, 52; Wieck Decl. (No. 26-2382, Dkt. 8-30), at ¶¶ 37–40, 42–48, 50–55.

withhold their recommendations, or risk enforcement. The threatened injury is therefore tied to imminent planned expression, not merely to the Act's existence.

Because Plaintiffs have shown that enforcement would likely impose unconstitutional burdens on their imminent planned expression, they have "made a sufficient showing that they will suffer irreparable injury…if the preliminary injunction is not granted."[118] "[T]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury."[119]

**b. Balance of the Equities**

The third preliminary injunction factor is whether the threatened harm to Plaintiffs outweighs the harm caused by the injunction to the opposing party. The Court recognizes the State's interest in protecting investors from deception and enforcing duly enacted laws. The injunction nevertheless leaves Defendant free to enforce otherwise applicable law against conduct independently unlawful without regard to the challenged § 4 requirements. But "the threatened injury to Plaintiffs' constitutionally protected speech outweighs whatever damage the preliminary injunction may cause [via] Defendants' inability to enforce what appears to be an unconstitutional statute."[120] "[W]hen a law is likely unconstitutional, the interests of those the government represents, such as voters[,] do not outweigh a plaintiff's interest in having its constitutional rights protected."[121]

---

[118] *ACLU v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999) (citation omitted).

[119] *Hobby Lobby*, 723 F.3d at 1145 (citation omitted).

[120] *ACLU*, 194 F.3d at 1163 (citation omitted).

[121] *Hobby Lobby*, 723 F.3d at 1145 (alterations adopted) (citation omitted).

### c. Public Interest

The final preliminary injunction factor is whether the requested injunction is in the public interest. Because Defendant is sued in his official capacity, the balance-of-equities and public-interest factors merge.[122] And "it is always in the public interest to prevent the violation of a party's constitutional rights."[123] Moreover, "the preliminary injunction will not be adverse to the public interest as it will protect the free expression" of proxy advisors.[124]

## IV. Bond

Rule 65(c) of the Federal Rules of Civil Procedure provides that a court "may issue a preliminary injunction…only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Courts have "wide discretion under Rule 65(c) in determining whether to require security."[125] A district court may "determine a bond is unnecessary…if there is an absence of proof showing a likelihood of harm."[126] Defendant has neither requested security nor identified costs or damages likely to result from a wrongful injunction. Exercising its discretion under Rule 65(c) and the authorities cited above, the Court determines that no security is necessary.

---

[122] *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

[123] *Hobby Lobby*, 723 F.3d at 1145 (citation omitted).

[124] *ACLU*, 194 F.3d at 1163 (citation and internal quotation marks omitted).

[125] *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009) (citation omitted).

[126] *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) (citation and internal quotation marks omitted).

### *Conclusion*

Accordingly, ISS's Motion for Preliminary Injunction (No. CIV-26-2111, Dkt. 12) and Glass Lewis's Motion for Preliminary Injunction (No. CIV-26-2382, Dkt. 8) are **GRANTED** as follows:

Pending final judgment or further order of this Court, Defendant Gentner Drummond, in his official capacity as Attorney General of Oklahoma, is **PRELIMINARILY ENJOINED** from enforcing against Plaintiffs Institutional Shareholder Services, Inc. and Glass, Lewis & Co., LLC the disclosure, publication, and production requirements imposed by § 4(A) and § 4(B) of the Act. This prohibition includes investigating or pursuing an alleged violation of those requirements under § 5, whether directly or through intervention in an action seeking their enforcement.

This injunction also binds Defendant's officers, agents, servants, employees, and attorneys, and other persons in active concert or participation with Defendant or any of those persons, provided they receive actual notice of this Order by personal service or otherwise.

No security is required.

**IT IS SO ORDERED** this 31st day of October 2026.

PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE